## UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| **BCR SAFEGUARD HOLDING, L.L.C.,** | * | **CIVIL ACTION NO.** |
| **JAC SAFEGUARD HOLDING, L.L.C.,** | * | |
| **and SAFEGUARD DEVELOPMENT** | * | |
| **GROUP II, L.L.C.** | * | **SECTION** |
| | * | |
| **versus** | * | |
| | * | **DISTRICT JUDGE** |
| **MORGAN STANLEY REAL ESTATE** | * | |
| **ADVISOR, INC., PPF SAFEGUARD,** | * | |
| **L.L.C., CERTAIN UNDERWRITERS** | * | **MAGISTRATE JUDGE** |
| **AT LLOYD'S OF LONDON, and** | * | |
| **SCOTT ALLEN BROWN** | * | |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## COMPLAINT FOR DAMAGES

The plaintiffs, BCR Safeguard Holding, L.L.C. ("BCR"), JAC Safeguard Holding, L.L.C. ("JAC"), and Safeguard Development Group II, L.L.C. ("Mountainside; collectively with BCR and JAC, "the BCR parties"), file this Complaint for Damages against the defendants, Morgan Stanley Real Estate Advisor, Inc. ("Morgan Stanley"), PPF Safeguard, L.L.C. ("PPF"), Certain Underwriters at Lloyd's of London ("Lloyd's"), and Scott Allen Brown.

## I.   INTRODUCTION

As demonstrated in the following enumerated allegations, in 1989 Bruce C. Roch, Jr., and Jack A. Chaney created the business that would come to be known as Safeguard Storage Properties, L.L.C. ("Safeguard"), and from their headquarters and original operations in southeast Louisiana quickly built a thriving company operating in multiple states and drawing millions of dollars in revenue. Mr. Roch and Mr. Chaney formed the BCR parties to own and operate Safeguard. The steady and solid growth and the plans for aggressive expansion of the company attracted major investment suitors, including in 2005 Morgan Stanley, which formed

PPF (and subsequently managed PPF) to enter into an Amended and Restated Limited Liability Company Agreement of Safeguard Storage Properties LLC ("the LLC Agreement"), effective May 31, 2005. PPF became a member of Safeguard along with the BCR parties; while PPF's investment equated to ownership of approximately 94% of Safeguard, Morgan Stanley and PPF agreed in the LLC Agreement to allow BCR to be the "Administrative Member" in charge of all day-to-day operations of Safeguard, and provided the BCR parties with "waterfall" distribution rights that would entitle the BCR parties to distribution of Safeguard proceeds disproportionate to and well in excess of their equity interests in the company. "Major Decisions," however, including bringing suit on matters in excess of $250,000, required the unanimous approval of a four-person Management Committee, which the LLC Agreement specified had to include Morgan Stanley employees Scott Brown and John Kessler.

Immediately after execution of the LLC Agreement, Morgan Stanley took on the responsibility of placing Safeguard under its insurance program, which packaged its multi-billion-dollar real estate and business portfolio under an alliance of insurers providing coverage at various layers, including as provided by Lloyd's. When Hurricane Katrina hit in August 2005 and caused damage to and severe disruption of Safeguard's development plans, Safeguard and the BCR parties were assured that Morgan Stanley would look out for their interests in handling the related claims to the insurers, which the BCR parties would directly receive any damages or settlement proceeds from as quarterly distributions from Safeguard pursuant to the LLC Agreement and its waterfall distribution provision. The BCR parties were not informed by Morgan Stanley, their business partners, that Morgan Stanley would essentially do nothing to advance the full value of Safeguard's insurance claims. When the BCR parties discovered near the end of the prescriptive period for Safeguard to file suit against the insurers for Katrina-related

claims that little action had been taken by Morgan Stanley, it took the threat by the BCR parties of a lawsuit for breach of fiduciary duty against PPF, Mr. Brown, and Morgan Stanley for the two Morgan Stanley-controlled members of the Safeguard Management Committee to agree to Safeguard filing suit against the insurers. However, still unbeknownst to the BCR parties, Morgan Stanley had no intention to pursue the full value of Safeguard's business interruption claims—which, as predicated on Safeguard's lost development opportunities and on demonstrated bad faith of the insurers, would exceed $350 million (of which BCR would receive a disproportionately large amount relative to their ownership as quarterly distributions)—because Morgan Stanley was concerned about protecting its position in negotiations to renew its insurance coverage and the value of its investment banking relationships with the insurers. The insurers, particularly Lloyd's, exploited these conflicts by exerting overt pressure on Morgan Stanley to reduce the claimed value of Safeguard's claims, to cause Safeguard not to seek damages for bad faith, to reveal Safeguard's confidential litigation strategy, and to take control of Safeguard and the Insurance Litigation.

Morgan Stanley complied with these directives from the insurers. When it could not control the BCR parties and Safeguard to the satisfaction of the insurers, Morgan Stanley and Mr. Brown (1) devised a plan whereby PPF would execute a buy/sell provision from the LLC Agreement after assuring the BCR parties it would not do so; then (2) simultaneously sabotaged the BCR parties' ability to respond as purchasers under the buy/sell provision by filing two lawsuits against the BCR parties, Mr. Roch, and Mr. Chaney in the Delaware Court of Chancery, including an action alleging misconduct and mismanagement that failed to comply with mandatory venue and arbitration provisions in the LLC Agreement and employment agreements for Mr. Roch and Mr. Chaney, as well as by engaging in other onerous activities designed to tie

up the BCR parties' ability to obtain financing to buy out PPF's stake in Safeguard. In so doing, Morgan Stanley was able to (1) wrest control of Safeguard and the Insurance Litigation from the BCR parties, (2) further delay the resolution of that litigation, (3) ultimately settle it for substantially less than the exposure that Safeguard's expert accountants and attorneys had determined was available, (4) protect Morgan Stanley's business and insurance relationships with the insurers, and (5) refinance Morgan Stanley's line of credit (which BCR's ownership in Safeguard made difficult) to set Safeguard up for providing enormous economic advantage to Morgan Stanley. As detailed below, these actions wrongfully deprived the BCR parties of proceeds from the Insurance Litigation as either quarterly distributions pursuant to the LLC Agreement or consideration when Morgan Stanley executed the Buy/Sell provision and denied BCR the opportunity to purchase PPF's interest and to own Safeguard outright.

The BCR parties provide this introductory statement for the benefit of the Court, as supported by the following enumerated allegations:

## II.   PARTIES - PLAINTIFFS

1.      Plaintiff BCR Safeguard Holding, L.L.C. ("BCR") is a limited liability company organized under the laws of the state of Delaware, with its sole member domiciled in the state of Georgia.

2.      Plaintiff JAC Safeguard Holding, L.L.C. ("JAC") is a limited liability company organized under the laws of the state of Delaware, with its sole member domiciled in the state of Louisiana.

3.      Plaintiff Safeguard Development Group II, L.L.C. ("Mountainside") is a limited liability company organized under the laws of the state of Louisiana, with its members domiciled in the states of Louisiana and Georgia.

4

### III.    PARTIES - DEFENDANTS

4.      Defendant PPF Safeguard, L.L.C. ("PPF") is a limited liability company organized under the laws of the state of Delaware. PPF's sole member is Prime Property Fund, L.L.C. ("Prime"), organized under the laws of the state of Delaware. On information and belief, Prime's sole member, defendant Morgan Stanley, is incorporated in the state of Delaware with its principal place of business in the state of New York.

5.      Defendant Morgan Stanley Real Estate Advisor, Inc. ("Morgan Stanley") is incorporated under the laws of the state of Delaware, with its principal place of business in the state of New York.

6.      Defendant Scott Allen Brown is an individual who is domiciled in the state of Connecticut.

7.      Defendant Certain Underwriters at Lloyd's of London ("Lloyd's") is a collection of syndicates of individual underwriters and London market insurance companies consisting of, but not limited to, Lloyd's Underwriter Syndicate No. 2623 AFB, London; Lloyd's Underwriter Syndicate No. 0623 AFB, London; Lloyd's Underwriter Syndicate No. 2020 WEL, London; Lloyd's Underwriter Syndicate No. 2001 AML, London; Lloyd's Underwriter Syndicate No. 2010 MMX, London; Lloyd's Underwriter Syndicate No. 3000 MKL, London; Lloyd's Underwriter Syndicate No. 2987 BRT, London; Lloyd's Underwriter Syndicate No. 1084 CSL, London; Lloyd's Underwriter Syndicate No. 2000 HAR, London.

### IV.    JURISDICTION AND VENUE

8.      This Court has subject matter jurisdiction over this civil action pursuant to 28 U.S.C. § 1331, 28 U.S.C. § 1332, and 28 U.S.C. § 1367. The plaintiffs assert a claim arising under the laws of the United States, specifically the Racketeer Influenced and Corrupt Organizations Act,

18 U.S.C. § 1961 *et seq.* ("RICO"), to which plaintiffs' state law claims are closely related. In addition, the plaintiffs are citizens of the states of Louisiana and Georgia, and no defendant is a citizen of either state, such that there is complete diversity between the plaintiffs and defendants; and the amount in controversy in the plaintiffs' claims exceeds of $75,000.00, exclusive of interest or costs.

9.      Upon information and belief, defendants PPF, Morgan Stanley, Mr. Brown, and Lloyd's, at all material times relevant hereto, regularly transacted business within the Eastern District of Louisiana.

10.      Specifically, PPF is now the sole member of Safeguard Storage Properties, L.L.C. ("Safeguard"), which operates multiple self-storage facilities within the Eastern District of Louisiana. From May 31, 2005 until July 30, 2009 PPF was a member of Safeguard with the plaintiffs, and since July 30, 2009 has been the sole member of Safeguard.

11.      Morgan Stanley is the manager of PPF, and through PPF's membership in Safeguard and through management, ownership, or operation of other investments, Morgan Stanley also conducts regular transactions within the Eastern District of Louisiana.

12.      Defendant Mr. Brown is on the Management Committee of Safeguard, as well as a director of PPF, and thereby has regular contacts within the Eastern District of Louisiana.

13.      Defendant Lloyd's insures properties within the Eastern District of Louisiana.

14.      By the contacts alleged in ¶¶ 9-13, and by other contacts, the defendants fall within this Court's general personal jurisdiction.

15.      This Court also has specific personal jurisdiction over each of the defendants. Defendants Mr. Brown, PPF, and Morgan Stanley conducted meetings with the plaintiffs in the Eastern District of Louisiana, in person, by telephone, and by other means, in order to facilitate PPF's

investment and membership in Safeguard, which was headquartered in this District at the time that investment was perfected in 2005.

16.     Defendant Lloyd's participated in a program of insurance for properties and businesses in which Morgan Stanley was involved, specifically including Safeguard, which was headquartered in this District at the time of the insured loss that underlies many of the allegations herein.

17.     The defendants all were parties to and participated in the litigation and settlement of the case titled *Safeguard Storage Properties, LLC, et al. v. Donahue-Favret Contractors, Inc., et al.*, Civil Action No. 07-9359 (Civ. Dist. Ct. Orleans Parish) (the "Insurance Litigation"), which was filed in Civil District Court for Orleans Parish in August 2007 regarding losses incurred as a result of Hurricane Katrina in 2005, and which case was dismissed upon settlement in October 2012.

18.     As held by the Louisiana state courts, the resolution of the Insurance Litigation is a necessary element in the accrual of the plaintiffs' causes of action here. *See BCR Safeguard Holding, L.L.C., et al. v. Morgan Stanley Real Estate Advisor, Inc., et al.*, No. 2010-C-1275, Order Denying Writ (La. App. 4 Cir. 9/24/2010) ("Even assuming the truth of the relator's allegations as to their causes of action, the relator's own claims make clear that any alleged harm for which they seek to recover has not yet occurred. Specifically, because the relator's alleged damages in this action are predicated upon a theoretical diminution in the value of Safeguard's ultimate recover [sic] in the as-yet-unresolved Insurance Litigation, damage attributable to the defendants' alleged misconduct cannot be determined until the Insurance Litigation is litigated or settled.").

19.     By the contacts alleged in ¶¶ 15-18 above, and by other contacts, the defendants fall within this Court's specific personal jurisdiction.

20.     Pursuant to 28 U.S.C. § 1391(b)(2), venue is appropriate in the Eastern District of Louisiana. As alleged in ¶¶ 15-18, and detailed in the factual allegations below, a substantial part of the events and omissions giving rise to the plaintiffs' causes of action occurred in this District and affected property situated within this District.

21.     Venue is also appropriate in the Eastern District of Louisiana pursuant to 28 U.S.C. § 1391(b)(3), where the Court in this District also has personal jurisdiction over all parties.

## V.    FACTUAL ALLEGATIONS

### *The LLC Agreement*

22.     Safeguard's predecessor was founded in New Orleans in 1989 by Bruce Roch, Jr. Mr. Roch is the sole member of plaintiff BCR, which was the Administrative Member of Safeguard until July 30, 2009.

23.     Soon after Mr. Roch founded Safeguard's predecessor, Jack Chaney joined Mr. Roch in building the company. Mr. Chaney is the sole member of JAC, and is one of the two members of Mountainside.

24.     Effective May 31, 2005, defendant PPF invested in and became a member of Safeguard by entering into the Amended and Restated Limited Liability Company Agreement of Safeguard Storage Properties, LLC ("the LLC Agreement"). The other parties to the LLC Agreement were plaintiffs BCR, JAC, and Mountainside (collectively, "the BCR parties").

25.     Under § 4.02 of the LLC Agreement, BCR was designated as the "managing Member" or "Administrative Member" of Safeguard.

26.     Mr. Roch also was the Chief Executive Officer of Safeguard during the effective period of the LLC Agreement, and Mr. Chaney was the Chief Operating Officer.

27.     Under §§ 4.02 and 9.01 of the LLC Agreement, subject to particular exceptions enumerated in §§ 9.02 and 9.10 of the LLC Agreement, the Administrative Member of Safeguard had "the sole and exclusive right, power, authority and discretion to conduct the business and affairs of the Company and the Property Owners, and to do all things necessary to carry on the business of the Company and the Property Owners, … and to take any action of any kind and to do anything and everything the Administrative Member deems necessary, desirable or appropriate in accordance with the provisions of [the LLC Agreement] and applicable law."

28.     Under § 9.02(i) of the LLC Agreement, a four-person Management Committee was required to unanimously approve the filing of any litigation involving more than $250,000.00.

29.     Under § 9.02 of the LLC Agreement, the Safeguard Management Committee was composed of four members, two of which were to be designated by BCR, and two of which were to be designated by Prime. The LLC Agreement specifically denominated as Prime's designees Mr. Brown and John Kessler, who remained the Prime-designees to the Management Committee throughout the time period relevant to these allegations. Mr. Brown and Mr. Kessler during all relevant times were full-time Morgan Stanley employees operating under the direction and control of Morgan Stanley.

30.     Under § 9.07 of the LLC Agreement, Safeguard could engage "Third Parties" "to act as developers, brokers, accountants, attorneys, engineers or in such other capacities as may be necessary or desirable in connection with the Company's business." Specifically, § 9.07 allowed such Third Parties to include "any Affiliate of any Member." Regardless of affiliation, however, § 9.07 also expressly incorporated an individual entitlement of each Safeguard member "to rely in good faith upon the recommendations, reports and advice given to them by any such Persons or entities in the course of their professional engagement."

9

31.     Under § 7.02 of the LLC Agreement, the "waterfall" provision for distribution of Safeguard proceeds to its members, the BCR parties were entitled to receive proceeds disproportionately high in relation to their combined equity interest in Safeguard. Under that provision, distributions of "Net Cash Flow" (including damages or settlement proceeds from litigation) to Safeguard members were to be made on a calendar quarterly basis as follows: (1) "to each member in an amount equal to the excess of the sum of (i) the Priority Loans made by such Member … and (ii) the Priority Loan Yield with respect to such Priority Loan"; (2) to each member on a basis proportional to their ownership interest in Safeguard until PPF achieved a 10% "Internal Rate of Return" with regard to its "Notional Capital Contributions"; (3) then 75% of proceeds made to each member on a basis proportional to their ownership interests and the remaining 25% wholly to the BCR parties until PPF achieved a 14% Internal Rate of Return on its Notional Capital Contributions; and (4) then 60% of proceeds made to each member on a basis proportional to their ownership interests and the remaining 40% wholly to the BCR parties. The effect of this waterfall provision is that 60% of the net proceeds from an insurance recovery (or other distribution event) in excess of Priority Loans made by PPF would be distributable pro rata to all of the Safeguard members but that 40% of those excess proceeds were distributable solely to the BCR parties regardless of the ownership percentage of the respective members of Safeguard. In no case would proceeds be distributed directly to Morgan Stanley.

32.     Under § 11.03 of the LLC Agreement, either PPF or the BCR parties, after a "Trigger Event," had the right to issue a Buy/Sell "Offer Notice" declaring the intention to either purchase or sell their interest in Safeguard from or to the other for an "Applicable Purchase Price" "equal to the cumulative, aggregate amount that the Notified Party or the Notifying Party, as applicable, would be entitled to receive if the Company were sold for an all-cash price … and a liquidating

distribution were made immediately following such sale after satisfying all liabilities of the Company, whether or not then due and payable." The Notified Party under § 11.03 then had a 70-day "Election Period" within which to choose to be either the "Purchasing Member" or the "Non-Purchasing Member" based upon the Applicable Purchase Price in the Offer Notice. Where the Offer Notice is an offer to purchase the interests of the Notified Party, a failure to make an election within the Election Period is deemed an election to be the Non-Purchasing Member.

### *The Genesis of Morgan Stanley's and PPF's Involvement in Safeguard*

33.    PPF is managed by Morgan Stanley, which is PPF's sole advisor and makes all decisions on its behalf.

34.    Morgan Stanley has the responsibility of placing insurance for PPF.

35.    Specifically, following PPF's entry into the LLC Agreement, Morgan Stanley agreed to obtain coverage for Safeguard under Morgan Stanley's property and business interruption insurance program.

36.    Lloyd's was one of many participating insurers in the insurance program covering Safeguard, participating in portions of various excess layers.

37.    Other insurers participating in the insurance program with which Morgan Stanley placed insurance for Safeguard included Lexington Insurance Co.; Bituminous Casualty Company; Ace American Insurance Company; Allied World Assurance Company; American International Specialty Lines Insurance Company; Axis Reinsurance Company; Axis Specialty Limited; Continental Casualty Company; Federal Insurance Company; Great Lakes UK (a/k/a Great Lakes Reinsurance (UK), PLC); Illinois Union Insurance Company; International Insurance Company of Hannover; Employers Insurance Company of Wausau; Pacific Insurance Company,

Ltd.; SR International Insurance Company, Ltd. and XL Insurance American, Inc. (collectively with Lloyd's, "the Insurers").

38.     At the time of the entry into the LLC Agreement by PPF and the BCR parties, Safeguard was headquartered in the metro New Orleans area, with its national operations headquarters and call center located here, with self-storage locations throughout the region and the nation.

### *The Katrina-Related Litigation and Morgan Stanley's Initial Conflict*

39.     On or about August 29, 2005, Hurricane Katrina and associated flooding devastated the New Orleans area and the Gulf South.

40.     In addition to suffering millions of dollars in real and personal property damage as a result of Hurricane Katrina's destruction, the disruption of Safeguard's business headquarters near New Orleans caused extensive business interruption losses, including lost development opportunities, lost profits, and lost rents in excess of $350,000,000.00. The BCR parties were unaware that the value of these claims implicated the excess layers of insurance in which Lloyd's and other Europe-based insurers participated because, despite being requested by BCR multiple times in 2005, 2006, and 2007, Morgan Stanley never provided BCR a full copy of the policy documents or slips documenting the coverage to which Safeguard was entitled. Indeed, at least as early as December 2005 Morgan Stanley actively and intentionally altered documents and limited the information provided to Safeguard and BCR regarding the insurance program.

41.     In or about December 2005, pursuant to the decision-making authority under § 9.02(i) of the LLC Agreement and Morgan Stanley's assurances that it would take care of the insurance claims while BCR looked after the business and physical recovery of Safeguard after Katrina, the Safeguard Management Committee delegated to Morgan Stanley the role of negotiating the insurance claims with the Insurers. Pursuant to § 9.07 of the LLC Agreement, Morgan Stanley

agreed to take on this role. Morgan Stanley's agreement to handle Safeguard's Katrina-related insurance claim was confirmed █████████████████.

42.     The BCR parties reasonably believed that Morgan Stanley, because of its control over two members of the Safeguard Management Committee, because it served as managing agent of PPF, and because of its independent agreement to take responsibility to handle the negotiation of the Katrina-related claim on behalf of Safeguard, would act in their best interests and deal with the Insurers fairly and in good faith, rather than acting to advance Morgan Stanley's separate interests.

43.     The BCR parties had no knowledge that Morgan Stanley actually operated under multiple sources of conflicts and would act to protect its own interests in a favorable relationship with the Insurers rather than to protect the interests of Safeguard and its members.

44.     While the BCR parties worked diligently to rejuvenate Safeguard's operations following Katrina, including relocation of the company's headquarters and call center, they were unaware that Morgan Stanley was performing little substantive negotiation with the Insurers to protect and pursue the value of Safeguard's property and business interruption claims.

45.     In 2006, without an adequate analysis of the breadth of Safeguard's insurance claims, Morgan Stanley attempted to convince BCR to settle Safeguard's Katrina-related claims for approximately $6 million.

46.     In May 2007, still never having negotiated or seriously pursued resolution of Safeguard's claims in an amount reflecting their full property and business interruption loss, Morgan Stanley's ████████████████████████████████████████████ ████████████████████████████████████████████ ███████████████████████████████████.

13

47.     In the summer of 2007, with the August 29, 2007 deadline for filing lawsuits against insurers under Louisiana law looming, BCR was made aware that little to no progress had been made by Morgan Stanley in pursuing Safeguard's claims against the Insurers. BCR therefore attempted to gain Safeguard Management Committee approval under § 9.02(i) of the LLC Agreement to file suit against the Insurers.

48.     Until the final week prior to the lawsuit filing deadline, Morgan Stanley and the Morgan Stanley-appointed-and-employed Safeguard Management Committee Members refused to provide the approval required to file suit against the Insurers. At the same time, both BCR representatives on the Management Committee voted to approve filing suit, but their efforts were thwarted because filing suit required the Management Committee's unanimous approval.

49.     Left with no other options to protect the interests of Safeguard and the disproportionate interests of the BCR parties under the waterfall provision of the LLC Agreement, Mr. Roch on behalf of BCR prepared to take legal action against Morgan Stanley, PPF, and the Morgan Stanley-appointed representatives of the Management Committee. After Mr. Roch informed Mr. Brown and Mr. Kessler of the legal action he planned to take, they ultimately relented on August 27, 2007 and approved the filing of the lawsuit against the Insurers.

50.     The truth that would be borne out in subsequent events, omissions, and communications is that Morgan Stanley did not want to pursue Safeguard's insurance claim, either through settlement or litigation, in any meaningful way. Morgan Stanley had no direct equity interest in Safeguard and would gain no direct proceeds from an insurance recovery by Safeguard. Even PPF, a member of Safeguard, stood to receive an amount of proceeds disproportionately small in relation to its equity interest in Safeguard under the "waterfall" provision for distribution of Safeguard proceeds to members under § 7.02 of the LLC Agreement.

51.     Mr. Brown has admitted in sworn deposition testimony that, at the time of his conduct toward the BCR parties, he never really thought about which "hat" he was wearing, which role he was acting in, *i.e.,* whether to look after Morgan Stanley's interests as an employee of Morgan Stanley, PPF's interests as a director of PPF, or Safeguard's interests as a Managing Committee member of Safeguard.

52.     Mr. Brown's failure to recognize his distinct obligations as a director of PPF, a Managing Committee member of Safeguard, and an employee of Morgan Stanley demonstrate that he callously disregarded any conflicts of interest between Safeguard, PPF, and Morgan Stanley and as detailed below always acted to protect Morgan Stanley's interests, in violation of the duties he owed to all of the members of Safeguard, in particular the BCR parties.

53.     Morgan Stanley believed that an insurance recovery that fairly compensated Safeguard's insured losses would jeopardize Morgan Stanley's ability to renew participation in the insurance program with the Insurers for all of its properties or, at a minimum, greatly increase the future cost of Morgan Stanley's coverage. As Mr. Brown explained to Mr. Roch, Morgan Stanley viewed Safeguard's insurance claim simply as a "wealth transfer" from Morgan Stanley to Safeguard's members, with proceeds going disproportionately to the BCR parties at the expense of lost coverage or higher premiums to Morgan Stanley.

54.     The value of coverage to Morgan Stanley for its real estate holdings is critical, as it manages and supports insurance for more than $36 billion in real estate assets.

55.     Morgan Stanley also believed that allowing the BCR parties to remain in control of Safeguard and pursuing the full value of Safeguard's claims would jeopardize Morgan Stanley's investment banking and other business relationships with the Insurers.

*The Insurers Knowingly Exploit Morgan Stanley's Conflict*

56.     The Insurers—in particular, Lloyd's—leveraged this conflict of interest. In an email string involving AON, Morgan Stanley's insurance broker, on and around September 25, 2007, an AON representative wrote, "Our placing broker has come back from Lloyd's and the lead on current placement is considering issuing notice of cancellation due to this......we need to get to the bottom of this, and assume have Morgan Stanley corporate seek to clarify the matter."

57.     In another September 25, 2007, email, AON personnel emailed to personnel at Beazley (Lloyd's) that, "Unfortunately, the local MS partner, Safeguard, sued on their own to protect their right to sue."

58.     On September 28, 2007, Morgan Stanley internal counsel Dina DeFalco (now Dina Romani) called Ed Downing, the litigation counsel initially retained by Safeguard to pursue the Insurance Litigation, to scold him for communicating to the Insurers' counsel that the business interruption claim may exceed $180-200 million, telling Mr. Downing that Morgan Stanley had "other business interests" with the insurers that could be disrupted by pursuing such a large claim.

59.     On October 3, 2007, AON personnel emailed each other inquiring whether Morgan Stanley had been successful "in restraining their partner," and noting that "MS Corporate" had "advised local counsel to restrain themselves."

60.     On October 15, 2007, Morgan Stanley's Bruce Plummer emailed AON and noted that the Insurers' "underwriters," not the Insurers' claims personnel, "are questioning Morgan Stanley's control over joint venture partners and may hinder their participation at renewal."

61.     On October 30, 2007, AON personnel emailed each other noting that Lloyd's has "major concern that MS do not have control over their partner … that if no positive movement is made

soon, a recommendation may go from claims to underwriting regarding the future viability of underwriting this risk."

62.     AON communicated Morgan Stanley's risks to it, ensuring that Morgan Stanley knew that it needed to "control" Safeguard if it was to protect its interests with the Insurers. On November 4, 2007, AON emailed Morgan Stanley regarding the Safeguard claim, "as failure to take decisive action may very well result in markets not wanting to participate in renewal. Some markets have expressed concern over whether or not MS has control over Safeguard in this matter."

63.     On January 22, 2008, Trevor Self, with Beazley (Lloyd's), wrote an email detailing a meeting with Morgan Stanley's Mr. Plummer, detailing Mr. Plummer's agreement to provide information to Lloyd's regarding Safeguard's strategizing for the Insurance Litigation; explaining that Morgan Stanley was "aware the uncertainty of the claim to the excess layers will affect their renewal negotiations"; and stating that the employee who valued the insurance claims at $150 million "has been removed from the case, and no longer works for Safeguard Storage."

64.     A February 6, 2008 email from Mr. Self to AON personnel highlighted the interplay between the Safeguard claim and the underwriting of Morgan Stanley's insurance renewals: Mr. Self noted that the amended petition in the Insurance Litigation asserted damages in excess of $250 million, and requested that Morgan Stanley's Mr. Plummer provide "comments on these recent developments, especially as I believe he is due to meet several representatives from London who participate in this risk and have also been asked to quote renewal terms at next week's AON Symposium in Fort Lauderdale."

65.     In response, on February 22, 2008, Mr. Plummer emailed AON and Alistair Blades, an underwriter at Beazley (Lloyd's), with details of the membership of the internal "task force"

17

handling the Safeguard litigation; identifying the forensic accountants working on the claims on behalf of Safeguard, including the non-testifying consultants; and describing the status of the internal document review at Morgan Stanley in relation to the litigation.

66.    Repeating the mantra from Lloyd's to Morgan Stanley that Morgan Stanley gain "control" of Safeguard to limit the Katrina claim, in an April 9, 2008 email from Mr. Self to AON, Mr. Self requested that Mr. Plummer explain the business relationship between Morgan Stanley and Safeguard and "advise whether Morgan Stanley are the controlling entity within Safeguard." In the same email, Mr. Self requested that Mr. Plummer provide an explanation of the report of Safeguard's non-testifying forensic accountant, Navigant, regarding the business interruption claims.

67.    On April 21, 2008, Safeguard's litigation counsel, James Garner of the New Orleans law firm of Sher Garner Cahill Richter Klein & Hilbert, L.L.C. ("Sher Garner") discussed with Morgan Stanley's Dina DeFalco that the Insurers "have evidently been contacting Bruce Plummer and others to obtain substantive information regarding" the Insurance Litigation, and Sher Garner proposed to Ms. DeFalco a draft email directing the Insurers to cease direct communications with Morgan Stanley, PPF, or Safeguard regarding the claim while it was in litigation. Expressly acknowledging and acting on Morgan Stanley's conflict, Ms. DeFalco directed Sher Garner to not send the proposed email: "I would not send the email. It is quite possible that one hand is not talking to the other at the insurers and I don't think we should accuse them of something we are not sure they are doing. I am not being naïve here, but I don't want to tip the boat unless we have to. We have relationships to protect on the investment banking side, as well as policies to continue renewing, and sending this email may compromise, albeit slightly, those relationships."

68.     At the same time that Ms. DeFalco was directing Safeguard's litigation counsel to not "tip the boat," recognizing that Mr. Plummer's communications with Lloyd's had not assuaged Lloyd's concerns in late spring 2008 Morgan Stanley designated its employee Vince D'Angelo to lead the handling of the Safeguard claim. In a ███████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████

69.     A ███████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████ Mr. D'Angelo in fact delivered this message to the Insurers, including Lloyd's, not later than August 2008.

70.     The effect of Morgan Stanley's continuous communications with the Insurers regarding Safeguard's confidential litigation strategies and the status of Safeguard's litigation efforts, and the assurances provided by Morgan Stanley to the Insurers that it would gain control of the situation, was to comfort the Insurers that they did not need to engage in serious consideration of settlement of Safeguard's claims at amounts that reflected the value of Safeguard's business interruptions claims, and that they could count on the litigation being protracted and delayed through Morgan Stanley's machinations until it could gain full control of Safeguard.

71.     In January 2009, Mr. Garner deposed Lloyd's personnel in London, and confirmed that the coverage for the Safeguard Katrina losses included gross revenues from the lost development opportunities, which greatly increased the Insurers' exposure—particularly at the excess layers provided by Lloyd's and other Europe-based insurers—and solidified a basis for claims of bad faith.

72.     During the January 2009 depositions, counsel for Lloyd's communicated to Mr. Garner that Morgan Stanley would never get insurance coverage again if it continued to go after the excess layers of insurance that included Lloyd's.

73.     In email exchanges in January 2009 between Sher Garner, Mr. Roch, and Morgan Stanley personnel, Mr. Garner proposed amending the petition for damages in the Insurance Litigation to include bad faith claims against Lloyd's and the other excess insurers. While Mr. Roch expressly encouraged pursuit of the bad faith claims, Morgan Stanley's Dina Romani (formerly Dina DeFalco) replied "absolutely no" to the proposal, and Morgan Stanley refused to assent to adding the bad faith claims—which under Louisiana law governing the Insurance Litigation could implicate recovery of double damages—against the excess insurers.

74.     As a result of the information learned during the January 2009 depositions, Safeguard's expert forensic accountants calculated potential damages models for lost gross revenues from the lost development prospects covered by the Insurers in excess of $350 million.

75.     On February 2, 2009, Mr. Brown emailed Mr. Roch, Mr. Garner, and others that "he will have a very hard time on the witness stand" defending the new damages calculations.

76.     On February 5, 2009, Morgan Stanley's Ms. Romani acknowledged that a range of $270 million to $280 million was "a conservative, credible damages calculation."

77.     On May 4, 2009, ████████████████████████████████████

████████████████████████████████████████████████████████████

██████████████████████████████

78.     On May 19, 2009, Morgan Stanley's ████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

██████████████████████████████████████████

79.     In her May 19, 2009 email, ███████████████████████████████

█████████████████████████████████████████████████████ Although Mr.

Roch on behalf of BCR, Safeguard's Administrative Member, sought to examine the emails

involving Morgan Stanley's communications with the Insurers to protect the interests of

Safeguard and of the BCR parties, Morgan Stanley withheld them from Mr. Roch.

***Morgan Stanley's Desire to Eliminate BCR's Ownership in Safeguard Presents its Second
Conflict***

80.     Morgan Stanley was seeking to gain control of Safeguard from the BCR parties for other

reasons, as well. In particular, Morgan Stanley was looking to take full control of Safeguard so it

could liquidate it and keep the full proceeds unencumbered by the disproportionate distribution

in the waterfall provision.

81.     In December 2008, Morgan Stanley was trying to get Safeguard to start using a new

software business platform developed for another Morgan Stanley-controlled entity, AMLI. On

December 12, 2008, ████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

82.     In the spring of 2009, Mr. Brown was determined "to make this [Safeguard] unencumbered in order for us [Morgan Stanley] to get our line of credit to maintain the proper level of liquidity to our shareholders." Mr. Brown testified that as long as the BCR parties maintained an ownership stake in Safeguard it could not refinance Morgan Stanley's line of credit because "lenders looked at one thing: unleveraged wholly-owned assets. … If you have a partner [such as the BCR parties] with a 1 percent share on an unleveraged building, they don't look [at] it."

***Morgan Stanley Lies to the BCR Parties About its Intentions***

83.     Through § 11.03 of the LLC Agreement (the "Buy/Sell provision"), Morgan Stanley and PPF set about to take full control and ownership of Safeguard, to control the Insurance Litigation, to tamp down the Insurers' exposure in that litigation, protect Morgan Stanley's interests, and allow Morgan Stanley to refinance its line of credit.

84.     On March 31, 2009, concerned by Morgan Stanley's reluctance to aggressively pursue the lost revenues business-interruption claim that Safeguard's expert witnesses had projected in excess of $350 million, BCR's Mr. Roch inquired of Mr. Brown and Mr. Kessler whether Morgan Stanley would cause PPF to "go to the documents," meaning to exercise the Buy/Sell provision of the LLC Agreement. Mr. Brown and Mr. Kessler promised Mr. Roch that Morgan Stanley would not do so.

85.     Again on April 1, 2009, Mr. Roch inquired whether Morgan Stanley would "go to the documents," because if so he would know to divert his focus from the pursuit of the Insurance Litigation and instead focus efforts on responding to any imminent Buy/Sell Offer. Again, he

22

was told by Mr. Brown to keep his efforts focused on Safeguard's pursuit of the Insurance Litigation, and that Morgan Stanley would not cause PPF to invoke the buy/sell.

86.    Morgan Stanley knew that, in order to buy out PPF's almost 95% share of Safeguard, the BCR parties would have to raise almost 19 times the amount that PPF would have to pay to buy out the BCR parties. On top of that, under the terms of the LLC Agreement, the BCR parties would have to find a lender to assume the approximately $290 million of Safeguard debt held by Prime, something that PPF would not have to do if it bought the BCR parties' interests.

87.    Doing either of those things was made even more difficult because Morgan Stanley had delayed and impeded Safeguard's effective prosecution of the Insurance Litigation. Had Morgan Stanley not taken bad faith actions to undermine Safeguard's aggressive pursuit of the Insurance Litigation, the proceeds from timely settlement or resolution of the Insurance Litigation would have been available through waterfall distribution to the BCR parties to use as funds to respond to the buy/sell as a "Purchasing Member." Instead, Morgan Stanley's actions undermined and weakened Safeguard's claims and therefore the BCR parties' financial position. Moreover, the delays and impediments engendered by Morgan Stanley's actions increased and protracted the costs of pursuing the Insurance Litigation, which increased costs borne by Safeguard's members, including the BCR parties, through multiple cash calls.

88.    Indeed, one of the Morgan Stanley-controlled Management Committee members told BCR's Mr. Roch that Morgan Stanley did not believe that the BCR parties could afford to buy out PPF in a Buy/Sell and so would be forced to sell.

89.    Morgan Stanley knew that, by causing PPF to invoke the Buy/Sell provision, it could remove the BCR parties from Safeguard and remove BCR as Administrative Member. Through invocation of the Buy/Sell, Morgan Stanley intended to shut down the BCR parties' inquiries

into its conflicts of interest and disloyal conduct and to dispose of the Insurance Litigation as it wished.

90.     Indeed, on May 13, 2009, ███████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████ precisely the points of conflict that had been

driven home by the Insurers for a year and a half at that point, as well as by Mr. Brown ██

████████████████████████████████████████████

91.     One day later, on May 14, 2009, Morgan Stanley caused PPF to invoke the LLC Agreement's Buy/Sell provision through issuance of a Buy/Sell Offer to the BCR parties. Under the timing provisions of § 11.03 of the LLC Agreement, the Plaintiffs were required to elect whether to be a "Non-Purchasing Member" or a "Purchasing Member" by July 24, 2009.

***Morgan Stanley Renders the BCR Parties' Ability to Elect to be Purchasing Members Illusory, Ignores the Value of the Insurance Litigation, then Allows the Defendants' Destruction of the Value of the Insurance Litigation to be Manifested in a Low Value Settlement***

92.     During the Buy/Sell election period, between the time of the Buy/Sell Notice and July 24, 2009, Morgan Stanley took a number of actions—directly on its own behalf and through its management control over PPF—to inhibit the Plaintiffs' ability to elect to be "Purchasing Members."

93.     Simultaneous with the filing of the Buy/Sell Notice, on May 14, 2009 Morgan Stanley caused PPF to file a lawsuit in Delaware Chancery Court, in an action styled *PPF Safeguard, LLC v. BCR Safeguard, LLC, JAC Safeguard, LLC, and Safeguard Development Group II, LLC*, No. 4594-VCS (Del. Ch. Ct.) ("Delaware 1"), seeking declaratory judgment that PPF "has the right and ability to exercise the Buy/Sell provision of the LLC Agreement and, further, to consummate the Buy/Sell transaction"; and injunctive relief enjoining the BCR parties "from interfering with or otherwise frustrating the right and ability of PPF to invoke the Buy/Sell

provision of the LLC Agreement and from interfering with or otherwise frustrating the right and ability of PPF to consummate the Buy/Sell transaction."

94.     On July 6, 2009, Morgan Stanley caused PPF to file a second lawsuit in Delaware Chancery Court against BCR and Mr. Roch, in an action styled *PPF Safeguard, LLC v. BCR Safeguard Holding, LLC, and Bruce C. Roch, Jr.*, No. 4712-VCS (Del. Ch. Ct.) ("Delaware 2"), alleging mismanagement and self-dealing by Mr. Roch and seeking declaratory judgment that Mr. Roch ceased being CEO of Safeguard on May 31, 2009 and was ineligible to serve on the Safeguard Management Committee at that time; declaratory judgment that Jack Chaney, the sole member of JAC and a member of Mountainside, was not an executive officer of Safeguard and was ineligible to serve on the Safeguard Management Committee; injunctive relief enjoining BCR "from continuing to block the proper functioning of the Management Committee under the LLC Agreement"; injunctive relief ordering BCR to provide PPF "access to critical records, files, documents and information relating to Safeguard's business operations, financial condition and material matters of concern to the Company"; injunctive relief enjoining Mr. Roch "from continuing to tortiously interfere with PPF's rights under the LLC Agreement"; injunctive relief ordering PPF's access to "Safeguard's books, records, files and other documents"; and injunctive relief seeking to enjoin BCR and Mr. Roch from allegedly breaching fiduciary duties and the implied covenant of good faith and fair dealing to PPF.

95.     The two Delaware lawsuits served to cloud the status of Safeguard and its management and thereby increase the difficulty of the BCR parties in soliciting financing or new partners to respond to the Buy/Sell Offer as a "Purchasing Member." Both lawsuits ultimately proved to be, at best, unnecessary. The BCR parties never took actions to frustrate PPF's ability to invoke or consummate the Buy/Sell and Delaware 1 was subject to a Stipulated Judgment, and Delaware 2

was dismissed due to PPF's failure to comply with mandatory venue and arbitration provisions in the LLC Agreement and in the employment agreements for Mr. Roch and Mr. Chaney.

96.     Also during the Buy/Sell election period, Morgan Stanley, through Mr. Brown, issued capital calls beyond the scope of those allowed by the Safeguard LLC Agreement, issued information and data requests to BCR of a burdensome nature and also beyond the scope of those provided for in the LLC Agreement, and dramatically increased the frequency of called Management Committee meetings.

97.     Due to the actions taken by Morgan Stanley and PPF, the BCR parties were unable to obtain financing or other partners that would have enabled them to elect to become "Purchasing Members" under the Buy/Sell provision of the LLC Agreement.

98.     As a result, the BCR parties did not make an election by July 24, 2009; by the terms of the LLC Agreement, they were then deemed to be "Non-Purchasing Members."

99.     Effective July 30, 2009, pursuant to the expiration of the Buy/Sell election period, Morgan Stanley took actions to consummate the Buy/Sell transaction by arranging and executing the closing of the transaction to buy out the BCR parties.

100.     Notably, Morgan Stanley personnel ████████████████████████████████████ ████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████ ████████████ Indeed, as alleged further below, Morgan Stanley had been working hard to diminish the value of the Insurance Litigation, which would ultimately result in a settlement at a fraction of the value assigned to that litigation by Sher Garner and by the expert forensic accountants that Mr. Roch had retained on behalf of Safeguard at Sher Garner's recommendation.

101.   After letting the Insurance Litigation—which had been scheduled to go forward with an October 2009 trial date prior to the consummation of the Safeguard Buy/Sell—languish for more than three more years, and after buying out the interests in the Insurance Litigation of independent entities controlled by Mr. Roch, on information and belief in October 2012 Morgan Stanley caused Safeguard to settle the Insurance Litigation with the Insurers for substantially less than the objective value ascribed to the claim by Safeguard's expert accountants and, presumably after careful analysis of risks and probability of success, by Safeguard's litigation counsel. On information and belief, the settlement value was also substantially less than even the "conservative[]" value of the claim agreed to by Morgan Stanley's own in-house counsel.

### *The Prior Litigation of the BCR Parties' Claims*

102.   On May 7, 2009, the BCR parties originally brought suit against PPF and Morgan Stanley in the Civil District Court for the Parish of Orleans, in an action styled *BCR Safeguard Holding, L.L.C., JAC Safeguard Holding, L.L.C., and Safeguard Development Group II, L.L.C. v. Morgan Stanley Dean Witter Investment Management Inc., Formerly Known as Morgan Stanley Asset Management Inc., and PPF Safeguard, LLC*, No. 2009-4705 (C.D.C. Par. Orl.) ("The CDC Litigation"). In the CDC Litigation as filed on May 7, 2009, the BCR parties initially sought damages arising from alleged breach of fiduciary duty and civil conspiracy among Morgan Stanley and PPF for the actions taken to undermine Safeguard's position in the Insurance Litigation and destroy the value of that litigation. In the May 7 Prayer for Relief, the BCR parties also included a request for injunctive relief seeking to enjoin the transfer of ownership interests under the Buy/Sell provision but the BCR parties never moved for preliminary injunctive relief of that nature and removed that request by subsequent amendment.

103.    Seeking to avoid having the potential dispute among the members of Safeguard impact the Insurance Litigation, the BCR parties initially filed the CDC Litigation under seal.

104.    The BCR parties, hoping for an amicable resolution of the conflict issues that had been identified at that point with regard to Morgan Stanley's communications with the Insurers and still trusting the representations by Mr. Brown and Mr. Kessler to Mr. Roch that Morgan Stanley would not cause PPF to "go to the papers," initially withheld official service of the petition in the CDC Litigation, though corporate counsel for Safeguard informed Morgan Stanley of the petition on May 12, 2009.

105.    The BCR parties then twice amended the petition in the CDC Litigation, once to correct the name of Morgan Stanley as a defendant, then to add allegations regarding Morgan Stanley's independent duties of good faith under the LLC Agreement, to add a separate cause of action for breach of good faith, and to add a derivative claim on behalf of Safeguard regarding the breaches of good faith and fiduciary duties. On June 2, 2009, the BCR parties unsealed the pleadings in the CDC Litigation, and served the original and first two amending petitions on PPF and Morgan Stanley.

106.    On September 28, 2009, the BCR parties filed a third amended petition in the CDC Litigation, adding allegations regarding the defendants' conduct with regard to the Buy/Sell transaction, and restating causes of action for breach of the LLC Agreement and the implied covenant of good faith and fair dealing, breach of fiduciary duty, tortious interference with contract, civil conspiracy, and aiding and abetting breach of fiduciary duty. The BCR parties also added a claim for indemnification and advancement of its costs and expenses incurred in Delaware 1, Delaware 2, and the CDC Litigation, pursuant to the LLC Agreement.

107.   On February 11, 2010, the BCR parties filed a fourth amended petition in the CDC Litigation, adding causes of action for detrimental reliance and violation of the Louisiana Unfair Trade Practices Act ("LUTPA").

108.   On July 29, 2010, the district court in the CDC Litigation dismissed as premature all of the BCR parties' causes of action except the claim against Safeguard for indemnification and advancement. The Louisiana Fourth Circuit Court of Appeal affirmed that dismissal, finding that the BCR parties' claims would not accrue until the resolution of the Insurance Litigation: "Even assuming the truth of the relator's allegations as to their causes of action, the relator's own claims make clear that any alleged harm for which they seek to recover has not yet occurred. Specifically, because the relator's alleged damages in this action are predicated upon a theoretical diminution in the value of Safeguard's ultimate recover [sic] in the as-yet-unresolved Insurance Litigation, damage attributable to the defendants' alleged misconduct cannot be determined until the Insurance Litigation is litigated or settled." The BCR parties' claim against Safeguard for indemnification and advancement remains pending in the Louisiana Civil District Court and is not reasserted here. Safeguard is not a party to the claims pled herein, nor are the defendants herein named as defendants to the indemnification and advancement claim pending in state court.

109.   Also on July 29, 2010, the Delaware Chancery Court dismissed PPF's claims in Delaware 2 in their entirety, holding that PPF had filed them in Delaware state court in violation of mandatory forum selection and dispute resolution clauses in the LLC Agreement and the employment agreements for Mr. Roch and Mr. Chaney, which required that PPF's claims of mismanagement, self-dealing, and fraud against the BCR parties and their principals be pursued

mostly in arbitration and wholly within the state of Louisiana. PPF never re-filed those claims, either in arbitration or in Louisiana courts.

110.    On March 14, 2011, the Delaware Chancery Court entered a Stipulated Judgment in Delaware 1, upon the limited stipulations between PPF and the BCR parties that "[PPF's] invocation of the Buy/Sell provision of the LLC Agreement on May 14, 2009 was proper" and "[PPF] acted appropriately in setting the Total Purchase Price in the Buy/Sell transaction."

111.    The stipulations in the Delaware 1 Judgment did not reach beyond PPF to actions of Morgan Stanley, Mr. Brown (outside of his role as a PPF director), or the Insurers; and with regard to PPF did not reach beyond the issue of whether PPF's invocation of the Buy/Sell provision of the LLC Agreement on May 15, 2009 was proper and whether PPF acted appropriately in setting the Total Purchase Price in the Buy/Sell transaction.

112.    Upon the settlement of the Insurance Litigation in October or November 2012, the BCR parties' claims against PPF, Morgan Stanley, Mr. Brown, and Lloyd's have now accrued.

113.    The above allegations make clear that (a) Morgan Stanley did not pursue the Insurance Litigation or the preceding insurance claim on behalf of Safeguard in good faith; (b) the Insurers, particularly Lloyd's, ignored the barrier between their underwriting side and their claims side to put explicit pressure on Morgan Stanley to "restrain" and "control" Safeguard, or that its insurance renewal for its entire program would be in jeopardy; (c) Morgan Stanley also was aware of, and acted on, the conflict between the Insurance Litigation and its business-side relationships with the Insurers; (d) Mr. Brown had conflicts arising from his roles with Morgan Stanley, PPF, and Safeguard; (e) Mr. Brown, independent from concerns regarding controlling the Insurance Litigation, had a long-term plan to have Morgan Stanley, through PPF, gain control of Safeguard in order to sell it; (f) Morgan Stanley had increased pressure after the

Lloyd's depositions in January 2009 to get control of the litigation away from BCR; (g) Morgan Stanley affirmatively acted in concert with Lloyd's to undermine and devalue Safeguard's claim in the Insurance Litigation; (h) Morgan Stanley's actions not only undermined the value of Safeguard's claim in the Insurance Litigation but also led to delay of resolution of that litigation until such time that the BCR parties would not receive the benefit from resolution of those claims at their full value; (i) Morgan Stanley expressly represented to the BCR parties that it would not cause PPF to engage in a buy/sell, then acted on its conflicts by taking actions to engage in the buy/sell at the same time as creating conditions in bad faith that would make it impossible for the BCR parties to elect to be the "Purchasing Member" in the buy/sell transaction; and (j) eliminating BCR's interest was necessary so Morgan Stanley could refinance its line of credit.

### FIRST CAUSE OF ACTION—MORGAN STANLEY'S VIOLATION OF THE RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT, 18 U.S.C. §§ 1962(b)-(c)

114. The BCR parties adopt by reference and incorporate all previous allegations in all preceding paragraphs as if fully set forth herein.

115. Defendant Morgan Stanley violated RICO, specifically 18 U.S.C. §§ 1962(b) and (c), as a person employed by or associated with an enterprise that both (a) attempted to maintain and expand its control over Safeguard through a pattern of racketeering activity; and (b) also conducted the affairs of Safeguard through a pattern of racketeering activity from December 2005–October 2012 as alleged in detail herein.

### *The RICO Enterprise*

116. Safeguard, which was used by Morgan Stanley as the RICO enterprise, was at all times relevant to this Complaint a limited liability company organized and existing under the laws of the State of Delaware. At all relevant times, Safeguard engaged in interstate commerce through,

among other things, the operation of a call center and storage facilities in seven states (Louisiana, Florida, Georgia, Illinois, Pennsylvania, New York, and New Jersey).

117.    Safeguard was and is an enterprise separate and distinct from the pattern of racketeering activity in which Morgan Stanley engaged, in that it is a distinct company that had goals other than just racketeering, such as the operation of its self-storage business and rejuvenation of that business in the aftermath of Hurricane Katrina.

118.    Alternatively, the RICO enterprise here is comprised of an association-in-fact of all unnamed co-conspirators and the defendants—"Members of the Enterprise." The Members of the Enterprise include each of the defendants herein, as well as all other Insurers that benefitted from the scheme to reduce liability in the Insurance Litigation, and all other employees, directors, agents, brokers, or representatives of Morgan Stanley, PPF, Lloyd's, and the remaining Insurers that knowingly enabled the conduct of the Scheme as more fully detailed below.

119.    While the defendants participated in the Enterprise and were a part of it, the defendants also have an existence separate and distinct from the Enterprise.

120.    The defendants maintained an interest in and control of the Enterprise and also conducted or participated in the conduct of the Enterprise's affairs through a pattern of racketeering activity.

121.    The defendants' control and participation in the Enterprise were necessary for the successful operation of the defendants' scheme and pattern of racketeering activity as described herein.

### *The RICO Defendant Person*

122.    Morgan Stanley was employed by and/or associated with Safeguard in that, at all relevant times, Morgan Stanley was delegated the authority to negotiate Katrina-related insurance claims

32

on behalf of Safeguard pursuant to § 9.07 of the LLC Agreement, and Morgan Stanley managed and controlled PPF, a member of Safeguard holding approximately 95% ownership in Safeguard.

*The Pattern of Racketeering Activity*

123.    The pattern of racketeering activity in which Morgan Stanley engaged was closed-ended and began in or about December 2005 (when Morgan Stanley was delegated the authority to, and thus took control of, Safeguard's negotiations with respect to Safeguard's insurance claims arising out of the damage caused by Hurricane Katrina) and ended in October 2012, when Morgan Stanley, after succeeding in obtaining full control over Safeguard indirectly through PPF, which Morgan Stanley managed and controlled, caused PPF to reach a settlement of the Insurance Litigation with the Insurers for substantially less than the Insurers' potential exposure. The pattern of racketeering activity thus lasted for almost seven years.

124.    In sum and substance, the pattern of racketeering activity proceeded as follows. Morgan Stanley was aware that the Insurers had significant exposure as a result of the devastating effects of Hurricane Katrina on Safeguard's business. Morgan Stanley made numerous false representations and promises to the BCR parties beginning in or about December 2005 in which Morgan Stanley indicated that it would pursue the Katrina-related insurance claims in good faith while the BCR parties continued to work to rejuvenate Safeguard's business. In reality, however, Morgan Stanley used the authority delegated to it to advance its interests at the expense of the BCR parties. In effect, Morgan Stanley acted as a saboteur as it sought to minimize the Katrina-related insurance claim that it represented it would vigorously pursue.

125.    Morgan Stanley was aware that the excess Insurers, including Lloyd's, were obligated to cover losses resulting from not only real and personal property damage but also from lost gross revenues and business development opportunities as a result of Hurricane Katrina. Safeguard's

claim for lost gross revenues and business development opportunities was "conservative[ly]" estimated by Morgan Stanley to be worth between $270 and $280 million, and was likely worth in excess of $350 million.

126.   Morgan Stanley, however, was hopelessly conflicted from the outset of its receipt of delegated authority to pursue the Katrina-related insurance claims. Morgan Stanley had and continues to have ongoing investment banking relationships with Lloyd's and the other Insurers that Morgan Stanley sought to protect, as well as insurance placements with Lloyd's and the other Insurers that provided coverage for the $36 billion in real estate assets managed by Morgan Stanley. In contrast to these valuable relationships, Morgan Stanley stood to gain relatively little from successful prosecution of Safeguard's Katrina-related insurance claims. Under the LLC Agreement Safeguard served as a pass-through entity with cash flows distributed quarterly, and with the BCR parties entitled to a disproportionately high portion of any distribution of a $270–$350 million insurance recovery despite the BCR parties' relatively small ownership stake in Safeguard under the "waterfall" provision in § 7.02 of the LLC Agreement. Morgan Stanley had no direct equity interest in Safeguard and thus stood to gain nothing directly from an insurance recovery, no matter how large. PPF, which was under Morgan Stanley's control, stood to gain a disproportionately small amount of insurance proceeds under the "waterfall" distribution arrangement agreed to by PPF and the BCR parties. Indeed, as Mr. Brown admitted to Mr. Roch, Morgan Stanley viewed Safeguard's insurance claim as nothing more than a "wealth transfer" from Morgan Stanley to the members of Safeguard, with BCR obtaining a windfall as a result of the "waterfall" provisions of the LLC Agreement.

127.   Instead of seeking to obtain full value for the Katrina-related insurance claims, Morgan Stanley sought to devalue the claims and in fact actively worked with its supposed adversary

Lloyd's in an attempt to limit the latter's exposure. Among other things, Morgan Stanley initially refused to initiate litigation to pursue the Katrina-related insurance claims, shared confidential and privileged information with Lloyd's regarding Safeguard's litigation strategy, ███████ ██████ prior to sharing them with the BCR parties to make the insurance claims appear more limited than they actually were, made misrepresentations to Safeguard's litigation counsel regarding the flow of information between Morgan Stanley and Lloyd's, and actively strategized regarding methods to obtain "control" of, or otherwise rein in, BCR in order to prevent the zealous pursuit of the insurance proceeds.

128.     Ultimately, Morgan Stanley realized that it could accomplish two goals by undermining the Katrina-related insurance claims—Morgan Stanley could preserve its relationships with Lloyd's and the other Insurers while also obtaining full control over Safeguard. In particular, by helping to delay payment of the Katrina-related claims and by working to minimize the amount that would be paid on those claims, Morgan Stanley could deprive the BCR parties of the cash flows to which they were entitled and could seize upon the Buy/Sell clause in the LLC Agreement to enable PPF to take full control of Safeguard.

129.     Even after Morgan Stanley's scheme to obtain control over Safeguard succeeded in July 2009, Morgan Stanley's pattern of racketeering activity continued, as it tried to manipulate discussions relating to the settlement of insurance claims by three separate entities for which Mr. Roch was the authorized representative in order to obtain a release of the BCR parties' claims against Morgan Stanley for its blatant conflicts of interest and malfeasance as asserted herein.

130.     In particular, Mr. Roch was the authorized representative for Safeguard Thirteen Partners L.P., Safeguard Fourteen Partners L.P., and Safeguard Fifteen LLC (the "Louisiana Safeguard Entities"), all of which had separate claims against the Insurers arising out of and related to

damages sustained as a result of Hurricane Katrina. When Mr. Roch requested access to Sher Garner's litigation file on July 28, 2011 to evaluate a proposed settlement of the Louisiana Safeguard Entities' claims, Safeguard (by then under the control of Morgan Stanley) directed Mr. Roch to speak to in-house counsel at Morgan Stanley rather than the Louisiana Safeguard Entities' litigation counsel at Sher Garner.

131.    In response, Mr. Roch wrote letters to both Safeguard and Sher Garner explicitly referencing the BCR parties' claims against Morgan Stanley, PPF, and Lloyd's (which were set to be re-filed after the conclusion of the Insurance Litigation) and indicating that it was legally and ethically improper to purport to require Mr. Roch to speak with Morgan Stanley's in-house counsel to obtain an update regarding the status of the Louisiana Safeguard Entities' insurance claims.

132.    Ultimately, to avert the conflict between the Louisiana Safeguard Entities and the then-Morgan Stanley-controlled Safeguard, the parties agreed that the Louisiana Safeguard Entities would assign their claims to Safeguard and provide a release in exchange for a cash payment. Morgan Stanley, clearly aware of the BCR parties' pending claims, duplicitously attempted to expand the release to cover the BCR parties' claims against Morgan Stanley and the Insurers.

133.    The schemes orchestrated by Morgan Stanley were accomplished through numerous predicate acts of wire fraud within the meaning of 18 U.S.C. § 1343 as alleged herein. In particular, Morgan Stanley advanced its schemes to undermine the Katrina-related insurance claims and to gain control of Safeguard for PPF, contrary to its promises and representations and through various material misrepresentations and omissions, by communicating through the wires, or by engaging in actions rendering the subsequent use of the wires foreseeable, including

Morgan Stanley's use of its insurance broker, AON, as a go-between to funnel information to Lloyd's and the other Insurers.

134.    Morgan Stanley's predicate acts of wire fraud include, but are not limited to, the following:

(a) On May 7, 2007, ███████████████████████████████████

███████████████████████████████████████████████

████████████████████████████

(b) In or around September 2007, Morgan Stanley communicated to AON that the BCR parties had threatened suit to preserve Safeguard's Katrina-related insurance claims and to protect the BCR parties' rights under the LLC Agreement, after which the PPF representatives on Safeguard's management committee relented from their previous refusal to authorize suit against the Insurers and authorized such suit on August 27, 2007. AON, in turn, emailed personnel at Lloyd's on September 25, 2007 informing Lloyd's that "Safeguard … sued on their own to protect their right to sue." It was foreseeable to Morgan Stanley that AON would use the wires to communicate with Lloyd's regarding Safeguard's ability to move forward with litigation in pursuit of the Katrina-related insurance claims.

(c) On September 28, 2007, Morgan Stanley internal counsel Dina DeFalco telephoned Safeguard's outside counsel for purposes of the Insurance Litigation to scold him from communicating to the Insurers' counsel that Safeguard's business interruption claim could have exceeded $180-$200 million and stated that Morgan Stanley had "other business interests" with the Insurers that could be threatened by pursuit of such a large claim.

(d) In or around October 2007, Morgan Stanley advised AON that Morgan Stanley's internal counsel had "advised local counsel to restrain themselves" in respect of the size of the insurance claims. AON personnel subsequently emailed each other regarding whether Morgan Stanley had been successful "in restraining their partner," i.e., the BCR parties.

(e) On October 15, 2007, Morgan Stanley emailed AON and noted that the Insurers' underwriters were "questioning Morgan Stanley's control over joint venture partners," which "may hinder [the Insurers'] participation at renewal" of Morgan Stanley's policies.

(f) On October 30, 2007, AON personnel emailed each other noting that Lloyd's was concerned that Morgan Stanley did not "have control over their partner … [and] that if no positive movement is made soon, a recommendation may go from claims to underwriting regarding the future viability of underwriting this risk."

(g) On November 4, 2007, AON relayed the concerns expressed by Lloyd's to Morgan Stanley in no uncertain terms, indicating the need to take "decisive action" regarding the Katrina-related claims or else face the prospect of "markets not wanting to participate in renewal. Some markets have expressed concern over whether or not MS has control over Safeguard in this matter."

(h) On January 22, 2008, Mr. Self of Lloyd's sent an email to Andrew Mitchell confirming the details of his meeting with Morgan Stanley's Mr. Plummer, including that Morgan Stanley wished to resolve the Katrina-related claims "as soon and as amicably as possible," in light of the "uncertainty" that the litigation was creating for Morgan Stanley's insurance renewals. To that end, Morgan Stanley agreed to provide

information to Lloyd's regarding Safeguard's strategizing for the insurance litigation, including a confidential report from a consulting expert, and further advised Lloyd's that the employee who valued the insurance claims at $150 million had been terminated.

(i)  In the same January 22, 2008 meeting between Morgan Stanley and Lloyd's, Mr. Plummer of Morgan Stanley agreed "to act as liaison on [the Insurance Litigation] matter, and will assist Underwriters in obtaining any documentation required, subject to [Morgan Stanley's] in-house counsel's review and approval." Notably, Morgan Stanley did not intend to—and in fact did not—seek the approval of its litigation counsel regarding the documents to be provided to the (theoretically adverse) Insurers.

(j)  On February 6, 2008, Lloyd's emailed AON and requested that Morgan Stanley provide "comments" regarding the amended petition in the Insurance Litigation in light of upcoming discussions regarding insurance renewals.

(k)  On February 22, 2008, Morgan Stanley emailed AON and Lloyd's with details of the membership of the internal "task force" handling the Safeguard litigation, identifying non-testifying forensic accountants working on the claims on behalf of Safeguard, and describing the status of internal document review related to the Katrina claims.

(l)  On April 21, 2008, Safeguard's litigation counsel emailed Morgan Stanley's internal counsel, Ms. DeFalco, to raise concerns regarding the Insurers' efforts to obtain substantive information regarding the Katrina insurance litigation from Morgan Stanley and to suggest sending a cease-and-desist email to the Insurers. Morgan Stanley, despite being well aware of the free flow of information between itself and

the Insurers, responded: "I would not send the email. It is quite possible that one hand is not talking to the other at the insurers and I don't think we should accuse them of something we are not sure they are doing. I am not being naïve here, but I don't want to tip the boat unless we have to. We have relationships to protect on the investment banking side, as well as policies to continue renewing… ."

(m) On January 26, 2009, after Safeguard's litigation counsel had secured key deposition testimony from Lloyd's representatives confirming that coverage for the Katrina-related losses included gross revenues from lost business opportunities (which both increased the Insurers' underlying exposure and provided a basis for a double-damages bad faith claim under Louisiana law), Safeguard's litigation counsel suggested amending the company's petition to include a bad faith claim. Morgan Stanley's Dina Romani (formerly Dina DeFalco) replied via email, "absolutely no," to the proposal to add a bad faith claim, even though Ms. Romani recognized the value of a bad faith claim at least as negotiating leverage.

(n) On June 16, 2008, AON emailed Morgan Stanley regarding Munich Re's request that it be replaced as a participant on Morgan Stanley's excess policy in light of the amount of the Safeguard Katrina-related claim.

(o) On February 2, 2009, Mr. Brown emailed representatives of the BCR parties, Safeguard's litigation counsel, and others that "he will have a very hard time on the witness stand" defending revised damages calculations performed by Safeguard's testifying expert that reflected the deposition testimony of various Insurers regarding the scope of coverage provided by the excess policy.

(p) On February 5, 2009, Morgan Stanley's Randy Forth emailed representatives of the BCR parties, Safeguard's litigation counsel, and others that he was "strongly opposed" with an approach that updated the damages calculations to conform to the Insurers' deposition testimony.

(q) On February 5, 2009, Ms. Romani emailed representatives of the BCR parties, Safeguard's litigation counsel, and others that there was "no logical way" to defend the revised damages calculations notwithstanding the Insurers' deposition testimony.

(r) On May 19, 2009, ████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████ Morgan Stanley actively withheld the additional Plummer emails from Mr. Roch.

(s) On July 28, 2009, ████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████

41

████████████████████████████████████

██████████

(t)  On September 16, 2011, Morgan Stanley caused Safeguard to send a letter via e-mail and overnight courier to Mr. Roch, among others, related to a proposed settlement of the Louisiana Safeguard Entities' insurance claims.  The September 16, 2011 letter denied the Louisiana Safeguard Entities' request for access to the Insurance Litigation file and requested that the Louisiana Safeguard Entities direct "inquiries regarding the status of the prosecution and settlement of the case" to Ms. Romani of Morgan Stanley, rather than the Louisiana Safeguard Entities' litigation counsel.  In response, on September 19, 2011, Mr. Roch sent two letters (one to Safeguard and the other to Mr. Garner, Safeguard's litigation counsel) advising that it was legally and ethically improper to deny access to the litigation file and to require Mr. Roch to communicate with Morgan Stanley in light of the BCR parties' claims against Morgan Stanley related to the Insurance Litigation.

(u)  On October 26, 2011, Safeguard forwarded via e-mail a revised version of the assignment and release agreement between the Louisiana Safeguard Entities and Safeguard. The "track changes" metadata included with the October 26, 2011 revisions indicated that the revisions had been made by computer user "ddefalco," who is on information and belief Morgan Stanley's Dina Romani (f/k/a Dina DeFalco). The Safeguard/Morgan Stanley revisions attempted to sweep the BCR parties' claims against Morgan Stanley within the scope of the otherwise unrelated release by the Louisiana Safeguard Entities.

135.    Morgan Stanley's pattern of racketeering activity and schemes as alleged herein were designed to minimize and delay any recovery of insurance proceeds as a result of the Insurance Litigation. In so doing, Morgan Stanley was able to protect its investment banking and insurance relationships with the Insurers, without regard for the interests of Safeguard or the BCR parties.

136.    Morgan Stanley was also able to use its deliberate mismanagement of the Insurance Litigation to obtain control of Safeguard through PPF. By depriving the BCR parties of the insurance proceeds, sabotaging the value of the Insurance Litigation, misrepresenting to the BCR parties that Morgan Stanley did not intend to cause the invocation of the Buy/Sell provision, and delaying the resolution of the Insurance Litigation and thereby increasing costs that were borne through "cash calls" to the BCR parties, Morgan Stanley effectively eliminated the BCR parties' ability to purchase Safeguard, clearing the way for the Morgan Stanley-managed PPF to acquire control on July 30, 2009.

137.    The BCR parties were damaged in their business or property as a result of Morgan Stanley's pattern of racketeering activity and underlying schemes alleged herein. The damages thus suffered by the BCR parties include, without limitation, loss of the financial benefits that the BCR parties would have received from a resolution of the Insurance Litigation but for the delay and corruption of that litigation caused by Morgan Stanley's misconduct, the incurring of additional costs (including capital investments) as a result of that delay and interference, and the financial losses the BCR parties suffered as a result of the bad faith actions taken by Morgan Stanley in connection with the invocation of the Buy/Sell provision.

## SECOND CAUSE OF ACTION—LLOYD'S VIOLATION OF THE RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT, 18 U.S.C. § 1962(d)

138.    The BCR parties adopt by reference and incorporate all previous allegations in all preceding paragraphs as if fully set forth herein.

139.     Defendant Lloyd's conspired and agreed to abet, assist, and further Morgan Stanley's pattern of racketeering activity alleged above.

140.     Lloyd's was aware of the goal of the conspiracy—to minimize the amount paid as a result of the Katrina-related claims in the Insurance Litigation.

141.     Lloyd's was aware that Morgan Stanley had been delegated the authority to act on behalf of Safeguard in respect of the Katrina-related claims.

142.     Lloyd's was aware that Morgan Stanley was sharing information related to the Insurance Litigation that was privileged, confidential, and not for distribution to an adverse party such as Lloyd's.

143.     Lloyd's encouraged Morgan Stanley's pattern of racketeering activity by seeking to leverage Lloyd's other relationships with Morgan Stanley to encourage Morgan Stanley to delay the Insurance Litigation, to settle the litigation on the type of "amicable" terms that would preserve Lloyd's business relationships with Morgan Stanley, and to gain "control" of Safeguard.

144.     As a result of Lloyd's conspiracy with Morgan Stanley to gain control of Safeguard, and to conduct the affairs of Safeguard, through a pattern of racketeering activity, the BCR parties were injured in their business and/or property as alleged herein.

### THIRD CAUSE OF ACTION—THE DEFENDANTS' CIVIL VIOLATION OF THE LOUISIANA RACKETEERING ACT, La. R.S. § 15:1351, *et seq.*

145.     The BCR parties adopt by reference and incorporate all previous allegations in all preceding paragraphs as if fully set forth herein.

146.     The existence of the Enterprise, pattern of racketeering activity, and scheme alleged herein also supports a claim for recovery under the Louisiana Racketeering Act, La. R.S. § 15:1351, *et seq.*.

147.    The defendants and those employed by or associated with the Enterprise have conducted the affairs of the Enterprise through a pattern of racketeering activity in violation of La. R.S. § 15:1353(a), (b), and (c), and have conspired to violate those provisions in violation of § 15:1353(d) by seeking through their scheme to control Safeguard by engaging in activities designed to deprive the BCR parties of ownership and/or control of Safeguard and the Insurance Litigation.

148.    With respect to each of the activities comprising the scheme alleged herein, the Enterprise sought to aid and abet and actually did aid and abet a set of transactions to violate La. R.S. §§ 15:1353(a), (b), and (c), comprising predicate acts in violation specifically of (And without limitation to) La. R.S. §§ 14:67. *See* La. R.S. § 15:1352(A)(10).

149.    As a result of the defendants' conspiracy to gain ownership and control of Safeguard and the Insurance Litigation away from the BCR parties by means of the fraudulent conduct described herein, and to conduct the affairs of Safeguard, through a pattern of racketeering activity in violation of La. R.S. § 15:1353, the BCR parties were injured in their business and/or property as alleged herein. Therefore, the BCR parties are entitled to recover three times their actual damages sustained, plus attorneys' fees and costs of investigation and litigation reasonably incurred, pursuant to La. R.S. § 15:1356(E).

## FOURTH CAUSE OF ACTION—BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING

150.    The BCR parties adopt by reference and incorporate all previous allegations in all preceding paragraphs as if fully set forth herein.

151.    As a result of entering the LLC Agreement, PPF owed contractual and fiduciary duties to the BCR parties, its fellow members in Safeguard, including the duty to prevent its agent Morgan Stanley from acting on behalf of PPF in bad faith and unfairly toward the BCR parties.

152.    Morgan Stanley breached its duties by causing PPF to invoke the Buy/Sell, and by creating circumstances that prevented the BCR parties from becoming "Purchasing Members" under the Buy/Sell provision, for the purpose of removing the BCR parties from Safeguard, gaining control over the Insurance Litigation, and excluding the BCR parties from any participation in the future proceeds of Safeguard, including but not limited to proceeds from recovery in the Insurance Litigation.

153.    Further, Morgan Stanley controlled all actions of two members of Safeguard's Management Committee and agreed to act as the agent of Safeguard and its members in pursuing the Katrina insurance claim against the Insurers.

154.    Among other things, Morgan Stanley owed duties to negotiate the highest amount of proceeds possible from Safeguard's insurers to compensate the members for damages incurred as a result of Hurricane Katrina, and to do so as expeditiously as reasonably possible.

155.    Similarly, Morgan Stanley owed duties to all of the members of Safeguard, including the BCR parties, to protect (and not to disclose) their litigation strategies in the Insurance Litigation brought against the Insurers.

156.    Morgan Stanley breached its duties to the BCR parties by failing for self-interested and disloyal reasons to make reasonable efforts to settle with the Insurers for an amount that would compensate Safeguard and its members for damages incurred as a result of Hurricane Katrina and causing the BCR parties to incur costly legal fees to litigate against the Insurers that would have been unnecessary had Morgan Stanley properly fulfilled its duties. Compounding this failure, Morgan Stanley delayed Safeguard's filing of the Insurance Litigation for two years, due to its failure to comply with its duties to act in the best interest of Safeguard and its members, by

acting to favor its own interests at the expense and to the detriment of Safeguard's members, which further delayed and frustrated a timely resolution of these claims.

157.   Morgan Stanley breached its duties to the BCR parties by sharing litigation strategies and other confidential and privileged information in the Insurance Litigation with the Insurers and by committing the other acts and/or omissions set forth above.

158.   Lloyd's also has the duty to its insureds, including Safeguard and its members, to act in good faith in payment of claims made against the coverage it provides.

159.   Lloyd's breached this duty and acted in bad faith through each of three courses of conduct: (a) failing until compelled to do so during the January 2009 depositions to disclose to Safeguard that the full scope of available coverage on the business interruption claims extended to gross revenues of the lost developments; (b) ignoring the barrier between claims and underwriting by threatening to allow Safeguard's pursuit of its right in the Insurance Litigation to impact underwriting of Morgan Stanley's insurance renewal, knowing that this would cause Morgan Stanley to undermine Safeguard's position in the Insurance Litigation; and (c) seeking and making use of confidential information regarding Safeguard's litigation strategy in the Insurance Litigation.

160.   Morgan Stanley had independent sources of duty to the BCR parties under the express invocation of the good faith duty of "Third Parties" under § 9.07 of the LLC Agreement.

161.   Morgan Stanley also had fiduciary and good faith duties to the BCR parties through its control over two of the Safeguard Management Committee members.

162.   Morgan Stanley's management actions in procuring insurance coverage and its other actions related to insurance issues on behalf of Safeguard and its members as set forth herein were within the professional actions denominated in § 9.07 of the LLC Agreement, and were

47

also governed by its duties arising from control of half of the Management Committee of Safeguard.

163.    As a result of Morgan Stanley's and Lloyd's conduct as set forth herein, the BCR parties have suffered injury. Those injuries include, without limitation, loss of the financial benefits that the BCR parties would have received from a resolution of the Insurance Litigation as quarterly distributions but for the delay and corruption of that litigation caused by the defendants' misconduct, the incurring of additional costs (including capital investments) as a result of that delay and interference, and the financial losses the BCR parties suffered as a result of the bad faith actions taken by Morgan Stanley and Mr. Brown in connection with the invocation of the Buy/Sell provision. The BCR parties' damages include but are not limited to the value the BCR parties would have received—either through a Buy/Sell transaction or as quarterly distributions as a full or part member of Safeguard—from the Insurance Litigation absent the defendants' actions to undermine the value of that litigation; the value to the BCR parties of maintaining control of and ownership interest in Safeguard absent the bad faith actions of Morgan Stanley and Mr. Brown to cause the Buy/Sell to occur to serve Morgan Stanley's self-interested reasons; and/or the BCR parties' loss of the ability to be a "Purchasing Member" of Safeguard and thereby be entitles to all future distributions from Safeguard.

164.    The BCR parties' entitlement to proceeds under the LLC Agreement were disproportionate to their equity ownership interest, such that they would have been entitled to receive far higher percentages of distribution of such proceeds than their percentage of the ownership interest, making them uniquely entitled to pursue these claims.

## FIFTH CAUSE OF ACTION—TORTIOUS INTERFERENCE WITH CONTRACT

165.   The BCR parties adopt by reference and incorporate all previous allegations in all preceding paragraphs as if fully set forth herein.

166.   At all pertinent times, Morgan Stanley and Lloyd's were aware of the terms of the LLC Agreement.

167.   Morgan Stanley and Lloyd's induced PPF and Mr. Brown to breach the LLC Agreement by creating circumstances that prevented the BCR parties from becoming "Purchasing Members," for the purpose of removing the BCR parties from Safeguard Storage, gaining control of the Insurance Litigation, receiving the proceeds from the Insurance Litigation as quarterly distributions under the LLC Agreement and excluding the BCR parties from any participation in the future proceeds of Safeguard, including but not limited to proceeds from recovery in the Insurance Litigation.

168.   Morgan Stanley also induced PPF and Mr. Brown to breach the LLC Agreement by failing for self-interested and disloyal reasons to make reasonable efforts to settle with the Insurers for an amount that would compensate Safeguard and its members for damages incurred as a result of Hurricane Katrina and causing the BCR parties to incur costly legal fees to litigate against the Insurers that would have been unnecessary had Morgan Stanley not tortiously interfered with the LLC Agreement. Furthermore, Morgan Stanley and Lloyd's induced PPF and Mr. Brown to breach the LLC Agreement by delaying Safeguard's filing of the Insurance Litigation for two years, and taking other actions that further delayed and frustrated a timely resolution of these claims.

169.   Morgan Stanley further induced Mr. Brown and PPF to breach their duties to the BCR parties under the LLC Agreement by sharing litigation strategies and other confidential and

privileged information in the Insurance Litigation with the Insurers and by committing the other acts and/or omissions set forth above.

170.    Lloyd's also induced Mr. Brown and PPF to breach their duties under the LLC Agreement by: (a) failing until compelled to do so during the January 2009 depositions to disclose to Safeguard that the full scope of available coverage on the business interruption claims extended to gross revenues of the lost developments; (b) ignoring the barrier between claims and underwriting by threatening to allow Safeguard's pursuit of its right in the Insurance Litigation to impact underwriting of Morgan Stanley's insurance renewal, knowing that this would cause Morgan Stanley to undermine Safeguard's position in the Insurance Litigation; and (c) seeking and making use of confidential information regarding Safeguard's litigation strategy in the Insurance Litigation.

171.    As a proximate result of Morgan Stanley's and Lloyd's conduct as set forth herein, the BCR parties have suffered injury. Those injuries include, without limitation, loss of the financial benefits that the BCR parties would have received as quarterly distributions from a resolution of the Insurance Litigation but for the delay and corruption of that litigation caused by the defendants' misconduct, the incurring of additional costs (including capital investments) as a result of that delay and interference, and the financial losses the BCR parties suffered as a result of the bad faith actions taken by Morgan Stanley in connection with the invocation of the Buy/Sell provision. The BCR parties' damages include but are not limited to the value the BCR parties would have received—either through a Buy/Sell transaction or as quarterly distributions as a full or part member of Safeguard—from the Insurance Litigation absent the defendants' actions to undermine the value of that litigation; the value to the BCR parties of maintaining control of and ownership interest in Safeguard absent the bad faith actions of Morgan Stanley to

cause the Buy/Sell to occur to serve Morgan Stanley's self-interested reasons; and/or the BCR parties' loss of the ability to be a "Purchasing Member" of Safeguard and thereby be entitled to all future distributions from Safeguard.

172. The BCR parties' entitlement to proceeds under the LLC Agreement were disproportionate to their equity ownership interest, such that they would have been entitled to receive far higher percentages of distribution of such proceeds than their percentage of the ownership interest, making them uniquely entitled to pursue these claims.

## SIXTH CAUSE OF ACTION—BREACH OF FIDUCIARY DUTY

173. The BCR parties adopt by reference and incorporate all previous allegations in all preceding paragraphs as if fully set forth herein.

174. PPF owed a fiduciary duty to the BCR parties, its Safeguard co-members, with regard to the control it exercised over aspects of Safeguard.

175. Because Morgan Stanley wholly owns and controls Prime Property Fund, the sole member of PPF, it owes the same duties to the BCR parties as PPF.

176. Also, as the managing agent of PPF, a co-member in Safeguard, and as controller of two members of Safeguard's Management Committee, Morgan Stanley independently owed the BCR parties fiduciary duties of loyalty and care.

177. Among other things, Morgan Stanley had a fiduciary duty to the BCR parties to negotiate the highest possible amount of proceeds from the Insurers to compensate the Safeguard members for damages incurred as a result of Hurricane Katrina.

178. Morgan Stanley also had a fiduciary duty to the BCR parties to protect (and certainly not to disclose) Safeguard's litigation strategies in the Insurance Litigation.

179.    Morgan Stanley breached its fiduciary duty to the BCR parties by failing for self-interested and disloyal reasons to make reasonable efforts to settle with the Insurers for an amount that would compensate Safeguard and its members for damages incurred as a result of Hurricane Katrina and causing the BCR parties to pay costly legal fees to litigate against the Insurers that would have been unnecessary had Morgan Stanley properly fulfilled its duties. Compounding this failure, Morgan Stanley delayed Safeguard's filing of litigation against the Insurers for two years, due to Morgan Stanley's disloyal conduct in failing to comply with its duties to Safeguard and its members by acting to favor its own interests at the expense and to the detriment of the BCR parties, which further delayed and frustrated a timely resolution of the claims in the Insurance Litigation.

180.    Morgan Stanley breached its fiduciary duty to the BCR parties by sharing litigation strategies and other confidential and privileged information in the Insurance Litigation with the Insurers.

181.    As a Management Committee member of Safeguard, Mr. Brown owed fiduciary duties to Safeguard's members, including the BCR parties, to act with loyalty to the members' interests and not to instead promote the interests of Morgan Stanley where those interests conflicted.

182.    Mr. Brown admitted that he did not respect, or so much as consider, the divisions in his roles with Safeguard, PPF, and Morgan Stanley.

183.    Mr. Brown breached his fiduciary duties to the BCR parties by acting to preserve Morgan Stanley's interests at the expense of the BCR parties' interests, by misrepresenting the intentions of Morgan Stanley and PPF regarding the potential for a buy/sell transaction, by causing PPF to take actions rendering impossible the BCR parties' ability to act as a "Purchasing Member," and otherwise.

184.    Lloyd's had fiduciary duties to Safeguard and its members as the insurer of Safeguard.

185.    Lloyd's breached its fiduciary duties to Safeguard and the BCR parties by not paying Safeguard's claims in good faith recognition of the expansive business interruption coverage applicable to Safeguard's losses, and by deliberately commingling underwriting considerations with claims handling.

186.    As a result of the defendants' breaches of fiduciary duties owed to the BCR parties, the BCR parties have uniquely suffered the loss of millions of dollars, in a specific amount to be determined at trial, due to the undermining of Safeguard's settlement and litigation position in the Insurance Litigation through, *inter alia*, the sharing of confidential litigation information, the refusal to seek bad faith damages against all of the Insurers, the initial concealment of the availability of expansive business-interruption coverage, the delay in and failure to seek the full value of Safeguard's claims, and the stripping of control over the litigation from the BCR parties. The BCR parties' loss is unique to it in that, pursuant to the waterfall provision of the LLC Agreement, the BCR parties' percentage of proceeds of the Insurance Litigation would increase as the value of those proceeds increased, while PPF's percentage of those proceeds would decrease, all substantially disproportionate to the parties' ownership interests in Safeguard.

187.    Additionally, the BCR parties have suffered the loss of control over and ownership interest in Safeguard, proximately caused by the breach of fiduciary duty by Morgan Stanley, Mr. Brown, and PPF, resulting from the loss of the BCR parties' ability to be a "Purchasing Member" of Safeguard Storage, and the loss of all future proceeds from Safeguard, including but not limited to the proceeds of the Insurance Litigation.

## SEVENTH CAUSE OF ACTION—AIDING AND ABETTING
## BREACH OF FIDUCIARY DUTY

188.    The BCR parties adopt by reference and incorporate all previous allegations in all preceding paragraphs as if fully set forth herein.

189.    PPF, as the majority member of Safeguard, owed fiduciary and contractual duties to the BCR parties, its co-members in Safeguard, including the implied covenant to act in good faith and with fair dealing.

190.    Through the conduct alleged above, PPF has breached its fiduciary and contractual duties and duty to act in good faith and with fair dealing by invoking the Buy/Sell and conducting itself during the Buy/Sell Election period in a manner to prevent the BCR parties from freely choosing to elect to be the "Purchasing Member," which precluded the BCR parties, the only members of Safeguard without a conflict of interest with regard to the relationship with Lloyd's and the Insurers, from prosecuting the Insurance Litigation timely, aggressively, and effectively.

191.    As set forth above, Morgan Stanley in some instances acted as agent for PPF, and controlled two members of Safeguard's Management Committee. Through that control, Morgan Stanley directed PPF and knowingly participated in, and wrongfully aided and abetted, PPF's breach of fiduciary duties under the Safeguard Storage LLC Agreement and the implied contractual covenant of good faith and fair dealing.

192.    As set forth above, Lloyd's induced Morgan Stanley to engage in actions to breach fiduciary duties and to cause PPF to breach its fiduciary duties under the LLC Agreement and the implied contractual covenant of good faith and fair dealing, through Lloyd's actions to gain confidential litigation information about the Insurance Litigation and through its threats to not renew insurance coverage for Morgan Stanley's properties if Morgan Stanley did not gain control over Safeguard.

193.   As a result of the defendants' conduct as set forth herein, the BCR parties have suffered injury as set forth herein and in an amount to be proved at trial.

## EIGHTH CAUSE OF ACTION—CIVIL CONSPIRACY

194.   The BCR parties adopt by reference and incorporate all previous allegations in all preceding paragraphs as if fully set forth herein.

195.   Through their actions and inactions, more fully described herein, Morgan Stanley and Lloyd's knowingly and intentionally acted in concert with each other to undermine the value of the recovery in the Insurance Litigation, and to wrongfully dislodge the BCR parties from any control over or ownership interest in Safeguard, to wrongfully disable the BCR parties from becoming "Purchasing Members" of Safeguard, and/or to wrongfully thwart the BCR parties from receiving any profits from Safeguard, including but not limited to proceeds of the Insurance Litigation, much less the highest amount of proceeds possible from the Insurers to compensate Safeguard's members for damages incurred as a result of Hurricane Katrina.

196.   Through their actions and inactions, more fully described herein, Morgan Stanley and Lloyd's knowingly and intentionally acted in concert with each other to breach the fiduciary duties they owed to Safeguard and its members—disproportionately to the BCR parties—by, among other things, sharing Safeguard's legal strategies and other confidential and privileged information in the Insurance Litigation, and causing the bad faith ouster of the BCR parties from control over Safeguard and the Insurance Litigation through methods including but not limited to misrepresenting the intentions of Morgan Stanley and PPF with regard to the invocation of the Buy/Sell provision.

197.   In furtherance of this conspiracy and in response to the urging of Lloyd's and other Insurers, Morgan Stanley took actions to invoke the Buy/Sell provision as described above.

198.    The defendants acted as described herein according to a commonly understood and accepted plan of action, all for the purposes of preventing the BCR parties from having any control over or ownership interest in Safeguard, including but not limited to any interest in the attainment of the proper amount of insurance proceeds possible from Insurers to compensate the members of Safeguard for damages incurred as a result of Hurricane Katrina—proceeds to which the BCR parties would have been entitled in a percentage disproportionate to their equity ownership interest in Safeguard.

199.    There was a meeting of the minds between and among the defendants to commit the unlawful acts alleged herein. The conspiracy to commit these intentional and willful overt acts, proximately caused and continues to cause damages to the BCR parties as set forth herein.

200.    As a result of the conduct of the defendants, the BCR parties have suffered injury to their business and property and have incurred actual damages and losses in an amount to be proven at trial.

## NINTH CAUSE OF ACTION—DETRIMENTAL RELIANCE

201.    The BCR parties adopt by reference and incorporate all previous allegations in all preceding paragraphs as if fully set forth herein.

202.    As detailed herein, Morgan Stanley personnel—specifically Mr. Brown and John Kessler—represented to the BCR parties that Morgan Stanley would not cause PPF to invoke the Buy/Sell provision, and encouraged the BCR parties to maintain their focus on developing and pursuing the Insurance Litigation rather than exerting efforts to respond to any imminent Buy/Sell offer.

203.    The BCR parties reasonably relied on Morgan Stanley's representations and took no actions to strengthen their position and ability to become "Purchasing Members" under the

Buy/Sell provision in the event of a Buy/Sell Notice, which actions they could have otherwise taken prior to the lawsuits and other onerous actions commenced by PPF and Morgan Stanley.

204.    In further reliance on Morgan Stanley's representations, the BCR parties determined not to enter into settlement negotiations with the Insurers below the $75 million layer of coverage. As a result, the claim in the Insurance Litigation remained a contingent asset, further rendering impossible the BCR parties' efforts to become the "Purchasing Members" under the Buy/Sell provision.

205.    As a result of the BCR parties' reasonable reliance on Morgan Stanley's representations, when Morgan Stanley took actions to invoke the Buy/Sell provision the BCR parties, did not receive the proceeds from the insurance litigation as quarterly distributions, were unable to respond by electing to be "Purchasing Members," and the BCR parties lost all control over or ownership interest in Safeguard, including any interest in future profits of Safeguard, including but not limited to proceeds from the Insurance Litigation.

206.    As proximately caused by the foregoing, Plaintiffs have been injured in an actual amount to be proven at trial, and should be awarded damages in accordance with the evidence, and as further described herein.

## TENTH CAUSE OF ACTION—UNJUST ENRICHMENT

207.    The BCR parties adopt by reference and incorporate all previous allegations in all preceding paragraphs as if fully set forth herein.

208.    Morgan Stanley and PPF unjustly enriched themselves by receiving, without justification, the settlement proceeds of the Insurance Litigation, as well as all other distributable revenue generated by Safeguard, unencumbered by ownership and waterfall distribution interests of the

BCR parties, as a result of creating circumstances that prevented the BCR parties from becoming "Purchasing Members" under the Buy/Sell provision.

209. Morgan Stanley and PPF also unjustly enriched themselves by receiving the proceeds from the settlement of the Insurance litigation by delaying, without justification, Safeguard's filing of the Insurance Litigation for two years, and taking actions, without justification and to the detriment of BCR to further delay and frustrate a timely resolution of the Insurance Litigation.

210. Morgan Stanley also unjustly enriched itself at the expense of the BCR parties by maintaining its investment banking relationships with the Insurers, and obtaining insurance renewals at lower rates, due to Morgan Stanley's efforts to take control of Safeguard from the BCR parties and to undermine and minimize the Katrina-related insurance claims.

211. Lloyd's was unjustly enriched at the expense of the BCR parties through its avoidance of its obligation to pay the Katrina-related insurance claims under the expansive excess policy that provided coverage for, without limitation, all gross revenues and business development opportunities lost as a result of Hurricane Katrina.

212. There is no adequate remedy at law for the unjust enrichment, at BCR's expense, of Morgan Stanley and Lloyd's.

**ELEVENTH CAUSE OF ACTION—LUTPA**

213. Plaintiffs adopt by reference and incorporate all previous allegations in all preceding paragraphs as if fully set forth herein.

214. The Louisiana Unfair Trade Practices and Consumer Protection Law, La. R.S. 51:1401, et seq. ("LUTPA"), prohibits unfair or deceptive methods, acts, or practices in trade or commerce.

215.     The defendants have collaborated amongst themselves, intentionally and in concert, to engage in unfair and deceptive trade practices for the purpose and with the effect of excluding the BCR parties from participating in the property management and self-storage business of Safeguard.

216.     As a direct consequence of the unlawful trade practices employed by the defendants, the BCR parties have been and continue to be damaged, including through loss of control over or ownership interest in Safeguard, with the attendant loss of revenues and profits from Safeguard, including but not limited to proceeds from the Insurance Litigation.

217.     As proximately caused by the foregoing, the BCR parties have been injured in an actual amount to be proven at trial, and should be awarded damages in accordance with the evidence, plus attorneys' fees and costs and all other damages to which they are entitled under LUTPA.

**WHEREFORE**, the BCR parties pray that, after due proceedings be had, there be judgment rendered herein in their favor and against the defendants, declaring Morgan Stanley and Lloyd's are to be liable and indebted to the BCR parties, jointly and *in solido*, for compensatory damages, trebled pursuant to RICO and/or the Louisiana Racketeering Act, and that all defendants are to be liable and indebted unto the BCR parties, jointly and *in solido*, for

    a. all damages as are just and reasonable under the circumstances,

    b.  judicial interest from the date of judicial demand;

    c. the award of costs, expenses and reasonable attorneys' fees in favor of the BCR parties and against the defendants to the fullest extent authorized by law; and

d.      such other and further relief which the Court deems necessary and proper at law and in equity and that may be just and reasonable under the circumstances of this matter.

Finally, the BCR parties demand that their claims be by jury trial.

Respectfully submitted,

/s/ Lynn E. Swanson

**GLADSTONE N. JONES, III (La. #22221)**
**LYNN E. SWANSON (La. #22650)**
**H.S. BARTLETT III (La. #26795)**
**CATHERINE E. LASKY (La. #28652)**
**KERRY MURPHY (La. #31382)**
**JONES, SWANSON, HUDDELL &**
      **GARRISON, L.L.C.**
601 Poydras Street, Suite 2655
New Orleans, Louisiana 70130
Telephone: (504) 523-2500
Telecopier: (504) 523-2508
**Counsel for BCR Safeguard Holding, L.L.C.,**
**JAC Safeguard Holding, L.L.C., and Safeguard**
**Development Group II, L.L.C.**