## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

**BCR SAFEGUARD HOLDING, L.L.C., et al.**      **CIVIL ACTION**

**VERSUS**      **NO. 13-0066**

**MORGAN STANLEY REAL ESTATE ADVISOR,**      **SECTION: "G"(1)**
**INC., et al.**

## ORDER AND REASONS

This litigation concerns a limited liability company that for approximately four years was jointly owned by Plaintiffs and one of the Defendants. Plaintiffs allege that Defendants engaged in a series of fraudulent actions designed to suppress the LLC's recovery of insurance proceeds after Hurricane Katrina and to wrest ownership of the LLC from Plaintiffs. Three pending motions are before the Court.

First, Plaintiffs BCR Safeguard Holding, L.L.C., JAC Safeguard Holding, L.L.C., and Safeguard Development Group II, L.L.C. have filed a "Motion to Dissolve Injunction."[1] In this motion, Plaintiffs urge that developments in a related state-court proceeding have altered the reasoning articulated in the Court's August 15, 2013 and December 12, 2013 orders enjoining Plaintiffs' use of certain privileged documents. Having considered the pending motion, the memoranda in support, the memoranda in opposition, the record, and the applicable law, the Court will grant the motion in part and deny the motion in part.

The two other pending motions are Defendants Morgan Stanley Real Estate Advisor, Inc.'s, PPF Safeguard, L.L.C.'s, and Scott Allen Brown's "Motion to Dismiss Amended Complaint"[2] and Defendant Lloyd's Underwriters' "Motion to Dismiss Amended Complaint for Damages."[3] Having

---

[1] Rec. Doc. 229.

[2] Rec. Doc. 186.

[3] Rec. Doc. 188.

considered the pending motions, the memoranda in support, the memoranda in opposition, the amended complaint, and the applicable law, and having taken judicial notice—where appropriate—of matters of public record, the Court will grant both motions.

## I. Background

### A.    Relationships Among the Parties

Plaintiffs in this action are BCR Safeguard Holding, L.L.C. ("BCR"), JAC Safeguard Holding, L.L.C. ("JAC"), and Safeguard Development Group II, L.L.C. ("SDG") (collectively, "Plaintiffs").   Plaintiffs were formed by Bruce C. Roch, Jr. ("Roch") and Jack A. Chaney ("Chaney") in order to own and operate Safeguard Storage Properties, LLC ("Safeguard").[4] Safeguard operates self-storage facilities in several states, including Louisiana.[5]

In 2005, Morgan Stanley became an investor in Safeguard through its affiliated company Defendant PPF Safeguard, L.L.C. ("PPF").[6] PPF is controlled by another Morgan Stanley affiliate, Defendant Morgan Stanley Real Estate Advisor, Inc. ("MSREA").[7] Pursuant to the Amended and Restated Limited Liability Company Agreement of Safeguard Storage Properties, LLC (the "LLC Agreement"), effective May 31, 2005, PPF became a member of Safeguard along with BCR, JAC, and SDG.[8] Under the LLC Agreement, PPF owned 94% of Safeguard; however, BCR was designated the "Administrative Member" in charge of day-to-day operations.[9] "Major Decisions," including the decision to bring suit on matters in excess of $250,000, required the unanimous

---

[4] Rec. Doc. 161 at p. 1.

[5] *Id.* at pp. 1–2, ¶ 10.

[6] *Id.* at pp. 1–2.

[7] *Id.* at ¶ 11.

[8] *Id.* at p. 2.

[9] *Id.*

approval of a four-person Management Committee, which included Defendant Scott Brown ("Brown"; collectively with PPF and MSREA, the "Morgan Stanley Defendants"), a Morgan Stanley employee.[10]

From May 31, 2005 until at least May 31, 2009, Roch and Chaney were senior executives at Safeguard and were responsible for the day-to-day management of the business. Roch was CEO and President throughout this period, and Chaney was COO until May 31, 2008 when he resigned.[11]

On May 14, 2009, PPF invoked a provision of the LLC Agreement that enabled it to offer to buy BCR's, JAC's, and SDG's interests in Safeguard,[12] and on July 31, 2009, PPF acquired 100% ownership of Safeguard.[13]

## B.    Hurricane Katrina Insurance Dispute

Plaintiffs allege that after the execution of the LLC Agreement, Morgan Stanley had the responsibility of placing Safeguard under its insurance program, which involved multiple insurers, including Defendant Lloyd's of London ("Lloyds").[14] According to Plaintiffs, after Hurricane Katrina hit, Safeguard should have pursued business interruption claims of approximately $350 million from its insurers.[15] However, Plaintiffs aver that PPF and MSREA did not fully pursue Safeguard's claims in order to maintain Morgan Stanley's relationships with its insurers.[16] Although Safeguard filed suit against its insurers on August 27, 2007 (the "Insurance Litigation" or "Katrina

---

[10] *Id.*

[11] Rec. Doc. 26-1 at p. 3. Roch may have served as Chief Development Officer thereafter. *See id.*

[12] Rec. Doc. 161 at ¶ 80.

[13] *Id.* at ¶ 10.

[14] *Id.* at p. 2.

[15] *Id.* at pp. 2–3.

[16] *Id.* at p. 3.

3

Litigation"),[17] Plaintiffs contend that Morgan Stanley took actions to "undermine and devalue Safeguard's claims in the Insurance Litigation" and to "delay the resolution of that litigation" until Plaintiff's interest in Safeguard had been bought out.[18] According to Plaintiffs, the Insurance Litigation settled in October 2012.[19]

## C.    State Court Litigation

On May 7, 2009, BCR, JAC, and SDG sued PPF and MSREA in the Civil District Court for the Parish of Orleans ("CDC Litigation").[20] While Plaintiffs amended their state court petition multiple times, essentially, they sought damages for PPF's and MSREA's actions in the Insurance Litigation as well as their actions in the buyout of Plaintiffs' interests in Safeguard.[21] Additionally, on May 14, 2009 and July 6, 2009, PPF filed two suits against BCR, JAC, SGR, and Roch, seeking declaratory and injunctive relief that would affirm the buyout, in Delaware Chancery Court (collectively, "Delaware Litigation").[22]

A major issue in the CDC Litigation and the Delaware Litigation was Plaintiffs' access to and use of documents concerning the Insurance Litigation and the buyout, which, according to Defendants, are protected by attorney-client and work-product privilege. On September 4, 2009, the judge in the CDC Litigation entered a "Protective Order" governing discovery of purportedly confidential materials.[23] On February 10, 2010, that court entered an additional "Joint Protective

---

[17] *Id.* at ¶ 47.

[18] *Id.* at ¶ 102.

[19] *Id.* at ¶ 17.

[20] *Id.* at ¶ 91.

[21] *Id.* at ¶¶ 91–97.

[22] *Id.* at ¶¶ 82–83.

[23] Rec. Doc. 52-2, "Protective Order," entered September 4, 2009 by the Civil District Court for the Parish of Orleans, Judge Hebert A. Cade, Case No. 2009-4705, at pp. 131–39.

Order," governing discovery of privileged materials; this order applied to both the CDC and Delaware Litigation.[24]

On July 29, 2010, the court in the CDC Litigation dismissed all but one cause of action, finding that Plaintiffs' claims would not accrue until the resolution of the Insurance Litigation.[25] As of March 14, 2011, the Delaware Litigation had also concluded.[26] With respect to the suit filed on May 14, 2009 ("Delaware I Litigation"), the Delaware court entered a Stipulated Judgment determining that "[PPF's] invocation of the Buy/Sell provision of the LLC Agreement on May 14, 2009 was proper" and "[PPF] acted appropriately in setting the Total Purchase Price in the Buy/Sell Transaction."[27] In the July 6, 2009 suit ("Delaware II Litigation"), the Delaware court dismissed the action pursuant to a mandatory forum selection clause.[28]

**D.    Federal Court Action and Injunction Preventing Use of Privileged Communications**

On January 11, 2013, Plaintiffs filed a Redacted Complaint in the above-captioned matter,[29] wherein Plaintiffs asserted eleven causes of action, including violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO") and Louisiana's anti-racketeering statute, breach of fiduciary duty, and tortious interference with contract.[30] Plaintiffs also sought to file an Unredacted

---

[24] Rec. Doc. 52-2, "Joint Protective Order," entered February 10, 2010 by the Civil District Court for the Parish of Orleans, Judge Herbert A. Cade, Case No. 2009-4705, at pp.140–43.

[25] Rec. Doc. 161 at ¶ 97.

[26] *Id.* at ¶¶ 98–99.

[27] *Id.* at ¶ 99 (alternations in original).

[28] *Id.* at ¶ 98.

[29] Rec. Doc. 1.

[30] *Id.* at pp. 31–59.

Complaint into the record under seal,[31] and the Court granted the unopposed motion.[32] However, Defendants requested that the Court place the Redacted Complaint under seal as well, claiming that it also contained numerous references to ten privileged documents that had been produced in the CDC litigation.[33] Plaintiffs opposed the motion to seal the Redacted Complaint.[34] The Court immediately placed the Redacted Complaint under seal while it considered that pending motion.[35] On January 25, 2013, the Court denied the motion to place the Redacted Complaint under seal because Defendants had "declined to identify the specific portions of the redacted complaint they f[ound] objectionable nor [did] Defendants argue[] in sufficient detail how disclosure of this information would negatively impact their interests."[36]

On January 28, 2013, Defendants filed a "Motion for Reconsideration of Motion to Seal Complaint and Motion for a Preliminary and Permanent Injunction Against the Improper Use or Disclosure of Privileged Material."[37] In light of that motion, the Court ordered that the Redacted Complaint remain under seal until it ruled upon the motion for reconsideration.[38]

On August 15, 2013, the Court entered an Order denying Defendants' motion in part and granting it in part.[39] The Court denied Defendants' request for reconsideration as moot as the

---

[31] Rec. Doc. 9.

[32] Rec. Doc. 15.

[33] Rec. Doc. 11.

[34] Rec. Doc. 19.

[35] Rec. Doc. 20.

[36] Rec. Doc. 24 at pp. 4–5 (internal quotation marks omitted).

[37] Rec. Doc. 26.

[38] Rec. Doc. 30.

[39] Rec. Doc. 147.

Redacted Complaint had already been placed under seal.[40] The Court granted Defendants' requests for a preliminary injunction and a permanent injunction, enjoining Plaintiffs "from making any further use or disclosure in this litigation of the privileged communications identified by Defendants . . . ."[41]

On August 22, 2013, Plaintiffs filed a motion for reconsideration.[42] The Court denied Plaintiffs' motion on December 12, 2013, but in its Order, clarified the basis for imposing the injunction on each of the ten documents.[43] The Court explained that five of the ten documents in question had been produced during the CDC Litigation and designated "privileged."[44] For these five documents, the Court determined that "Plaintiffs must obtain approval from the judge in the CDC Litigation who effected the February 2010 protective order" prior to making any further use or disclosure of these documents in the above-captioned matter.[45] Next, the Court explained that one of the ten documents in question had been produced during the CDC Litigation and designated "confidential."[46] For this document, the Court concluded that "Plaintiffs must obtain approval from the judge in the CDC Litigation who effected the September 2009 protective order."[47] Finally, the Court observed that four of the ten documents in question had not been produced in the CDC Litigation.[48] With respect to these four documents, the Court determined that "approval from the

---

[40] *Id.* at p. 44.

[41] *Id.*

[42] Rec. Doc. 148.

[43] Rec. Doc. 160.

[44] *Id.* at p. 22.

[45] *Id.*

[46] *Id.*

[47] *Id.* at p. 23.

[48] *Id.*

judge in the CDC Litigation is not required," but that "[n]evertheless, these communications are still subject to attorney-client privilege."[49] Thus, the Court enjoined Plaintiffs from making any further use of disclosure of these four documents in the above-captioned matter.[50]

## E.     Pending Motions to Dismiss

On December 23, 2013, Plaintiffs filed an amended complaint, removing references to the documents subject to the Court's injunction.[51] On February 5, 2014, the Morgan Stanley Defendants filed their pending "Motion to Dismiss Amended Complaint."[52] Also on February 5, 2014, Lloyd's filed its pending "Motion to Dismiss Amended Complaint for Damages."[53] On February 28, 2014, Plaintiffs filed an "Omnibus Memorandum in Opposition."[54] With leave of the Court, the Morgan Stanley Defendants and Lloyd's filed replies on March 21, 2014.[55] Oral argument was heard on April 2, 2014.[56] Following oral argument, Plaintiffs filed a supplemental memorandum on April 7, 2014,[57] to which the Morgan Stanley Defendants replied on April 11, 2014.[58]

## F.     Subsequent State Court Proceedings

On January 13, 2014, Plaintiffs filed a "Motion to Amend Protective Orders, or, in the Alternative, Grant Permission for Use of Documents in Federal Court Lawsuit" in the CDC

---

[49] *Id.*

[50] *Id.* at p. 27.

[51] Rec. Doc. 161.

[52] Rec. Doc. 186.

[53] Rec. Doc. 188.

[54] Rec. Doc. 209.

[55] Rec. Doc. 214 (Lloyd's); Rec. Doc. 216 (Morgan Stanley Defendants).

[56] Rec. Doc. 222.

[57] Rec. Doc. 225.

[58] Rec. Doc. 228.

Litigation.[59] On June 4, 2014, the CDC judge granted Plaintiffs' motion in part and denied in part.[60] Specifically, the CDC judge amended the September 2009 and the February 2010 Protective Orders "to include a narrow exception declaring that communications involving Safeguard, PPF, and Morgan Stanley that may demonstrate a direct conflict of interest among the parties are not subject to their shared common legal interest privilege."[61] Further, the CDC judge reviewed the ten documents sought to be used by Plaintiffs in the above-captioned matter and determined that these ten communications "fall within the narrow exception of being outside the zone of common legal interest and are not subject to either the September 2009 Protective Order or the February 2010 Protective Order.'"[62] Finally, the CDC judge "pretermit[ted] ruling on the BCR parties' alternative Motion for Permission to Use Documents in the Federal Court Lawsuit."[63] In its reasons for judgment, the CDC judge explained that it "expresses no opinion regarding the use or disclosure of the ten challenged communications in the federal action as that determination is reserved for the judge presiding over the federal litigation."[64]

Following the CDC judge's amendment of the Protective Orders, on June 25, 2014, Plaintiffs filed the pending "Motion to Dissolve Injunction" in the above-captioned matter.[65] According to Plaintiffs, "due to the change in circumstances occasioned by the amendment of the underlying protective order language, the Morgan Stanley defendants will be unable to sustain their showing

---

[59] Rec. Doc. 229-4, "Judgment," entered June 4, 2014 by the Civil District Court for the Parish of Orleans, Judge Paula A. Brown, Case No. 2009-4705, at p. 2.

[60] *Id.*

[61] *Id.*

[62] *Id.* at p. 3.

[63] *Id.*

[64] Rec. Doc. 229-4, "Reasons for Judgment," entered June 4, 2014 by the Civil District Court for the Parish of Orleans, Judge Paula A. Brown, Case No. 2009-4705, at p. 13.

[65] Rec. Doc. 229.

of the likelihood of success on the merits, irreparable harm, or the balance of comparative harms," and thus "the Morgan Stanley defendants will no longer be able to sustain their required showing for an injunction."[66]

On July 15, 2014, the Morgan Stanley Defendants filed an opposition.[67] In part, the Morgan Stanley Defendants argued that they were in the process of appealing the CDC judge's ruling and that dissolving the injunction would thus be premature:

> The Morgan Stanley Parties have filed an appeal challenging the CDC's decision on multiple legal and factual bases, which is still pending. Thus, if the court does not choose at this stage to deny Plaintiffs' motion on the merits, it should deny the motion as premature without prejudice to Plaintiffs resubmitting the motion after the CDC's ruling is final and not subject to appellate review.[68]

With leave of the Court, Plaintiffs filed a reply on July 24, 2014.[69]

On August 18, 2014, the Louisiana Court of Appeal for the Fourth Circuit entered its decision regarding the Morgan Stanley Defendants' appeal of the CDC judge's ruling, determining:

> We are satisfied, like the trial court, that two of the ten communications at issue are not privileged communications, subject to the article 506 attorney-client privilege, in the context of this case, specifically the 12 May 2009 inter-party communication and the 19 May 2009 email thread. Therefore, we find no error or abuse of discretion of the trial court in ordering those communications produced/disclosed/used, and therefore deny the defendants/relators' writ application in that regard only.

> Contrariwise, we grant the defendants/relators' writ application in part, finding the remaining eight communications are presently subject to the attorney-client privilege of La. C.E. art. 506.[70]

On August 22, 2014, with leave of the Court, the Morgan Stanley Defendants filed a copy

---

[66] Rec. Roc. 229-3 at p. 8.

[67] Rec. Doc. 233.

[68] *Id.* at p. 6.

[69] Rec. Doc. 236.

[70] Rec. Doc. 237-1, Case No. 2014-C-0694, *BCR Safeguard Holdings, LLC v. Morgan Stanley Dean Witter Inv. Mgmt., Inc.* (La. App. 4th Cir. Aug. 22, 2014).

of the Louisiana Court of Appeal for the Fourth Circuit's decision into the record of this case, and noted that "the Fourth Circuit found that, under state law, eight of the ten challenged communications were privileged."[71] Also on August 22, 2014, Plaintiffs filed a response, "disagree[ing] with the Morgan Stanley defendants' interpretation of that ruling's effect on the Motion to Dissolve Injunction."[72]

## II. Plaintiffs' Motion to Dissolve Injunction

As noted above, in its June 4, 2014 ruling, the CDC judge made two key amendments to the September 2009 and February 2010 Protective Orders: (1) the judge included "a narrow exception declaring that communications involving Safeguard, PPF, and Morgan Stanley that may demonstrate a direct conflict of interest among the parties are not subject to their shared common legal interest privilege"; and (2) the judge determined that the ten communications in question fell within this new exception.[73] These amendments by the CDC judge potentially altered the foundation of this Court's injunction in the above-captioned matter with respect to the five documents that this Court determined were covered by the February 2010 protective order and the one document that this Court determined was covered by the September 2009 order. The amendments would not have affected the four documents that were not produced subject to the September 2009 or February 2010 protective orders; for these documents, this Court independently concluded that the communications were protected by attorney-client privilege.

The Louisiana Court of Appeal for the Fourth Circuit has now ruled that eight of the communications are in fact subject to attorney-client privilege. Thus these eight documents no

---

[71] Rec. Doc. 237 at p. 2.

[72] Rec. Doc. 238.

[73] Rec. Doc. 229-4, "Judgment," entered June 4, 2014 by the Civil District Court for the Parish of Orleans, Judge Paula A. Brown, Case No. 2009-4705, at pp. 2–3.

longer fall within the narrow exception articulated in the CDC judge's June 4, 2014 order, and they still come within the ambit of the protective orders. The question becomes whether Plaintiffs should still be enjoined from using the two documents no longer subject to the protective orders.

The first document that is no longer considered privileged in the CDC Litigation is the "12 May 2009 inter-party communication."[74] The Court notes that originally the parties represented that this document was one of the four documents that was not produced in the CDC Litigation,[75] and thus, the Court enjoined Plaintiff's use of this document after independently determining that it was subject to attorney-client privilege. Accordingly, with respect to this document, no change to the injunction based on subsequent developments in the CDC litigation is warranted.

The second document that is no longer considered privileged in the CDC Litigation is the "19 May 2009 email thread." This document was produced pursuant to the September 2009 protective order.[76] In granting the Morgan Stanley Defendants' request for an injunction, the Court "enjoined [Plaintiffs] from making any further use or disclosure in this litigation of the privileged communications disclosed in the CDC Litigation—either as "privileged" or as 'confidential'—without prior approval from the judge in the CDC Litigation that effected the protective orders."[77] Now, the CDC judge has amended the September 2009 protective order to include "a narrow exception declaring that communications involving Safeguard, PPF, and Morgan Stanley that may demonstrate a direct conflict of interest among the parties are not subject to their

---

[74] Rec. Doc. 237-1, Case No. 2014-C-0694, *BCR Safeguard Holdings, LLC v. Morgan Stanley Dean Witter Inv. Mgmt., Inc.* (La. App. 4th Cir. Aug. 22, 2014), at p. 6.

[75] Rec. Doc. 52-3 at p. 4.

[76] *Id.*

[77] Rec. Doc. 160 at p. 27.

shared common legal interest privilege."[78] Further, both the CDC judge and the Louisiana appellate court have determined that the May 19, 2009 email thread falls within this exception. Accordingly, this document is no longer subject to the Court's injunction in the above-captioned matter, and Plaintiffs are permitted to use the May 19, 2009 email thread.

The Court notes that Plaintiffs referenced the May 19, 2009 email thread in their unredacted complaint filed on January 16, 2013 at paragraphs 78, 79, and 134(r).[79] However, following the Court's injunction, Plaintiffs removed all references to the May 19, 2009 email thread in their amended complaint, which is the subject of the pending motions to dismiss.[80] To the extent that allegations concerning the May 19, 2009 email thread may bear on the Court's evaluation of the pending motions to dismiss, the Court will consider the references to the May 19, 2009 email thread found in Plaintiff's original unredacted complaint in determining the pending motions to dismiss.

### III.  Morgan Stanley Defendants' Motion to Dismiss

In their "Motion to Dismiss," the Morgan Stanley Defendants contend that Plaintiffs' complaint should be dismissed because "(i) Plaintiffs have no standing, (ii) the Court has no personal jurisdiction over the Morgan Stanley Parties, and (iii) each of Plaintiffs' nine causes of action fails to state a claim for relief."[81] The Court first addresses the parties' arguments regarding standing.

---

[78]   Rec. Doc. 229-4, "Judgment," entered June 4, 2014 by the Civil District Court for the Parish of Orleans, Judge Paula A. Brown, Case No. 2009-4705, at p. 2.

[79] Rec. Doc. 16 at ¶¶ 78, 79, and 134(r).

[80] Rec. Doc. 161.

[81] Rec. Doc. 186 at p. 3.

A.     **Parties' Arguments Regarding Standing**

1.     **Morgan Stanley Defendants' Arguments in Support**

First, the Morgan Stanley Defendants assert that Plaintiffs lack standing to sue because the

harms alleged in the complaint are derivative, rather than direct, claims, and because Plaintiff no

longer hold an interest in Safeguard:

> Plaintiffs have no standing to sue because all of the alleged harms identified in the
> Amended Complaint—which arise from the alleged loss, diminution or delay of
> insurance proceeds—could only have been suffered by Safeguard, and not by
> Plaintiffs. Thus, Plaintiffs' claims are derivative of those belonging to Safeguard.
> Plaintiffs are no longer members of Safeguard, and in fact expressly relinquished any
> and all rights in Safeguard as of the closing of the July 2009 sale of their interest to
> PPF. Thus, they do not have standing to sue.[82]

According to the Morgan Stanley Defendants, Delaware law determines whether Plaintiffs' claim

are direct or directive.[83] They aver that the Delaware standard is "based solely on the following

questions: Who suffered the alleged harm—the corporation or the suing stockholder

individually—and who would receive the benefit of the recovery or other remedy?"[84] If a claim is

derivative, the Morgan Stanley Defendants contend, then "to bring 'a derivative action, the plaintiff

must be a member or an assignee of a limited liability company interest *at the time of bringing the*

*action*.'"[85]

In this case, the Morgan Stanley Defendants argue that "Plaintiffs' allegation that they—as

opposed to Safeguard—were harmed because they were deprived of distributions they allegedly

would have received from Safeguard do not confer standing on Plaintiffs or make their claims

---

[82] Rec. Doc. 186-1 at pp. 23–24 (internal citations omitted).

[83] *Id.* at p. 24 (citing *Smith v. Waste Mgmt., Inc.* 407 F.3d 381, 384 n.1 (5th Cir. 2005)).

[84] *Id.* (quoting *Tooley v. Donaldson, Lufkin & Jenrette, Inc.*, 845 A.2d 1031, 1035 (Del. 2004)) (internal
quotation marks omitted).

[85] *Id.* at p. 26 (emphasis in original) (quoting Del. code tit. 6, § 18-1002).

against the Morgan Stanley parties direct, as opposed to derivative."[86] According to the Morgan Stanley Defendants, "where a plaintiff alleges nothing more than a diminution of the value of its interest in an LLC, that injury is derivative as opposing to direct."[87] The Morgan Stanley Defendants assert that "[p]erhaps recognizing this fundamental flaw in their Amended Complaint, Plaintiffs appear to take the position that the circumstances surrounding the 2009 Buy/Sell transaction were somehow improper and thus either serve as an independent source of injury and/or wrongfully deprived Plaintiffs of some otherwise legitimate standing to assert claims for the insurance-related injury to Safeguard."[88] However, according to the Morgan Stanley Defendants, "any such theory must fail given the absolutely clear and preclusive order from the Delaware court that PPF acted entirely appropriately and legally in conducting the Buy/Sell transaction and setting the Buy/Sell price."[89]

Second, the Morgan Stanley Defendants argue that "Plaintiffs have no standing because any alleged harm to them is speculative and contingent on Safeguard having distributed any insurance proceeds it may have recovered to Plaintiffs."[90] Citing the Supreme Court's decision in *Clapper v. Amnesty International USA*,[91] the Morgan Stanley Defendants contend that "Plaintiffs' allegation that they would have received as much as $350 million in lost insurance proceeds allegedly owed to Safeguard (but never proven at trial in the Insurance Litigation) is too 'speculative' to establish

---

[86] *Id.* at p. 25.

[87] *Id.* (citing *Metro Comm'n Corp. BVI v. Advanced Mobilecomm Technologies, Inc.*, 854 A.2d 121, 168–69 (Del. Ch. 2004)).

[88] *Id.* at p. 26.

[89] *Id.*

[90] *Id.* at p. 27.

[91] 133 S. Ct. 1138, 1146 (2013).

their standing."[92] Specifically, they assert that "[l]itigation is, of course, inherently unpredictable. And, even assuming Safeguard had a strong claim against the Insurers, there was never a guarantee that it would prevail in court, much less at the full value of any claim it might have."[93] Further, the Morgan Stanley Defendants aver that "it is speculative to assume that Safeguard would have distributed the insurance proceeds to its members, including Plaintiffs" as "[t]he Amended Complaint points to no provision of the LLC Agreement that mandated Safeguard distribute the proceeds of any insurance recovery to its members—much less a 'disproportionately high' percentage of it to Plaintiffs."[94]

Finally, the Morgan Stanley Defendants contend that "Plaintiffs have no standing because they have already admitted in a stipulated judgment that the payment they received from PPF for their 6-percent interest in Safeguard was appropriately set."[95] According to the Morgan Stanley Defendants, "as an alternative theory of damages, Plaintiffs allege that because the Insurance Litigation was not resolved by July 2009, the value of Safeguard's insurance claim was not included in the purchase price that PPF paid for Plaintiffs' six-percent interest in Safeguard; and, thus, the Morgan Stanley Parties alleged misconduct in invoking that transaction denied Plaintiffs the full value of their investment in Safeguard."[96] The Morgan Stanley Defendants counter that Plaintiffs "are judicially estopped by the Delaware judgment from contending in this action that the price that PPF paid for Plaintiffs' interest in Safeguard was anything other than perfectly legal and

---

[92] Rec. Doc. 186-1 at p. 27.

[93] *Id.* at pp. 27–28.

[94] *Id.* at p. 28.

[95] *Id.* at p. 29.

[96] *Id.*

'appropriately' set."[97] The Morgan Stanley Defendants state that in the Delaware Litigation, the parties agreed to a Stipulated Judgment, which provided that "'[PPF's] invocation of the Buy/Sell provision of the LLC Agreement on May 14, 2009 was ***proper***' and '[PPF] ***acted appropriately*** in setting the Total Purchase Price in the Buy/Sell transaction.'"[98] According to the Morgan Stanley Defendants, "[t]he Total Purchase Price that was 'appropriately' set by PPF necessarily included the then present value of the Insurance Litigation to Safeguard—which, under basic valuation procedures, would have been discounted from a full recovery."[99]

### 2. Plaintiffs' Arguments in Opposition

In opposition to the Morgan Stanley Defendants' "Motion to Dismiss," Plaintiffs contend that their claims are direct, not derivative.[100] Although Plaintiffs agree that Delaware law applies,[101] they argue that "[i]n determining whether claims are direct or derivative in the context of a limited liability company or any other alternative business entity, there are distinct differences under Delaware law between the claim standards applicable to LLCs and partnerships, on the one hand, and corporations, on the other."[102] According to Plaintiffs, "Morgan Stanley's reliance on corporation-based precedent is therefore misplaced."[103] Plaintiffs aver that instead "Delaware limited partnership law is the relevant proxy for questions regarding the direct or derivative nature of claims related to LLCs, as the Delaware LLC Act is based on the Delaware LP Act; decisional authorities

---

[97] *Id.*

[98] *Id.* (emphasis and alternations in original) (quoting Rec. Doc. 161 at ¶ 99).

[99] *Id.*

[100] Rec. Doc. 209 at p. 24.

[101] *Id.* ("Whether the BCR parties' claims are derivative or direct is a question of Delaware law because Safeguard is a Delaware LLC.").

[102] *Id.* at pp. 24–25.

[103] *Id.* at p. 25.

applicable to LPs also apply to LLCs."[104] "Contrary to the Morgan Stanley defendants' corporation-law-based argument," Plaintiffs assert that their claims are direct because (1) "Safeguard is a pass-through entity"; (2) "the harm [Plaintiffs] suffered as a result of the defendants' actions was not suffered in accordance with the BCR parties' *pro rata* membership interest in Safeguard, but through their contractual entitlement to a disproportionate share of Safeguard's mandatory quarterly distribution"; and (3) "the Morgan Stanley defendants' misconduct was integral to their effort to eliminate the BCR parties' membership in Safeguard."[105]

In support of their argument that their claims are direct because Safeguard is a pass-through entity, Plaintiffs cite the Delaware Court of Chancery's opinion in *Angelo American Security Fund, L.P. v. S.R. Global International Fund, L.P.*[106] Quoting *Angelo American*, Plaintiffs aver that the "purposes underlying the classification as derivative" are "(1) to ensure that any remedy accrues to the entity that sustained the injury but does not confer benefits on wrongdoers nor provide windfalls to the uninjured and (2) to provide a gatekeeping function that will both promote corporate resolution of internal problems and deter strike suits."[107] According to Plaintiffs, the court in *Angelo American* "determined that diminution in value claims were direct for a number of reasons relating to the pass-through structure of the limited partnership at issue, causing a 'fleeting injury to the Fund, one that is immediately and irrevocably passed through to the partners.'"[108] Thus, Plaintiffs assert that "[a]s a matter of Delaware law, application of derivative rules to pass-through entities 'makes no sense' because the result would be 'antithetical' to the purpose of preventing windfalls

---

[104] *Id.* (citing *Achaian, Inc. v. Leemon Family, LLC*, 25 A.3d 800, 803 n.10 (Del. Ch. 2011)).

[105] *Id.* at pp. 25–26.

[106] 829 A.2d 143 (Del. Ch. 2003).

[107] Rec. Doc. 209 at p. 26 (quoting *Angelo Am. Sec. Fund, L.P.*, 829 A.2d at 152) (internal quotation marks omitted).

[108] *Id.* (quoting *Angelo Am. Sec. Fund, L.P.*, 829 A.2d at 152–53).

and does little to further the gatekeeping function."[109] In the above-captioned matter, Plaintiffs contend that "[w]ith only two classes of members (the BCR parties and PPF) and a contractual waterfall provision that requires quarterly distributions of all net profits, the members of Safeguard felt the impact of gains and losses almost immediately."[110] Additionally, they assert that "because of the waterfall, dismissing the BCR parties' claims for lack of standing would, rather than preventing windfalls to undeserving plaintiffs, have the effect of creating a windfall for PPF."[111]

Plaintiffs' second argument is that their claims are direct because "[u]nder the LLC Agreement, any recovery by the BCR parties will be distributed in accordance with the agreed-upon waterfall distribution provisions rather than in proportion to the BCR parties' member interests."[112] Citing a footnote in the Delaware Court of Chancery's unpublished decision in *Kelly v. Blum*,[113] Plaintiffs maintain that "[a] claim is direct when injury is suffered disproportionate to a member's *pro rata* ownership interest."[114] Thus, according to Plaintiffs, "the BCR parties are plainly alleging more than a diminution of the value of their interest in an LLC. The BCR parties' claims are based, among other things, on the fact that they were entitled to receive *more* than merely their proportionate, *pro rata* share (calculated based on their interest in Safeguard) of the proceeds of the Katrina Litigation."[115]

Third, Plaintiffs maintain that "[t]he Morgan Stanley Defendants' efforts to seize control of

---

[109] *Id.* at p. 27 (quoting *Angelo Am. Sec. Fund, L.P.*, 829 A.2d at 153).

[110] *Id.*

[111] *Id.*

[112] *Id.*

[113] No. 4516, 2010 WL 629850 (Del Ch. Feb. 24, 2010).

[114] *Id.* (citing *Kelly*, 2010 WL 629850 at *9 n.63).

[115] *Id.* at p. 28.

Safeguard through the misconduct alleged in the amended complaint renders the BCR parties' claims direct."[116] In support of this position, Plaintiffs first cite the Delaware Court of Chancery's decision in *Brinckerhoff v. Texas Eastern products Pipeline Company, LLC*[117] for the proposition that "[a]s a matter of Delaware law, when a limited partnership is involved in a merger, there is effectively no distinction between direct and derivative claims by the limited partners."[118] Plaintiffs further contend that in *Kelly v. Blum*, the Delaware Court of Chancery held that "(1) controlling members in an LLC owe minority members 'the additional fiduciary duties that controlling shareholders owe minority shareholders,' including 'the duty not to cause the corporation to effect a transaction that would benefit the fiduciary at the expense of the minority stockholders,' and that (2) facts stating a claim that a controlling stockholder with the aid of appointed managers effected a merger to benefit itself allege a direct claim."[119] According to Plaintiffs, "PPF was a controlling member of Safeguard, notwithstanding that it was not a 'manager,' because (1) PPF owned a majority of the equity interest in the LLC; and (2) PPF in conjunction with Morgan Stanley controlled a sufficient number of votes on the Management Committee to exert control over any decision by Safeguard to enter into significant litigation."[120] Thus, Plaintiffs conclude that "[b]ecause the Morgan Stanley defendants' misconduct related to the Insurance Litigation was inextricably intertwined with their scheme to take full control of Safeguard, and because the Insurance Litigation and events surrounding it specifically led to the abusive use of the Buy/Sell provision, PPF's exercise of the Buy/Sell [provision] is precisely the type of self-dealing conduct by a controlling

---

[116] *Id.*

[117] 986 A.2d 370 (Del. Ch. 2010).

[118] Rec. Doc. 209 at p. 29.

[119] *Id.* at p. 29 (quoting *Kelly*, 2010 WL 629850, at *12–13).

[120] *Id.*

member of an LLC that gives rise to a *Blum*-type direct claim."[121]

With respect to the Morgan Stanley Defendants' argument that the stipulated judgment in the Delaware litigation precludes Plaintiffs' claims, Plaintiffs contend that "[t]he Delaware I judgment cannot preclude the claims here because the narrow factual issues resolved through the stipulated judgment were not the same questions of fact underlying the BCR parties' claims here."[122] According to Plaintiffs, the Delaware judgment "only determined whether the invocation of and application of the Buy/Sell were mechanically carried out in accordance with the terms of the Buy/Sell provision (§ 11.03) of the LLC Agreement."[123] They maintain that "[t]he parties there did not litigate *any issues* beyond whether PPF complied with the express terms of § 11.03 of the LLC Agreement."[124] Specifically, Plaintiffs argue that in the Delaware case, the parties "did not litigate whether the Morgan Stanley defendants and Lloyd's engaged in a criminal racketeering conspiracy, breached their fiduciary duties to the BCR parties, or engaged in any otherwise tortious activity."[125]

### 3. Morgan Stanley Defendants' Reply

In response to Plaintiffs' opposition, the Morgan Stanley Defendants contend that "[i]t is well established in Delaware that the rules governing derivative actions apply to pass-through entities like LLCs and limited partnerships."[126] According to the Morgan Stanley Defendants, "*Anglo American* did not establish any categorical rule regarding the applicability of Delaware derivative action restrictions to pass-through entities. Rather, the *Anglo American* court declined to apply the

---

[121] *Id.*

[122] *Id.* at p. 23.

[123] *Id.*

[124] *Id.*

[125] *Id.*

[126] Rec. Doc. 216 at p. 8 (citing, *e.g.*, *Kelly*, 2010 WL 629850, at *9; *Anglo Am. Sec. Fund, L.P.*, 892 A.2d at 149).

derivative action requirements where doing so would lead to a windfall for new investors and prevent the plaintiffs from obtaining a recovery for losses that they had 'immediately' suffered when the partnership had suffered its losses."[127] The Morgan Stanley Defendants maintain that in this case, "Safeguard has taken on no new members . . . . There is thus no risk that new investors will achieve a windfall if the Court holds that Plaintiffs' claims are derivative."[128]

Second, the Morgan Stanley Defendants note that they "dispute that Plaintiffs would have received the lion's share of any insurance recovery."[129] However, assuming that proceeds would have been distributed disproportionately to Plaintiffs, the Morgan Stanley Defendants argue that "[e]ven if a member's interest in an LLC's profits is greater than its ownership stake in the company, the harm that the member suffers because of injury to the company is still derivative of the injury suffered by the company."[130]

Next, the Morgan Stanley Defendants contend that they did not exercise control over Safeguard. According to the Morgan Stanley Defendants, "Plaintiffs' position directly contradicts the allegations in the Amended Complaint" that "Plaintiff BCR was the 'managing Member' of Safeguard and had the 'sole and exclusive right, power, authority and discretion to conduct the business and affairs of the Company.'"[131] The Morgan Stanley Defendants additionally point out that Bruce C. Roch, Jr. and Jack A. Chaney were CEO and COO of Safeguard, respectively, and that Plaintiffs had the right to appoint two members of Safeguard's Management Committee.[132]

---

[127] *Id.* at p. 9.

[128] *Id.*

[129] *Id.* at p. 10 n.3.

[130] *Id.* at pp. 10–11.

[131] *Id.* at p. 11 (quoting Rec. Doc. 161 at ¶¶ 25, 27).

[132] *Id.*

Third, the Morgan Stanley Defendants reiterate their position that Plaintiffs do not have standing because their claims are speculative.[133]

Finally, with respect to Plaintiffs' argument that "the Delaware judgment has no preclusive effect because it did not decide whether the Morgan Stanley Parties engaged in criminal racketeering, breached their fiduciary duties or otherwise engaged in tortious actions,"[134] defendants aver that they are "asserting issue preclusion, not claim preclusion."[135] Further, the Morgan Stanley Defendants assert that the Stipulated Judgment "means that Plaintiffs have already received full compensation for their interest in Safeguard, and consequently also for any interest they had in Safeguard's insurance recovery. Because Plaintiffs have suffered no injury they have no standing and all of the claims in the Amended Complaint fail as a matter of law."[136] According to the Morgan Stanley Defendants,

> Given that Plaintiffs' entire lawsuit turns on the allegation that Plaintiffs were denied their fair share of the insurance proceeds through PPF's allegedly improper invocation of the Buy/Sell Provision, all of Plaintiffs' claims fail as a matter of law if Plaintiffs are collaterally estopped from contending that PPF acted improperly in invoking the Buy/Sell Provision or that PPF inappropriately set the Buy/Sell Price.[137]

### 4. Plaintiffs' Supplemental Briefing

Following oral argument, Plaintiffs submitted a supplemental brief "regarding the scope of the Stipulated Judgment in the matter referred to by the parties as 'Delaware 1.'"[138] According to Plaintiffs, "PPF intended to craft its cause of action and its prayer for relief in Delaware 1

---

[133] *See id.* at pp. 12–13.

[134] *Id.* at p. 13.

[135] *Id.*

[136] *Id.* at 13.

[137] *Id.*

[138] Rec. Doc. 225 at p. 1.

narrowly."[139] In support, Plaintiffs quote from a pleading filed by PPF in the Delaware litigation, in which PPF argued that the Delaware proceedings should not be stayed pending the resolution of the CDC Litigation:

> [T]he *only issue* involved in this [the Delaware] action is whether the Buy/Sell transaction was properly noticed and closed, including the timing of the Offer Notice and the Total Purchase Price set forth therein. Limited discovery is needed, and this matter can be resolved promptly on dispositive motions from the parties or a simple trial.
>
> *By contrast*, the Louisiana Action will require resolution of *far more complicated, yet unrelated claims and issues* that concern PPF and Morgan Stanley's conduct in obtaining insurance payment from Safeguard's insurers. Resolution of the Louisiana Action thus likely will require more extensive discovery of the issues and claims.[140]

"Accordingly," Plaintiffs maintain, "in Delaware I PPF was requesting narrow relief regarding compliance with the terms of 'the Buy/Sell Provision of the LLC Agreement,' which [PPF] conceded was 'unrelated' to the 'far more complicated' issues in the Louisiana Action (and which are still at issue in this litigation)."[141] Plaintiffs contend that the Delaware judgment "cannot be construed as providing PPF any more than what it requested, a declaration that '[PPF's] invocation of the Buy/Sell provision of the LLC Agreement on May 14, 2009 was proper,' and a declaration that '[PPF] acted appropriately in setting the Total Purchase Price in the Buy/Sell transaction.'"[142]

### 5. Morgan Stanley Defendants' Supplemental Briefing

In response to Plaintiffs' supplemental brief, the Morgan Stanley Defendants contend that the language of the Delaware judgment is "unambiguous" and "the Court need look no further than the plain words of the Stipulated Judgment to conclude that the breadth of that judgment forecloses

---

[139] *Id.* at p. 3.

[140] *Id.* (emphasis in original) (quoting Rec. Doc. 225-1, "Plaintiffs Opposition to Defendants' Motion to Dismiss or Stay," filed December 8, 2009 in the Court of Chancery of the State of Delaware, Case No. 4594, at pp. 53–54).

[141] *Id.* at p. 4.

[142] *Id.*

Plaintiffs' claims in this lawsuit."[143] Further, they aver that in the amended complaint in the Delaware Litigation, "PPF explained that it sought declaratory relief regarding its proper invocation of the Buy/Sell Provision because Plaintiffs had 'embarked on a course of conduct designed to frustrate' PPF's right to purchase Plaintiffs' 6% interest in Safeguard through this pre-negotiated mechanism."[144] Quoting from PPF's complaint in the Delaware litigation, the Morgan Stanley Defendants argue that "[t]his was because 'Defendants [Plaintiffs in the above-captioned matter] have, through their words, deeds and actions, express and implied, threatened PPF that they deem such invocation and closing a contractual and fiduciary breach and will pursue a claim for damages as a result.'"[145]

## B.    Applicable Law

### 1.    Standard on a Rule 12(b)(1) Motion to Dismiss

A motion to dismiss filed under Federal Rule of Civil Procedure 12(b)(1) challenges a federal district court's subject matter jurisdiction. In determining its subject matter jurisdiction, a district court may consider: "(1) the complaint alone; (2) the complaint supplemented by undisputed facts evidenced in the record; or (3) the complaint supplemented by undisputed facts plus the court's resolution of disputed facts."[146]

"A case is properly dismissed for lack of subject matter jurisdiction when the court lacks the

---

[143] Rec. Doc. 228 at pp. 1–2.

[144] *Id.* at p. 2 (quoting Rec. Doc. 225-1, "Verified First Amended Complaint for Declaratory Relief," filed December 8, 2009 in the Court of Chancery of the State of Delaware, Case No. 4594, at p. 2).

[145] *Id.* (quoting Rec. Doc. 225-1, "Verified First Amended Complaint for Declaratory Relief," filed December 8, 2009 in the Court of Chancery of the State of Delaware, Case No. 4594, at p. 2).

[146] *Rodriguez v. Christus Spohn Health Sys. Corp.*, 628 F.3d 731, 734 (5th Cir. 2010) (quoting *Ramming v. United States*, 281 F.3d 158, 162 (5th Cir. 2001)) (internal quotation marks omitted).

statutory or constitutional power to adjudicate the case."[147] Article III of the United States Constitution establishes as an "irreducible minimum," that in order to invoke the judicial power of the United States, there must be a "case or controversy" between the parties.[148] "One element of the case-or-controversy requirement is that [plaintiffs], based on their complaint, must establish that they have standing to sue."[149] In essence, "[t]he standing inquiry focuses on whether the plaintiff is the proper party to bring this suit";[150] said differently, "the question of standing is whether the litigant is entitled to have the court decide the merits of the dispute or of particular issues."[151] As the Supreme Court has recognized, "standing is perhaps the most important of the jurisdictional doctrines."[152]

To have standing, a plaintiff must have suffered an injury that is "concrete, particularized, and actual or imminent; fairly traceable to the challenged action; and redressable by a favorable ruling."[153] The requirement of imminence "ensure[s] that the alleged injury is not too speculative for Article III purposes—that the injury is *certainly* impending."[154] The party seeking to invoke federal jurisdiction has the burden of establishing that it has standing to bring its claims.[155]

---

[147] *Krim v. pcOrder.com, Inc.*, 402 F.3d 489, 494 (5th Cir. 2005) (quoting *Home Builders Ass'n of Miss., Inc. v. City of Madison*, 143 F.3d 1006, 1010 (5th Cir. 1998)) (internal quotation marks omitted); *see also Cornerstone Christian Sch. v. Univ. Interscholastic League*, 563 F.3d 127, 133 (assessing whether plaintiffs had standing under Federal Rule of Civil Procedure 12(b)(1) dismissal for lack of subject matter jurisdiction).

[148] *United States v. Hays*, 515 U.S. 737, 742–43 (1995)

[149] *Raines v. Byrd*, 521 U.S. 811, 818 (1997).

[150] *Id.*

[151] *Warth v. Seldin*, 422 U.S. 490, 498 (1975).

[152] *Hays*, 515 U.S. at 742 (1995) (internal quotation marks and alterations omitted).

[153] *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 149 (2010).

[154] *Clapper v. Amnesty Int'l USA*, 133 S. Ct. 1138, 1147 (2013) (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 565 n.2 (1992) (emphasis in original)) (internal quotation marks omitted).

[155] *Grant ex rel. Family Eldercare v. Gilbert*, 324 F.3d 838, 387 (2003).

## 2.    Direct Versus Derivative Suits

A claim brought by a member against a limited liability company can be either direct or derivative. Both Plaintiffs and Morgan Stanley Defendants agree that because Safeguard is a Delaware LLC, the Court must apply Delaware law to determine whether Plaintiffs' claims are direct or derivative.[156] However, the parties disagree on whether the standard for distinguishing direct and directive claims in the general corporate context is applicable in the LLC context. Citing the Delaware Court of Chancery's decision in *CML V, LLC v. Bax*,[157] Plaintiffs contend that "there are distinct differences under Delaware law between the claim standards applicable to LLCs and partnerships, on the one hand, and corporations, on the other," and that "Morgan Stanley's reliance on corporation-based precedent is therefore misplaced."[158]

Despite Plaintiffs' assertion to the contrary, Delaware caselaw has consistently recognized that the same standard applies to corporations, LLCs, and partnerships. For example, in *Kelly v. Blum*, a case Plaintiffs cite frequently throughout their brief, the Delaware Court of Chancery stated that "'case law governing corporate derivative suits is equally applicable to suits on behalf of an LLC,' and I look to corporate case law to determine the proper method for distinguishing between derivative actions brought on behalf of [the LLC] and [Plaintiff's] direct claims."[159] Similarly, in *Anglo American Security Fund, L.P. v. S.R. Global International Fund, L.P.*, another case relied upon by Plaintiffs, the Delaware Court of Chancery explained that "[t]he test for distinguishing direct from derivative claims in the context of a limited partnership is substantially the same as that

---

[156] *See, e.g.*, *Smith v. Waste Mgmt, Inc.*, 407 F.3d 381, 384 (5th Cir. 2005) ("This Court looks to Delaware law, including the Delaware Supreme Court's recent opinion in *Tooley*, to decide whether Smith's claims are direct or derivative.").

[157] 6 A.3d 238 (Del. Ch. 2010).

[158] Rec. Doc. 209 at p. 25 (citing *CML V, LLC*, 6 A.3d at 250)).

[159] *Kelly v. Blum*, Case No. 4516, 2010 WL 629850, at *9 (Del. Ch. Feb. 24, 2010).

used when the underlying entity is a corporation."[160]

Furthermore, *CML V, LLC* does not instruct differently. In *CML V, LLC*, a creditor of an insolvent LLC attempted to bring a derivative action against the LLC's board of managers; defendants moved to dismiss, arguing that an LLC's creditor does not have standing to bring a derivative suit.[161] The creditor countered that because a creditor of an insolvent corporation has standing to maintain derivative claims against the corporation's directors, then a creditor of an insolvent LLC must have a similar ability.[162] The Delaware Court of Chancery, however, observed that the Delaware LLC Act explicitly provides that "[i]n a derivative action, the plaintiff must be a member or an assignee of a limited liability company interest at the time of bringing the action."[163] The court determined that "the plain language of the LLC Act controls," and thus rejected the creditor's analogy to the corporate context.[164] *CML V, LLC* does not address the standard for determining whether a claim is direct or derivative; rather it held, as matter of statutory interpretation, that a creditor of an insolvent LLC does not have standing to bring a derivative action. The Court will not rely on *CML V, LLC* outside its proper context.

Pursuant to the Delaware Supreme Court's decision in *Tooley v. Donaldson, Lufkin & Jenrette, Inc.*, the determination of whether a claim is direct or derivative depends "solely on the following questions: (1) who suffered the alleged harm (the corporation or the stockholder individually); and (2) who would receive the benefit of any recovery or other remedy (the

---

[160] *Anglo Am. Sec. Fund, L.P. v. S.R. Global Int'l Fund, L.P.*, 829 A.2d 143, 149 (Del. Ch. 2003).

[161] *CML V, LLC*, 6 A.3d at 239.

[162] *Id.* at 240.

[163] *Id.* at 241 (citing Del. Code tit. 6, § 18-1002).

[164] *Id.* at 239.

corporation or the stockholders, individually)?"[165] For a claim to be direct, the court must find that the defendants' actions "directly and individually harmed the stockholders, without injuring the corporation."[166] In other words, to bring a direct claim, the plaintiff "must demonstrate that the duty breached was owed to the stockholder and that he or she can prevail without showing an injury to the corporation."[167] In determining whether the plaintiff has made this showing, the court looks beyond plaintiff's characterization of the claims to the specific facts alleged in the complaint.[168]

In this case, whether Plaintiffs' claims are direct or derivative bears on whether Plaintiffs have standing. Under the Delaware LLC Act, to have standing to bring a derivative action,

> [T]he plaintiff must be a member or an assignee of a limited liability company interest at the time of bringing the action and:
>
> (1)     At the time of the transaction of which the plaintiff complains; or
>
> (2)     The plaintiff's status as a member or an assignee or a limited liability company interest had devolved upon the plaintiff by operation of law or pursuant to the terms of a limited liability company agreement from a person who was a member or an assignee of a limited liability company interest at the time of the transaction.[169]

## C.     Analysis

### 1.     Identifying Plaintiffs' Alleged Injuries

As discussed above, whether a claim is direct or derivative turns on (1) who suffered the alleged harm, and (2) who would receive the benefit of the remedy. Thus, in order to determine

---

[165] *Tooley v. Donaldson, Lufkin & Jennrette, Inc.*, 845 A.2d 1031, 1033 (Del. 2004); *see also Smith*, 407 F.3d at 384 (citing the *Tooley* standard).

[166] *Tooley*, 845 A.2d at 1039.

[167] *Id.*

[168] *See Dietrich v. Harrer*, 857 A.2d 1017, 1027 (Del. Ch. 2004) ("Even after *Tooley*, a claim is not 'direct' simply because it is pleaded that way . . . . Instead, the court must look to all the facts of the complaint."); *In re Syncor Int'l Corp. Shareholders Litig.*, 857 A.2d 994, 997 (Del. Ch. 2004) (explaining that court applying *Tooley* "look at the nature of the wrong alleged, not merely at the form of the words in the complaint.").

[169] Del. Code tit. 6, § 18-1002.

whether Plaintiffs' claims against the Morgan Stanley Defendants are direct or derivative, the Court must first carefully evaluate Plaintiffs' lengthy complaint to clearly identify what specific harms Plaintiffs allege and what remedies Plaintiffs seek.

First, Plaintiffs bring a claim against MSREA pursuant to the Racketeer Influence and Corrupt Organizations Act ("RICO"), alleging that "Defendant Morgan Stanley[170] violated RICO, specifically 18 U.S.C. §§ 1962(b) and (c), as a person employed by or associated with an enterprise that both (a) attempted to maintain and expand its control over Safeguard through a pattern of racketeering activity; and (b) also conducted the affairs of Safeguard through a pattern of racketeering activity from December 2005–October 2012."[171] The complaint elaborates, stating:

> In sum and substance, the pattern of racketeering activity proceeded as follows. Morgan Stanley was aware that the Insurers had significant exposure as a result of the devastating effects of Hurricane Katrina on Safeguard's business. Morgan Stanley made numerous false representations and promises to the BCR parties beginning in or about December 2005 in which Morgan Stanley indicated that it would pursue the Katrina-related insurance claims in good faith while the BCR parties continued to work to rejuvenate Safeguard's business. In reality, however, Morgan Stanley used the authority delegated to it to advance its interest at the expense of the BCR parties. In effect, Morgan Stanley acted as a saboteur as it sought to minimize the Katrina-related insurance claim that it represented it would vigorously pursue.[172]

In describing the specific injury that MSREA allegedly caused, Plaintiffs assert:

> The damages thus suffered by the BCR parties include, without limitation, the loss of financial benefits that the BCR parties would have received from a resolution of the Insurance Litigation but for the delay and corruption of that litigation caused by Morgan Stanley's misconduct, the incurring of additional costs (including capital investments) as a result of that delay and interference, and the financial losses the BCR parties suffered as a result of the bad faith actions taken by Morgan Stanley in connection with the Buy/Sell provision.[173]

---

[170] In Plaintiffs' complaint, "Morgan Stanley" refers to MSREA.

[171] Rec. Doc. 161 at ¶ 104.

[172] *Id.* at ¶ 113.

[173] *Id.* at ¶ 126.

Second, Plaintiffs bring a claim against all defendants pursuant to the Louisiana Racketeering Act, codified at Louisiana Revised Statute § 15:1351, *et seq.*[174] This claim is based on the same allegations as Plaintiffs' federal RICO claim.[175]

Third, Plaintiffs bring a claim against MSREA and Brown for breach of the implied covenant of good faith and fair dealing.[176] According to the complaint, MSREA

> . . . breached its duties by causing PPF to invoke the Buy/Sell, and by creating circumstances that prevented the BCR parties from becoming 'Purchasing Members' under the Buy/Sell provision, for the purpose of removing the BCR parties from Safeguard, gaining control over the Insurance Litigation and excluding the BCR parties from any participation in the future proceeds of Safeguard, including but not limited to proceeds from recovery in the Insurance Litigation.[177]

The complaint further alleges that MSREA failed "to make reasonable efforts to settle with the Insurers for an amount that would compensate Safeguard and its members for damages incurred as a result of Hurricane Katrina,"[178] and that MSREA shared its litigation strategy with Lloyd's. As a result, Plaintiffs allege that they suffered the following injuries:

> loss of the financial benefits that the BCR parties would have received from a resolution of the Insurance Litigation as quarterly distributions but for the delay and corruption of that litigation caused by the defendants' misconduct, and the incurring of additional costs (including capital investments) as a result of that delay and interference, and the financial losses the BCR parties suffered as a result of the bad faith actions taken by Morgan Stanley and Mr. Brown in connection with the invocation of the Buy/Sell provision.[179]

Next, Plaintiffs assert a cause of action against MSREA for tortious inference with

---

[174] *Id.* at ¶ 135.

[175] *See id.* at ¶¶ 134–38.

[176] *Id.* at ¶¶ 139–53.

[177] *Id.* at ¶ 141.

[178] *Id.* at ¶ 145.

[179] *Id.* at ¶ 152.

contract.[180] According to the complaint, MSREA "induced PPF and Mr. Brown to breach the LLC Agreement by creating circumstances that prevented the BCR parties from becoming 'Purchasing Members'"[181] and "by failing for self-interested and disloyal reasons to make reasonable efforts to settle with the Insurers for an amount that would compensate Safeguard and its members for damages incurred as a result of Hurricane Katrina."[182] Again, Plaintiffs assert that their injuries include:

> loss of the financial benefits that the BCR parties would have received from a resolution of the Insurance Litigation as quarterly distributions but for the delay and corruption of that litigation caused by the defendants' misconduct, and the incurring of additional costs (including capital investments) as a result of that delay and interference, and the financial losses the BCR parties suffered as a result of the bad faith actions taken by Morgan Stanley in connection with the invocation of the Buy/Sell provision.[183]

Fifth, Plaintiffs bring claims for breach of fiduciary duty against PPF, MSREA and Brown.[184] According to Plaintiffs, MSREA breached its fiduciary duties by failing to make reasonable efforts to settle with the Insurers, delaying the Insurance Litigation, and by sharing its litigation strategy with Lloyd's.[185] Plaintiffs allege that Brown breached his fiduciary duties by "acting to preserve Morgan Stanley's interests at the expense of the BCR parties' interests, by misrepresenting the intentions of Morgan Stanley and PPF regarding the potential for a buy/sell transaction, by causing PPF to take actions rendering impossible the BCR parties' ability to act as a 'Purchasing Member,' and otherwise."[186] In terms of their injuries, Plaintiffs contend:

---

[180] *Id.* at ¶¶ 154–61.

[181] *Id.* at ¶ 156.

[182] *Id.* at ¶ 157.

[183] *Id.* at ¶ 152.

[184] *Id.* at ¶¶ 162–76.

[185] *Id.* at ¶¶ 168–69.

[186] *Id.* at ¶ 172.

. . . the BCR parties have uniquely suffered the loss of millions of dollars, in a specific amount to be determined at trial, due to the undermining of Safeguard's settlement and litigation position in the Insurance Litigation through, *inter alia*, the sharing of confidential litigation information, the refusal to seek bad faith damages against all of the Insurers, the initial concealment of the availability of expansive business-interruption coverage, the delay in and failure to seek the full value of Safeguard's claims, and the stripping of control over the litigation from the BCR parties.[187]

Further, Plaintiffs urge:

the BCR parties have suffered the loss of control over and ownership interest in Safeguard, proximately caused by the breach of fiduciary duty by Morgan Stanley, Mr. Brown, and PPF, resulting from the loss of the BCR parties' ability to be a 'Purchasing Member' of Safeguard Storage, and the loss of all future proceeds from Safeguard, including but not limited to the proceeds of the Insurance Litigation.[188]

Sixth, Plaintiffs bring a claim against MSREA for aiding and abetting breach of fiduciary duty.[189] They allege that MSREA "directed PPF and knowingly participated in, and wrongfully aided and abetted, PPF's breach of fiduciary duties under the Safeguard Storage LLC Agreement and the implied contractual covenant of good faith and fair dealing."[190]

Next, Plaintiffs assert a claim for civil conspiracy,[191] alleging that MSREA acted in concert with Lloyd's

. . . to undermine the value of the recovery in the Insurance Litigation, and to wrongfully dislodge the BCR parties from any control over or ownership interest in Safeguard, to wrongfully disable the BCR parties from becoming "Purchasing Members" of Safeguard, and/or to wrongfully thwart the BCR parties from receiving any profits from Safeguard, including but not limited to proceeds of the Insurance Litigation, much less the highest amount of proceeds possible from the Insurers to compensate Safeguard's members for damages incurred as a result of Hurricane

---

[187] *Id.* at ¶ 175.

[188] *Id.* at ¶ 176.

[189] *Id.* at ¶¶ 177–82.

[190] *Id.* at ¶ 180.

[191] *Id.* at ¶¶ 183–89.

Katrina.[192]

Eighth, Plaintiffs bring a claim for detrimental reliance against MSREA and Brown.[193] According Plaintiffs, MSREA and Brown "represented to the BCR parties that Morgan Stanley would not cause PPF to invoke the Buy/Sell provision, and encouraged the BCR parties to maintain their focus on developing and pursuing the Insurance Litigation rather than exerting efforts to respond to any imminent Buy/Sell offer."[194] With respect to their injuries, Plaintiffs contend that

> [a]s a result of the BCR parties' reasonable reliance on Morgan Stanley's representations, when Morgan Stanley took actions to invoke the Buy/Sell provision the BCR parties, did not receive the proceeds from the insurance litigation as quarterly distributions, were unable to respond by electing to be "Purchasing Members," and the BCR parties lost all control over or ownership interest in Safeguard, including any interest in future profits of Safeguard, including but not limited to proceeds from the Insurance Litigation.[195]

Ninth, Plaintiffs assert a claim for unjust enrichment against MSREA and PPF.[196] Plaintiffs maintain that MSREA and PPF unjustly enriched themselves by receiving the settlement proceeds of the Insurance Litigation, by maintaining their investment banking relationships with the Insurers, by obtaining insurance for MSREA's other businesses at lower rates, and by creating circumstances that prevent the BCR parties from becoming "Purchasing Members" under the Buy/Sell provision.[197]

Finally, Plaintiffs bring a claim against all defendants under the Louisiana Unfair Trade Practices and Consumer Protection Law.[198] According to Plaintiffs, as a result of defendants' unfair trade practices, "the BCR parties have been and continue to be damaged, including through loss of

---

[192] *Id.* at ¶ 184.

[193] *Id.* at ¶¶ 190–95.

[194] *Id.* at ¶ 191.

[195] *Id.* at ¶ 194.

[196] *Id.* at ¶¶ 196–201.

[197] *Id.* at ¶¶ 197–99.

[198] *Id.* at ¶¶ 202–06.

control over or ownership interest in Safeguard, with the attendant loss of revenues and profits from Safeguard, including but not limited to proceeds from the Insurance Litigation."[199]

As evident from the breakdown of Plaintiffs' claims, although Plaintiffs assert ten causes of action against the Morgan Stanley Defendants, Plaintiffs allege only a few underlying harms in this litigation. First, Plaintiffs contend that they where harmed because the Morgan Stanley Defendants undermined Safeguard's recovery in the Insurance Litigation; thus, Plaintiffs never received the distributions from the Insurance Litigation to which they were entitled. Second, Plaintiffs aver that they were harmed because the Morgan Stanley Defendants invoked the Buy/Sell provision in bad faith, prevented Plaintiffs from becoming "Purchasing Members," and seized control of Safeguard; thus, Plaintiffs were deprived of their future profit interest in Safeguard. The Court now turns to whether claims based on these two harms are direct or derivative.

### 2. Harm Related to the Insurance Litigation

As just discussed, Plaintiffs first contend that they where harmed because the Morgan Stanley Defendants undermined Safeguard's recovery in the Insurance Litigation, and thus, Plaintiffs never received the distributions from the Insurance Litigation to which they were entitled. To determine whether Plaintiffs' claims based on this injury are direct or derivative, the Court evaluates "(1) who suffered the alleged harm (the corporation or the stockholder individually) and (2) who would receive the benefit of any recovery or other remedy (the corporation or the stockholders, individually)?"[200] For a claim to be direct, the Court must find that the Morgan Stanley Defendants' actions "directly and individually harmed the stockholders, *without injuring the corporation,*"[201] (or, in this case, the LLC). As the Delaware Court of Chancery observed in *Anglo American* (a case

---

[199] *Id.* at ¶ 205.

[200] *Tooley*, 845 A.2d at 1033.

[201] *Id.* at 1039 (emphasis added).

repeatedly cited by Plaintiffs), "Delaware corporate and limited partnership cases have agreed that

a diminution of the value of a business entity is classically derivative in nature."[202] In this case,

Plaintiffs essentially make a diminution in value claim—that is, they allege that the conduct of the

Morgan Stanley Defendants reduced or delayed *Safeguard's* recovery in the Insurance Litigation.

This situation is similar to facts faced by Delaware Court of Chancery in *Metro Communication Corp. BVI v. Advanced Mobilecomm Technologies*.[203] In *Metro Communication*,

three entities—Metro Communication Corp., BVI ("Metro"), Advanced MobileComm Technologies

("Advanced"), and Boston Ventures Limited Partnership V ("Boston Ventures")—formed the

limited liability corporation Fidelity Ventures Brazil, LLC ("Fidelity Brazil") in 1998 to invest

venture capital in the South American telecommunications market.[204] Advanced held 52% of Fidelity

Brazil; Boston Ventures held 40%; and Metro held 8%.[205] By 2000, Fidelity Brazil had became

engulfed in scandal, as a news agency revealed that Fidelity Brazil employees had bribed local

officials to obtain permits in Brazil.[206] The scandal dashed Metro's hopes that Fidelity Brazil would

have a lucrative IPO.[207] Following the scandal, Metro sued Advanced, Boston Ventures, Fidelity

Brazil, and various managers, asserting that they either participated in the bribery or failed to be

---

[202] *Anglo Am. Sec. Fund, L.P.*, 829 A.2d at 151; *see also In re WorldCom, Inc.*, 323 B.R. 844, 856 (Bankr. S.D.N.Y. 2005) (applying Delaware law and finding claims at issue derivative because that they were "based upon allegations of fraud and misrepresentation on the corporation that resulted in its diminution of value"); *Met. Commc'n Corp. BVI v. Advanced Mobilecomm Tech.*, 854 A.2d 121, 168 (Del. Ch. 2004) ("Distilled down, [plaintiff's] theory is that the bribery scheme destroyed the economic value of Fidelity Brazil, preventing it from being a viable enough company to go public. Thus, the injury that Metro alleges is, in the first instance, an injury to Fidelity Brazil itself and is therefore derivative in nature."); *Litman v. Prudential-Bache Prop., Inc.*, 611 A.2d 12, 15–16 (Del. Ch. 1992) (concluding that plaintiffs' claims were derivative where "plaintiffs' true argument is that the alleged misconduct resulted in diminished income to the Partnership, diminished distributions to Unitholders and a diminished value of the Units").

[203] 854 A.2d 121 (Del. Ch. 2004).

[204] *Id.* at 132.

[205] *Id.* at 133.

[206] *Id.* at 134.

[207] *Id.* at 130.

candid with Metro regarding the bribery, and thus caused Metro to lose its investment in Fidelity Brazil.[208] Although Metro characterized its claims as direct, the court held that they were derivative:

> Any harm that Metro suffered in this regard, such as lost profits from the scuttled IPO, is entirely contingent on harm suffered by Fidelity Brazil as a whole as result of alleged mismanagement. . . . Metro's complaint seeks damages for lost profits because the bribery scheme deprived Fidelity Brazil of the possibility of going public. Distilled down, its theory is that the bribery scheme destroyed the economic value of Fidelity Brazil, preventing it from being a viable enough company to go public. Thus, the injury that Metro alleges is, in the first instance, an injury to Fidelity Brazil itself and is therefore derivative in nature.[209]

Plaintiffs offer three reasons why the general rule that diminution in value claims are derivative should not apply here. Specifically, Plaintiffs assert that their claims are direct because (1) Safeguard is a pass-through entity; (2) Plaintiffs had a disproportionate, non-pro rata interest in distributions; and (3) the Morgan Stanley Defendants made efforts to seize control of Safeguard through their conduct. These contentions are addressed in turn.

### a. Whether Plaintiffs' Claims Are Direct Because Safeguard Is a Pass-Through Entity

Plaintiffs assert that their claims are direct because Safeguard is a pass-through entity. As discussed above, Plaintiffs cite the Delaware Court of Chancery's decision in *Anglo American* for the proposition that "the direct/derivative claims analysis in the LP or LLC context must be different than in the corporate context."[210] According to Plaintiffs, *Anglo American* "determined that diminution in value claims were direct for a number of reasons relating to the pass-through structure of the limited partnership at issue, causing 'a fleeting injury to the Fund, one that is immediately and irrevocably passed through to the partners.'"[211]

---

[208] *Id.*

[209] *Id.* at 167–68.

[210] Rec. Doc. 209 at p. 26.

[211] *Id.* (quoting *Anglo Am. Sec. Fund, L.P.*, 829 A.2d at 152–53).

Plaintiffs appear to inappropriately read *Anglo American* for broad propositions regarding the direct/directive analysis in the LP and LLC context. However, the court in *Anglo American* expressly recognized that "[t]he test for distinguishing direct from derivative claims in the context of a limited partnership is substantially the same as that used when the underlying entity is a corporation."[212] The court further acknowledged that "Delaware corporate and limited partnership cases have agreed that a diminution of the value of a business entity is classically derivative in nature."[213] *Anglo American* did not upset these general rules; rather, it drew a narrow distinction in a specific factual context.

In *Anglo American*, plaintiffs, limited partners in a hedge fund, brought claims against the limited parntership, the general partner, and the limited partnership's auditor alleging that the general partner had made improper capital withdrawals from the hedge fund.[214] The court held that plaintiffs' claims were derivative because "[d]ue to the structure and operation of the Fund, whenever the value of the Fund is reduced, the injury accrues irrevocably and almost immediately to the current partners but will not harm those who later become partners."[215] In its opinion, the court emphasized how the structure and function of the hedge fund was "dissimilar to the corporate structure."[216] Specifically, it observed, that "limited partners have absolutely no control over the governance and management of the Fund"; that "the limited partners' interests in the Fund are not freely transferable or tradeable"; and that "the Fund solely exists to utilize the assets of its Partners in various investment vehicles and maintains its books to account separately for the value of each

---

[212] *Anglo Am. Sec. Fund, L.P.*, 829 A.2d at 149.

[213] *Id.* at 151.

[214] *Id.* at 147–48.

[215] *Id.* at 152.

[216] *Id.* at 153.

partners' assets at all times."[217] According to the court, "the Fund operates more like a bank with the individual partners each having accounts."[218] Further, the hedge fund had no value as a going concern: "This is not a typical corporate business venture in which the value to the investors is based not only upon the physical assets of the entity but also upon the speculative value of the entity as a going concern. Other than a general partners's interest in management fees, there is no going-concern value."[219]

Safeguard is fundamentally different from the hedge fund at issue in *Anglo American*. Rather than functioning essentially as a bank, Safeguard is a business operating self-storage facilities. Its value derives not only from its physical assets—*e.g.*, the facilities it owns—but from intangible asserts, such as its brand and reputation. Accordingly, *Anglo American* is not applicable in this case, and Plaintiff's argument that their claims are direct because Safeguard is a pass-through entity fails.

      **b.**      **Whether Plaintiffs' Claims Are Direct Because Plaintiffs Had a Disproportionate, Non-Pro Rata Interest in Distributions**

Second, Plaintiffs assert that "[u]nder the LLC Agreement, any recovery by the BCR parties will be distributed in accordance with the agreed-upon waterfall distribution provisions rather than in proportion to the BCR parties' membership."[220] According to Plaintiffs, this distinction matters because "[a] claim is direct when injury is suffered disproportionate to a member's *pro rata* ownership interest."[221] In support of this proposition, Plaintiffs cite to the Delaware Court of Chancery's decisions in *Anglo American* and *Kelly v. Blum*.

As discussed above, in *Anglo American*, the court deviated from the general rules concerning

---

[217] *Id.* at 154.

[218] *Id.*

[219] *Id.*

[220] Rec. Doc. 209 at p. 27.

[221] *Id.*

39

direct and derivative claims due to unique circumstances presented by the structure and operation of the hedge fund in that particular case. *Anglo American* is not applicable to the above-captioned matter, however, given its particular facts in the hedge fund context.

Turning to *Kelly v. Blum*, Plaintiffs appear to extract from footnote number 63 a rule that a claim is direct where the entity in question has an alternative distribution scheme. Footnote 63 must be placed in its proper context. The decision in *Kelly* includes a discussion of how a court should evaluate whether a claim is direct or derivative.[222] In this high-level discussion, the *Kelly* court notes that a court applying the *Tooley* standard "looks to the nature of the wrong alleged, not merely at the form of words used in the complaint."[223] In footnote 63, the court cites its authority for this statement, stating:

> Specifically, the Court evaluates whether the nature of the alleged injury is such that it falls directly on the LLC as a whole and only secondarily on an individual member as a function of and in proportion to his pro rata investment in the LLC, in which case the claim would be derivative, or whether the injury inflicts direct harm on the rights of the member as an individual. *See In re Syncor Int'l Corp. S'holders Litig.*, 857 A.2d 994, 997 (Del. Ch. 2004); *Tooley*, 845 A.2d at 1033; *see also In re Transkaryotic Therapies, Inc.*, 954 A.2d 346, 371 n.112 (Del. Ch. 2008).[224]

This Court will not infer that a claim is direct where the entity in question has an alternative distribution scheme based on a footnote that happens to contain the words "pro rata" but cites authority for an entirely unrelated proposition. The facts in *Kelly* do not address an alternative distribution scheme, such as the waterfall provisions in Safeguard's LLC Agreement, and thus, it would be improper to apply *Kelly* in the manner suggested by Plaintiffs.

In this case, Plaintiffs argue that the Morgan Stanley Defendants' conduct prevented Safeguard from recovering insurance proceeds, which in turn prevented distributions to Plaintiffs.

---

[222] *See Kelly*, 2010 WL 629850, at *9.

[223] *Id.*

[224] *Id.* at *9 n.63.

Thus, the harm to Plaintiffs—not receiving distributions—is predicated on the diminished value of Safeguard. In *Litman v. Prudential-Bache Properties, Inc.*,[225] the Delaware Court of Chancery rejected the idea diminished distributions represent a different harm than the diminished value of the entity. The court observed that "the initial injury for which plaintiffs seek redress was to the Partnership. That is, plaintiffs complain that the Partnership received a lower amount of income because of the alleged misconduct."[226] It then explained that unless plaintiffs allege that the defendants violated a contractual obligation to make distributions in a prescribed manner, the claims are derivative:

> *The second alleged injury, the diminished distributions, is merely a different way of repeating the first claim.* That is, the cause of this injury was that the Partnership had less income on account of defendants' alleged misconduct, not that the general partners had somehow failed to abide by an agreement with the limited partners to distribute certain amounts to the limited partners. Thus, the defendants did not inflict the injury of lower distributions directly on the plaintiffs. Rather, the injury flowed from a direct injury to the Partnership (*i.e.*, the lower income of the Partnership).[227]

Accordingly, Plaintiffs' argument that their claims are direct because Plaintiffs had a disproportionate, non-pro rata interest in distributions fails.

        **c.**     **Whether Plaintiffs' Claims Are Direct Because the Morgan Stanley Defendants Made Efforts to Seize Control of Safeguard Through Their Conduct**

Finally, Plaintiffs argue that their claims are direct because the Morgan Stanley Defendants made efforts to seize control of Safeguard through their conduct. In support of this position, Plaintiffs first cite the Delaware Court of Chancery's decision in *Brinckerhoff v. Texas Eastern Products Pipeline Company, LLC*[228] for the proposition that "[a]s a matter of Delaware law, when

---

[225] 611 A.2d 12 (Del. Ch. 1992).

[226] *Id.* at 16.

[227] *Id.* at 16 (emphasis added).

[228] 986 A.2d 370 (Del. Ch. 2010).

a limited partnership is involved in a merger, there is effectively no distinction between direct and derivative claims by the limited partners."[229] Plaintiffs then assert that

> [t]he Delaware Court of Chancery applied this framework even more broadly to the LLC context in *Kelly v. Blum*, holding that (1) controlling members in an LLC owe minority members 'the additional fiduciary duties that controlling shareholders owe minority shareholders,' including 'the duty not to cause the corporation to effect a transaction that would benefit the fiduciary at the expense of the minority stockholders,' and that (2) facts stating a claim that a controlling stockholder with the aid of appointed managers effected a merger to benefit itself allege a direct claim.[230]

As a preliminary matter, the Court notes that, unlike *Brinckerhoff*, the above-captioned matter does not involve a limited partnership or a merger; thus it is dubious that any rule that "there is effectively no distinction between direct and derivative claims" would apply in this context. Further, Plaintiffs appear to misread *Brinckerhoff*. In *Brinckerhoff*, the plaintiffs were holders of limited partnership units in Teppco Partners, L.P. ("Teppco"); defendants included Teppco's general partner, the directors of Teppco's general partner, and Daniel L. Duncan, an individual who controlled Teppco's general partner.[231] Plaintiffs brought a derivative suit (the "Derivative Action"), alleging that defendants breached their fiduciary duties to Teppco by entering into transactions with Enterprise Products Partners, L.P ("Enterprise"), which was also controlled by Duncan.[232] According to Plaintiffs, the transaction unfairly favored Enterprise.[233] During the course of the Derivative Action, a merger between Teppco and Enterprise extinguished plaintiffs' interests in Teppco, and resulted in plaintiffs' bringing another suit, challenging the merger (the "Merger Action").[234] In

---

[229] Rec. Doc. 209 at p. 29.

[230] *Id.* (quoting *Kelly*, 2010 WL 629850, at *12–13).

[231] *Brinckerhoff v. Tex. E. Products Pipeline Co., LLC.*, 986 A.2d 370, 373 (Del. Ch. 2010).

[232] *Id.*

[233] *Id.*

[234] *Id.*

*Brinckerhoff*, the Delaware Court of Chancery was called upon to approve a settlement resolving both the Derivative Action and the Merger Action.[235] In its decision approving the settlement, the court noted that it would "not consider in detail whether the closing of the Merger extinguished the plaintiffs' standing" to assert their claims.[236] First, the court observed that "[n]o party has raised the plaintiffs' potential loss of standing as a basis for dismissal or sought to modify the settlement."[237] Further, the court explained that the specific claims asserted by plaintiffs, although styled as derivative, could be characterized as derivative or direct:

> [T]he Teppco limited partnership agreement specifically prohibited the actions that were challenged in the Derivative Action, and the plaintiffs had standing as limited partners to enforce the limited partnership agreement directly. The wrongs challenged in the Derivative Action thus gave rise to both a derivative right of action on behalf of Teppco and a direct right of action by the limited partners for breach of the limited partnership agreement.[238]

Accordingly, the court concluded that "[i]n light of the dual nature of the claim, I would see no reason why plaintiffs could not have continued their action post-Merger as a *de facto* class action on behalf of holders of Teppco LP units as of the effective time [of the Merger]."[239] The court ultimately approved the agreed-upon settlement among the parties.[240]

Unlike *Brinckerhoff*, the above-captioned matter does not involve approval of a settlement where no party has raised the standing issue. This litigation is at the motion-to-dismiss stage and the Plaintiffs' standing is vigorously contested. Further, in this case, Plaintiffs' do not assert that their claims could be recharacterized as claims for breach of the LLC agreement; thus, the "dual nature"

---

[235] *Id.*

[236] *Id.* at 383.

[237] *Id.*

[238] *Id.*

[239] *Id.*

[240] *Id.* 374.

observed in *Brinckerhoff* is absent here.

Turning to *Kelly v. Blum*, first, the Court observes that *Kelly* does not apply the *Brinckerhoff* framework "even more broadly," as Plaintiffs suggest; *Kelly* does not cite *Brinkerhoff* at all and addresses a fundamentally different context. In *Kelly*, the plaintiff—the founder and former member, manager, and president of Marconi Broadcasting Company, LLC ("Marconi")—purported to bring both derivative and direct claims for breach of fiduciary duties against Marconi's two other members.[241] The Delaware Court of Chancery first dismissed the plaintiff's derivative claims for lack of standing, noting that the plaintiff no longer held an interest in Marconi.[242] Next, the court considered whether plaintiff could bring his direct claim, and as a threshold matter, examined whether the other two members owed fiduciary duties to the plaintiff, as opposed to the LLC.[243] The court explained that absent contractual provisions to the contrary, controlling members of an LLC owe "traditional fiduciary duties" to minority members:

> [I]n the absence of provisions in the LLC agreement explicitly disclaiming the applicability of default principles of fiduciary duty, controlling members in a manager-managed LLC owe minority members the traditional fiduciary duties that controlling shareholders owe minority shareholders. Controlling shareholders—typically defined as shareholders who have voting power to elect directors, cause a break-up of the company, merge the company with another, or otherwise materially alter the nature of the corporation and the public shareholder's interests—owe certain fiduciary duties to minority shareholders. Specifically, and very pertinently to this case, such fiduciary duties include the duty not to cause the corporation to effect a transaction that would benefit the fiduciary at the expense of the minority stockholders.[244]

The court in *Kelly* concluded that the other Marconi members were "controlling members" who thus

---

[241] *Id.* at *1.

[242] *Id.* at *1.

[243] *Id.* at *12.

[244] *Id.*

owed the plaintiff the "traditional fiduciary duties."[245] In making this determination, the court first noted that the two defendants had the authority to appoint two managers with 24% and 51% of the voting power of the board of managers.[246] Further, the defendants in *Marconi* "held the power to, on their own or through their designed Managers, issue membership units, enter affiliated transactions, sell a material amount of Marconi's asserts, enter agreements involving any merger, conversion, consolidation, or business combination, amend the [LLC] Agreement or Certificate of Formation, and incur any indebtedness without [Plaintiff's] input or approval."[247]

For *Kelly* to apply, the Morgan Stanley Defendants must have been controlling members of Safeguard. The allegations of the complaint, however, do not support such a conclusion. Plaintiff BCR was the "Managing Member" or "Administrative Member" of Safeguard.[248] In this capacity, Plaintiff BCR "had the sole and exclusive right, power, authority and discretion to conduct the business and affairs of the Company and the Property Owners, and to do all things necessary to carry on the business of the Company and the Property Owners, . . . and to take any action of any kind and to do anything and everything the Administrative Member deems necessary, desirable, or appropriate in accordance with the provisions of [the LLC Agreement] and applicable law."[249] Furthermore, the LLC Agreement gave Plaintiff BCR the right to designate two of the four members of Safeguard's Management Committee.[250] According to the complaint, "Major Decisions" required

---

[245] *Id.* at *13.

[246] *Id.*

[247] *Id.*

[248] Rec. Doc. 161 at ¶ 25.

[249] *Id.* at ¶ 27 (alteration in original).

[250] *Id.* at ¶ 29.

the unanimous approval of the Management Committee.[251] Finally, Roch and Chaney served as CEO and COO, respectively.[252] Unlike the defendants in *Kelly*, the Morgan Stanley Defendants' did not control 75% of the management committee, and were not empowered to take unilateral actions. Thus, "controlling member" framework set forth in *Kelly* does not apply.

Given that neither *Brinckerhoff* nor *Kelly* apply to the allegations in this case, Plaintiffs' argument that their claims are direct because the Morgan Stanley Defendants made efforts to seize control of Safeguard through their conduct fails.

### 3.    Harm Related to the Buy/Sell Provision

In addition to contending that they were injured by the frustration of the Insurance Litigation, Plaintiffs also aver that they were harmed because the Morgan Stanley Defendants invoked the Buy/Sell provision in bad faith, prevented Plaintiffs from becoming "Purchasing Members," and seized control of Safeguard; thus, Plaintiffs were deprived of their future profit interest in Safeguard. Under *Tooley*, this harm may present a direct claim. With respect to who suffered the harm, Plaintiffs appear to allege not that the Morgan Stanley Defendants reduced the value of Safeguard by invoking the Buy/Sell provision, but rather that Defendants eliminated Plaintiffs' right to share in Safeguard's profits without fairly compensating Plaintiffs. Turning to who would benefit from any recovery, if Plaintiffs prevail, they might receive the value of their interest in Safeguard.

The Morgan Stanley Defendants admit that characterizing the harm in this manner may appear to state a direct claim.[253] However, as discussed above, they contend that based on the Stipulated Judgment in the Delaware Litigation, Plaintiffs are judicially estopped from asserting that the Morgan Stanley Defendants improperly invoked the Buy/Sell provision or paid an inappropriate

---

[251] *Id.* at p. 2.

[252] *Id.* at ¶ 26.

[253] *See* Rec. Doc. 186-1 at p. 29.

price. Thus, the Morgan Stanley Defendants maintain that "Plaintiffs are precluded from establishing

the factual predicates for their claims (including that they suffered any damages)," and cannot

establish standing.[254] Plaintiffs counter that the Stipulated Judgment addressed a narrow contractual

issue, and thus does not preclude Plaintiffs from establishing that they were harmed by the Buy/Sell

transaction.

### a.      Collateral Estoppel

As a preliminary matter, the Court notes that in analyzing whether collateral estoppel bars

Plaintiffs from asserting harms associated with the Buy/Sell transaction, it may take judicial notice

of the contents of public records, including the Stipulated Judgment entered in the Delaware I

Litigation and the pleadings filed in that case.[255]

The parties agree that "[t]o determine the preclusive effect of a state court judgment in a

federal action, 'federal courts must apply the law of the state from which the judgment emerged.'"[256]

In this case, the judgment at issue comes from the Delaware Court of Chancery, and thus Delaware

law applies. As the Delaware Supreme Court has explained, "where a court or administrative agency

has decided an issue of fact necessary to its decision, the doctrine of collateral estoppel precludes

relitigation of that issue in a subsequent suit or hearing concerning a different claim or cause of

action involving a party to the first case."[257] Collateral estoppel applies where:

> (1) The issue previously decided is identical with the one presented in the action in
> question, (2) the prior action has been finally adjudicated on the merits, (3) the party
> against whom the doctrine is invoked was a party or in privity with a party to the

---

[254] Rec. Doc. 216 at p. 14.

[255] *See, e.g.*, *Norris v. Hearst Trust*, 500 F.3d 454, 461 n.9 (5th Cir. 2007); *Jefferson v. Leads Indus. Ass'n, Inc.*, 106 F.3d 1245, 1250 n.14 (5th Cir. 1997).

[256] *Black v. N. Panola Sch. Dist.*, 461 F.3d 584, 588 (5th Cir. 2006) (quoting *Amica Mut. Ins. Co. v. Moak*, 55 F.3d 1093, 1096–97 (5th Cir. 1995)); *see also La Croix v. Mashall Cnty, Miss.*, 409 F. App'x 794, 798 (5th Cir. 2011).

[257] *Betts v. Townsends, Inc.*, 765 A.2d 531, 534 (Del. 2000).

prior adjudication, and (4) the party against whom the doctrine is raised had a full and fair opportunity to litigate the issue in the prior action.[258]

"The party asserting collateral estoppel has the burden of showing that the issue was already decided in the first proceeding."[259]

> **b.** **Application to the Stipulated Judgment in the Delaware I Litigation**

In this case, the parties do not dispute whether the second and third prongs of the Delaware test for collateral estoppel are met. With respect to the second prong—whether the Delaware I Litigation has been finally adjudicated on the merits—the Stipulated Judgment expressly states that "[o]nce entered, this Order shall constitute a final, unappealable judgment in the above-captioned action, which shall be closed immediately thereafter."[260] Further, the third prong—whether the party against whom the doctrine is invoked was a party or in privity with a party to the prior adjudication—is satisfied. Plaintiffs in the above-captioned matter—BCR, JAC, and SDG—were defendants in the Delaware I Litigation.[261] However, the parties contest prong one—whether the issue decided in the Delaware I Litigation is the same as the issue here—and prong four—whether Plaintiffs had a full and fair opportunity to litigate that issue.

The Stipulated Judgment in the Delaware I Litigation provides that: (1) "[PPF's] invocation of the Buy/Sell provision of the LLC Agreement on May 14, 2009 was proper"; and (2) "[PPF] acted appropriately in setting the Total Purchase Price in the Buy/Sell transaction."[262] According to the Morgan Stanley Defendants "[t]his means that Plaintiffs have already received full compensation

---

[258] *Id.* at 535 (quoting *State v. Machin*, 642 A.2d 1235, 1239 (Del. Super. 1993)).

[259] *Troy Corp. v. Schoon*, 959 A.2d 1130, 1134 (Del. Ch. 2008).

[260] Rec. Doc. 186-2, "Stipulated Order of Judgment," entered March 15, 2011 by Judge Leo E. Strine, in Case No. 4594, Delaware Court of Chancery, at p. 125.

[261] *Id.* at p. 124.

[262] *Id.* at p. 125.

for their interest in Safeguard and consequently also for any interest they had in Safeguard's insurance recovery."[263] They aver that "the Buy/Sell Price necessarily took into account the value of Safeguard's contingent claim in the Insurance Litigation—which means that ***Plaintiffs have not suffered the damages they seek to recover in this action.***"[264] Plaintiffs counter that "[t]he Delaware 1 litigation only determined whether the invocation of and application of the Buy/Sell were mechanically carried out in accordance with the terms of the Buy/Sell provision (§ 11.03) of the LLC Agreement" and that "[t]he parties there did not litigate *any issues* beyond whether PPF complied with the express terms of the § 11.03 of the LLC Agreement."[265] Specifically, Plaintiffs contend that the Delaware I Litigation did not address "whether the Morgan Stanley defendants and Lloyd's engaged in a criminal racketeering conspiracy, breached their fiduciary duties to the BCR parties, or engaged in any otherwise tortious actions."[266]

First, the Court notes that whether RICO conspiracy, breach of fiduciary duty, or tort claims were asserted in the Delaware I Litigation does not determine whether collateral estoppel applies. As the Delaware Supreme Court has explained, collateral estoppel applies to a subsequent suit "concerning a *different* claim or cause of action."[267] The question the Court must determine is whether the claims asserted in the above-captioned matter involve an identical issue of fact as the Delaware I Litigation.[268]

Turning to the issues of fact resolved in the Delaware I Litigation, by the plain language of

---

[263] Rec. Doc. 216 at p. 13.

[264] Rec. Doc. 216 at p. 14 (emphasis in original).

[265] Rec. Doc. 209 at p. 23 (emphasis in original).

[266] *Id.*

[267] *Betts*, 765 A.2d at 534 (emphasis added).

[268] *See id.*

the Stipulated Judgment, the Delaware I Litigation determined that the invocation of the Buy/Sell provision was "proper" and that PPF "acted appropriately in setting the Total Purchase Price in the Buy/Sell transaction." Plaintiffs urge this Court to rule that although the Delaware I Litigation concluded that the transaction was "proper" and the price was "appropriately" set, that somehow Plaintiffs may now argue that the price failed to compensate them for the value of their interest in Safeguard. The pleadings in the Delaware I Litigation belie this interpretation. In its complaint in the Delaware I Litigation, PPF specifically sought

> . . . declaratory relief from [BCR's, JAC's, and SDG's] continuing improper campaign to frustrate PPF's contractual right to purchase Defendant's interest in Safeguard Storage Properties, LLC for a *fair and adequate* price pursuant to the Buy/Sell provision of the Amended & Restated Limited Liability Company Agreement among the parties.[269]

According to PPF's allegations, BCR, JAC, and SDG had "through their words, deeds and actions, express and implied, threatened PPF that they deem such invocation and closing a contractual and fiduciary breach and will pursue a claim for damages as a result."[270] Further, the complaint in the Delaware I Litigation specifically contemplated that the parties disputed how the potential recovery in Insurance Litigation would affect the value of Plaintiffs' interests in Safeguard. The complaint quoted a letter from Roch, alleging that Roch "attempted preemptively to price and control any Buy/Sell transaction by insisting that any valuation of Safeguard's assets be consistent with a valuation made in the Katrina Coverage Litigation."[271] As quoted in the complaint, Roch wrote: "[t]o the extent that a member must prepare a valuation of Safeguard or its assets for any purpose, it is imperative that the valuation include among Safeguard's assets the Claims at a present value

---

[269] Rec. Doc. 225-1, "Verified First Amended Company for Declaratory Relief," filed Dec. 8, 2009, in Case No. 4594, Delaware Court of Chancery., at p. 1 (emphasis added).

[270] *Id.* at p. 2.

[271] *Id.* at p. 9.

consistent with the Expert Valuation."[272]

In light of these allegations, whether Plaintiffs were fairly compensated for the value of their interest in Safeguard was a key factual issue in the Delaware I Litigation. The parties entered into a Stipulated Judgment determining that the Buy/Sell transaction was "proper" and that the price was "appropriately" set. Turning to the above-captioned matter, in order to show that they were harmed by being deprived of the value of their interest in Safeguard, Plaintiffs would have to relitigate the same factual issue. Thus, the Court finds that prong one—whether the issue decided in the Delaware I Litigation is the same as the issue here—is satisfied.

The fourth and final prong of the Delaware test for collateral estoppel asks whether the party against whom the doctrine is raised had a full and fair opportunity to litigate the issue in the prior action. In the Stipulated Judgment, Plaintiffs acknowledged that "having taken discovery with respect to [PPF's] claim in the amended complaint and in light of the facts disclosed thereby, [PPF] and [BCR, JAC, and SDG] agree that further prosecution of this Action is unneccessary."[273] Plaintiffs then proceeded to stipulate that (1) "[PPF's] invocation of the Buy/Sell provision of the LLC Agreement on May 14, 2009 was proper"; and (2) "[PPF] acted appropriately in setting the Total Purchase Price in the Buy/Sell transaction."[274] Plaintiffs may disagree with this stipulation now; however, as the Delaware Court of Chancery explained in *Troy Corp. v. Schoon*, "it is not for this court to rectify [Plaintiff's] litigation choices by now refusing the apply the doctrine of collateral estoppel."[275]

Therefore, the Court determines that collateral estoppel applies and that Plaintiffs are

[272] *Id.*

[273] Rec. Doc. 186-2, "Stipulated Order of Judgment," entered March 15, 2011 by Judge Leo E. Strine, in Case No. 4594, Delaware Court of Chancery, at p. 125.

[274] *Id.*

[275] *Troy Corp.*, 959 A.2d at 1137.

precluded from asserting that they were deprived of the fair value of their interest in Safeguard. As discussed above, in order to have standing, a plaintiff must have suffered an injury that is "concrete, particularized, and actual or imminent."[276] Here, it has already been determined that Plaintiffs were not harmed by the Buy/Sell transaction or the price paid for their interests in Safeguard. Accordingly, Plaintiffs cannot show any actual injury, and they thus lack standing.

## D.     Conclusion

In this litigation, Plaintiffs bring numerous causes of action but essentially allege two harms: (1) that the Morgan Stanley Defendants undermined Safeguard's recovery in the Insurance Litigation, and thus, Plaintiffs never received the distributions from the Insurance Litigation to which they were entitled; and (2) that the Morgan Stanley Defendants invoked the Buy/Sell provision in bad faith, prevented Plaintiffs from becoming "Purchasing Members," and seized control of Safeguard, and thus, Plaintiffs were deprived of their future profit interest in Safeguard. The first harm asserted by Plaintiffs is derivative, and because Plaintiffs are no longer members of Safeguard, they lack standing to bring this derivative claim. The second harm asserted by Plaintiffs may be direct. However, pursuant to the doctrine of collateral estoppel, Plaintiffs cannot establish that they were deprived of the fair value of their interest in Safeguard. Considering that Plaintiffs cannot show any injury, they do not having standing to bring this claim.

Since the Court concludes that Plaintiffs do not have standing, the Court grants the Morgan Stanley Defendants' Rule 12(b)(1) Motion to Dismiss for Lack of Subject Matter Jurisdiction. Accordingly, the Court need not address the portions of Defendants' motion relating to lack of personal jurisdiction under Rule 12(b)(2) or failure to state a claim under Rule 12(b)(6).

---

[276] *Monsanto Co.*, 561 U.S. at 149.

## IV. Lloyd's Underwriters' Motion to Dismiss

In their "Motion to Dismiss," Lloyd's Underwriters "move this Court pursuant to Rules 12(b)(6), 12(b)(1), 12(b)(4) and 9(b) of the Federal Rules of Civil Procedure for an order dismissing Plaintiffs' Amended Complaint for Damages ('Complaint') for failure to state a claim upon which relief can be granted, lack of subject matter jurisdiction, insufficient process, and failure to plead fraud with particularity."[277] The Court first addresses the parties' arguments regarding subject matter jurisdiction.

### A. Parties' Arguments Regarding Subject Matter Jurisdiction

#### 1. Lloyd's Underwriters' Arguments in Support

Lloyd's Underwriters argue that "Plaintiffs seek damages for two purported wrongs."[278] According to Lloyd's, Plaintiffs assert that Lloyd's Underwriters "conspired" with the Morgan Stanley Defendants first "to delay and minimize the payment on Safeguard's Katrina insurance claims,"[279] and second "to prevent Plaintiffs from receiving the insurance proceeds (via distributions from Safeguard) in sufficient time to prevent a buyout of their 6% interest in Safeguard by MSREA and Safeguard's former business partner, PPF, apparently by effectuating their own buyout of PPF's 94% interest."[280]

According to Lloyd's, "Plaintiffs do not have standing to bring claims relating to Lloyd's payment under the Excess Policies."[281] First, Lloyd's asserts, "Plaintiffs have no more rights under

---

[277] Rec. Doc. 188 at p. 1.

[278] *Id.*

[279] *Id.* at p. 2.

[280] *Id.*

[281] Rec. Doc. 188-1 at p. 26.

the Excess Policies than the named insured, Safeguard."[282] Lloyd's contends that "[t]he Buyout extinguished Plaintiffs' interests in Safeguard as of July 2009," and thus "even if Safeguard could have brought the instant claims . . . Plaintiffs lost any legal right to bring such claims themselves upon completion of the Buyout and the termination of their interests in Safeguard."[283]

Second, citing two cases from the Eastern District of Louisiana—*Lee v. Safeco Insurance Company of America*[284] and *Axis Surplus Insurance Company v. Third Millennium Insurance and Financial Services, Inc.*[285]—Lloyd's argues that "Plaintiffs *never* had the right to pursue claims related to the propriety of Lloyd's payment under the Excess Policies. Only a named insured, additional insured, or third-party beneficiary may bring suit under an insurance policy."[286] According to Lloyd's, Plaintiffs do not allege "that they are either named or additional insured parties under the Excess Policies" or "facts that would qualify them as third party beneficiaries to the policies."[287] Lloyd's asserts that "[a] third-party is a beneficiary to a contract only if a 'stipulation *pour autrui*' exists, which occurs only where: '1) the stipulation for a third party is manifestly clear; 2) there is certainty as to the benefit provided to the third party; and 3) the benefit is not a mere incident of the contract between the promisor and the promisee.'"[288] Citing *Harrison v. Safeco Insurance Company of America*, a case from the Eastern District of Louisiana, Lloyd's avers that "[i]n the context of *insurance contracts*, Louisiana federal courts have determined that

___

[282] *Id.*

[283] *Id.*

[284] No. 08-1100, 2008 WL 2622997, at *2 (E.D. La. July 2, 2008) (Africk, J.).

[285] 781 F. Supp. 2d 320 (E.D. La. 2011) (Vance, J.).

[286] *Id.* at pp. 26–27 (emphasis in original).

[287] *Id.* at p. 27.

[288] *Id.* (quoting *Williams v. Certain Underwriters at Lloyd's of London*, 398 F. App'x 44, 47 (5th Cir. 2010)).

the 'proper means to include a stipulation *pour autrui* in an insurance contract is to name the third party as an additional insured.'"[289] According to Lloyd's, "Plaintiffs are not additional insureds under the Excess Policies, and they are not third-party beneficiaries of those policies."[290]

Lloyd's further argues that "[e]ven were Plaintiffs able to assert rights under the Excess Policies, Louisiana law precludes released parties from bringing subsequent actions based on compromised claims."[291] Lloyd's explains that on October 19, 2012, a "Settlement and Release Agreement" ended the Insurance Litigation.[292] According to Lloyd's, "[i]n the Settlement Agreement, Safeguard released all Insurers, including Lloyd's, from 'all past, present and future claims alleged or that could have been alleged or claimed in the Coverage Litigation [*i.e.*, the Insurance Litigation], including 'any claims based on unfair claims handling or insurer bad faith.'"[293] Looking to the language of the Settlement Agreement, Lloyd's maintains that "[t]he Settlement Agreement here absolutely precludes further claims against Lloyd's arising from the Excess Policies."[294] Lloyd's contends that "'Releasers' in the Settlement Agreement include Safeguard's 'members,' as well as their 'respective predecessors, successors, assigns, affiliates and subsidiaries.'"[295] According to Lloyd's, "[s]uch language clearly includes Plaintiffs, each of whom

---

[289] *Id.* (emphasis in original) (quoting *Harrison v. Safeco Ins. Co. of Am.*, No. 06-4664, 2007 WL 1244268, at *5 (E.D. La. Jan. 26, 2007) (Barbier, J.)).

[290] *Id.*

[291] *Id.* at pp. 27–28 (citing *Tran v. Farmers & Merchants Ins. Co.*, 04-793 (La. App. 5 Cir. 12/14/04), 892 So. 2d 88, 90).

[292] *Id.* at p. 22.

[293] *Id.* (quoting Rec. Doc. 188-8, Settlement and Release Agreement, *Safeguard Storage Props., LLC, et al v. Donahue-Favret Contractors, Inc., et al*, No. 07-9359 (Civ. Dis. Ct. Orleans Parish Oct. 19, 2012)).

[294] *Id.* at p. 28.

[295] *Id.* (quoting Rec. Doc. 188-8, Settlement and Release Agreement, *Safeguard Storage Props., LLC, et al v. Donahue-Favret Contractors, Inc., et al*, No. 07-9359 (Civ. Dis. Ct. Orleans Parish Oct. 19, 2012)).

previously was 'a member of Safeguard.'"[296] Further, Lloyd's contends that "[t]he Settlement Agreement specifically releases Lloyd's from 'any claim that *was or could have been alleged* in the lawsuit by an insured.'"[297] Lloyd's additionally argues that "[t]he Settlement Agreement also triggers *res judicata* under La. R.S. § 13:4231."[298]

With respect to Plaintiffs' allegations that Lloyd's wrongfully aided the buyout, Lloyd's contends that these claims "are barred by Plaintiffs' voluntary entry into a 'Stipulated Order of Judgment' in the Delaware Litigation." According to Lloyd's, "[t]he issues conceded in the Delaware Stipulated Judgment are necessary to resolve Plaintiffs' case here."[299] Lloyd's explains:

> For Plaintiffs to demonstrate they would have received a better price in the Buyout absent Lloyd's alleged conduct (or that they were otherwise damaged by the purchase of their shares), Plaintiffs must prove that they received a price inconsistent with that to which they were entitled under the LLC Agreement. But Plaintiffs stipulated in Delaware that they received an "appropriate" price for their shares, thereby foreclosing any claim that they were entitled to more under the LLC Agreement. Similarly, for Plaintiffs to demonstrate that, but for Lloyd's conduct, Plaintiffs would have been able to purchase Morgan Stanley's interest in Safeguard, Plaintiffs would have to demonstrate that Morgan Stanley improperly invoked the Buy/Sell provision.[300]

### 2.    Plaintiffs' Arguments in Opposition

In their omnibus opposition to both Lloyd's "Motion to Dismiss" and the Morgan Stanley Defendant's "Motion to Dismiss," Plaintiffs assert that "[t]he BCR parties have standing to bring this lawsuit."[301] First, Plaintiffs aver that "[t]he Insurance Litigation Settlement Agreement did not

---

[296] *Id.* (quoting Rec. Doc. 161 at p. 2).

[297] *Id.* (emphasis in original) (quoting Rec. Doc. 188-8, Settlement and Release Agreement, *Safeguard Storage Props., LLC, et al v. Donahue-Favret Contractors, Inc., et al*, No. 07-9359 (Civ. Dis. Ct. Orleans Parish Oct. 19, 2012)).

[298] *Id.*

[299] *Id.* at p. 30.

[300] *Id.*

[301] Rec. Doc. 209 at p. 20.

release the BCR parties' claims."[302] According to Plaintiffs, "Safeguard could not release claims it did not own . . . . The BCR parties *were not even members* of Safeguard when the settlement and release were entered into."[303] Plaintiffs maintain that their claims exist "separate and apart from the claims owned by Safeguard in the Insurance Litigation."[304] Additionally, Plaintiffs argue that *res judicata* under Louisiana Revised Statute § 13:4231 does not apply. According to Plaintiffs, "under La. R.S. § 13:4231, a judgment is conclusive only 'between the same parties.'"[305] Further, Plaintiffs assert that "[t]he release also has no preclusive effect because the BCR parties' causes of action did not accrue until the Insurance Litigation concluded; therefore, their causes of action did not exist at the time of the release."[306] Plaintiffs also contend that "because the claims against Lloyd's were 'future' claims, the settlement cannot release such claims."[307] Citing the Louisiana Supreme Court's decision in *Brown v. Drillers, Inc.*, Plaintiffs urge that "[u]nder Louisiana law, releases of future actions 'are narrowly construed to assure that the parties fully understand the rights released and the resulting consequences. As a result, if the release instrument leaves any doubt as to whether *a particular* future action is covered by the compromise, it should be construed not to cover such future action.'"[308]

Second, Plaintiffs argue that "[t]he Stipulated Judgment in Delaware 1 does not preclude the BCR parties' claims."[309] As discussed above in the context of the Morgan Stanley Defendants'

---

[302] *Id.* at p. 21.

[303] *Id.* (emphasis in original).

[304] *Id.*

[305] *Id.* at p. 22 (alterations omitted).

[306] *Id.*

[307] *Id.*

[308] *Id.* (emphasis in original) (quoting *Brown v. Drillers, Inc.*, 630 So. 2d 741, 753 (La. 1994)).

[309] *Id.*

"Motion to Dismiss," Plaintiffs contend that "[t]he Delaware I judgment cannot preclude the claims here because the narrow factual issues resolved through the stipulated judgment were not the same questions of fact underlying the BCR parties' claims here."[310] According to Plaintiffs, the Delaware judgment "only determined whether the invocation of and application of the Buy/Sell were mechanically carried out in accordance with the terms of the Buy/Sell provision (§ 11.03) of the LLC Agreement."[311] They maintain that "[t]he parties there did not litigate *any issues* beyond whether PPF complied with the express terms of § 11.03 of the LLC Agreement."[312]

Finally, Plaintiffs argue that they may bring claims pursuant to the insurance policy. According to Plaintiffs, "Lloyd's asserts, with little analysis, that the BCR parties have not alleged facts sufficient to render them third party beneficiaries as a result of a stipulation *pour autrie*."[313] Plaintiffs contend that "[s]tipulations *pour autrie* are favored under Louisiana law."[314] They assert that "the insurance contract with Lloyd's was for the ultimate benefit of Safeguard's members, and particularly to protect the BCR parties in light of their entitlement to the disproportionate waterfall distribution under the LLC Agreement."[315]

### 3. Lloyd's Reply

In its reply, Lloyd's first argues that "Plaintiffs can make no claims related to the excess policies."[316] According to Lloyd's, "[t]o the extent Plaintiffs allege claims derivatively under the

---

[310] *Id.* at p. 23.

[311] *Id.*

[312] *Id.*

[313] *Id.* at p. 64.

[314] *Id.* (citing *Torch, Inc. v. Bridge Assoc., LLC*, No. 08-3738, 2009 WL 874506, at *2 (E.D. La. Feb. 10, 2009) (Lemmon, J.)).

[315] *Id.*

[316] Rec. Doc. 214 at p. 10.

Excess Policies, such claims plainly are barred by the terms of the Release and of the Excess Policies themselves."[317] Lloyd's further asserts that "[r]ecognizing that they do not stand in privity with Lloyd's under the Excess Policies, Plaintiffs assert that they may bring direct claims relating to the Excess Policies as third-party beneficiaries of those policies, but they point to no allegation in the Complaint that the parties to the insurance contracts intended Plaintiffs to be third-party beneficiaries, as required by both Louisiana and Delaware law."[318]

Additionally, Lloyd's maintains that "Plaintiffs argue that they were not parties to the Coverage Litigation settlement and that *res judicata* applies only 'between the same parties,' but this only highlights Plaintiff's lack of standing to re-litigate the time, propriety or amount of payment to Safeguard under the Excess Policies."[319] Thus, Lloyd's concludes, "Plaintiffs either stand in Safeguard's shoes, in which case they are successors to Safeguard and their claims are barred by the Release and *res judicata*, or Plaintiffs bring suit in their own right, in which case they lack standing to sue under the policies."[320] Further, Lloyd's contends that "Plaintiffs also argue that neither a release nor *res judicata* can bar future claims, although they cannot avoid the fact that these very claims were brought back in 2009 against Morgan Stanley in state court, and a bad faith claim was brought against the primary insurer (but not Lloyd's) in the Coverage Litigation while Plaintiffs were still members of Safeguard."[321] Thus, Lloyd's maintains that "Plaintiffs are reduced to arguing that releases are narrowly construed, but ignore the case law holding that agreements barring future

---

[317] *Id.*

[318] *Id.* at pp. 10–11 (citations omitted) (citing *Williams*, 398 F. App'x at 47; *Madison Realty Partners 7, LLC v. Ag ISA, LLC*, No. 18094, 2001 WL 406268, at *5 (Del. Ch. Apr. 17, 2001)).

[319] *Id.* at p. 11 (citations omitted).

[320] *Id.*

[321] *Id.*

claims are enforceable."[322]

Second, Lloyd's reiterates its position that "[t]he Delaware Stipulated Judgment bars Plaintiffs' buy-out related claims."[323]

### 3.    Plaintiffs' Supplemental Briefing

As discussed above in the context of the Morgan Stanley Defendant's "Motion to Dismiss," following oral argument, Plaintiffs submitted a supplemental brief "regarding the scope of the Stipulated Judgment in the matter referred to by the parties as 'Delaware 1.'"[324] According to Plaintiffs, "in Delaware I PPF was requesting narrow relief regarding compliance with the terms of 'the Buy/Sell Provision of the LLC Agreement,' which [PPF] conceded was 'unrelated' to the 'far more complicated' issues in the Louisiana Action (and which are still at issue in this litigation)."[325] Plaintiffs contend that the Delaware judgment "cannot be construed as providing PPF any more than what it requested, a declaration that '[PPF's] invocation of the Buy/Sell provision of the LLC Agreement on May 14, 2009 was proper,' and a declaration that '[PPF] acted appropriately in setting the Total Purchase Price in the Buy/Sell transaction.'"[326]

### 4.    Lloyd's Supplemental Briefing

Lloyd's did not file any supplemental brief following oral argument.

## B.    Standard on a Rule 12(b)(1) Motion to Dismiss

As discussed above, a motion to dismiss filed under Federal Rule of Civil Procedure 12(b)(1) challenges a federal district court's subject matter jurisdiction. "A case is properly dismissed for lack

---

[322] *Id.*

[323] *Id.*

[324] Rec. Doc. 225 at p. 1.

[325] *Id.* at p. 4.

[326] *Id.*

of subject matter jurisdiction when the court lacks the statutory or constitutional power to adjudicate the case."[327] Under Article III of the United States Constitution, in order to invoke the judicial power of the United States, there must be a "case or controversy" between the parties; one element of the case-or-controversy requirement is that the plaintiff must have standing to sue.[328] To have standing, a plaintiff must have suffered an injury that is "concrete, particularized, and actual or imminent; fairly traceable to the challenged action; and redressable by a favorable ruling."[329] The party seeking to invoke federal jurisdiction has the burden of establishing that it has standing to bring its claims.[330]

## C.    Analysis

### 1.    Identifying Plaintiffs' Alleged Injuries

Whether a plaintiff has standing to seek relief from a federal court depends on the alleged injury the plaintiff has suffered. Thus, as a threshold matter in determining whether Plaintiffs have standing in the above-captioned matter, the Court must carefully evaluate Plaintiffs' lengthy complaint to ascertain what specific injuries Plaintiffs allege. The Court is cognizant that some of the analysis that follows may be repetitive of the discussion of Plaintiff's complaint found above in the context of the Morgan Stanley Defendants' "Motion to Dismiss." However, considering that the Morgan Stanley Defendants and Lloyd's had different relationships with Plaintiffs and appear to have engaged in somewhat different conduct, the Court will conduct a separate review of the complaint to specifically identify the alleged injuries asserted with respect to Lloyd's.

First, Plaintiffs bring a claim against Lloyd's pursuant to the Racketeer Influence and Corrupt Organizations Act ("RICO"), alleging that "Lloyd's conspired and agreed to abet, assist,

---

[327] *Krim*, 402 F.3d at 494 (quoting *Home Builders Ass'n of Miss., Inc.*, 143 F.3d at 1010) (internal quotation marks omitted).

[328] *See Raines*, 521 U.S. at 818; *Hays*, 515 U.S. at 742–43.

[329] *Monsanto Co.*, 561 U.S. at 149.

[330] *Grant ex rel. Family Eldercare*, 324 F.3d at 387.

and further Morgan Stanley's pattern of racketeering activity."[331] According to Plaintiffs, the goal of the conspiracy was "to minimize the amount paid as a result of the Katrina-related claims in the Insurance Litigation."[332]

Second, Plaintiffs assert a claim against all defendants pursuant to the Louisiana Racketeering Act, codified at Louisiana Revised Statute § 15:1351, *et seq.*[333] This claim is based on the same allegations as Plaintiffs' federal RICO claim.[334]

Third, Plaintiffs bring a claim against Lloyd's for breach of the implied covenant of good faith and fair dealing.[335] According to the complaint, Lloyd's "has the duty to its insured, including Safeguard and its members, to act in good faith in payment of claims made against the coverage it provides."[336] Plaintiff urge that Lloyd's breached this duty by:

> (a) failing until compelled to do so during the January 2009 depositions to disclose to Safeguard that the full scope of available coverage on the business interruption claims extended to gross revenues of the lost developments; (b) ignoring the barrier between claims and underwriting by threatening to allow Safeguard's pursuit of its right in the Insurance Litigation to impact underwriting of Morgan Stanley's insurance renewal, knowing that this would cause Morgan Stanley to undermine Safeguard's position in the Insurance Litigation; and (c) seeking and making use of confidential information regarding Safeguard's litigation strategy in the Insurance Litigation.[337]

As a result of Lloyd's conduct, Plaintiffs allege that their injuries include:

> loss of the financial benefits that the BCR parties would have received from a resolution of the Insurance Litigation as quarterly distributions but for the delay and corruption of that litigation caused by the defendants' misconduct, and the incurring

---

[331] Rec. Doc. 161 at ¶ 128.

[332] *Id.* at ¶ 129.

[333] *Id.* at ¶ 135.

[334] *Id.* at ¶ 134–38.

[335] *Id.* at ¶¶ 139–53.

[336] *Id.* at ¶ 147.

[337] *Id.* at ¶ 148.

of additional costs (including capital investments) as a result of that delay and interference, and the financial losses the BCR parties suffered as a result of the bad faith action by Morgan Stanley in connection with the invocation of the Buy/Sell provision.[338]

Next, Plaintiffs assert a cause of action against Lloyd's for tortious inference with contract.[339]

According to Plaintiffs, Lloyd's induced PPF and Mr. Brown to breach the LLC Agreement by "creating circumstances that prevented the BCR parties from becoming 'Purchasing Members,'"[340] and by:

> (a) failing until compelled to do so during the January 2009 depositions to disclose to Safeguard that the full scope of available coverage on the business interruption claims extended to gross revenues of the lost developments; (b) ignoring the barrier between claims and underwriting by threatening to allow Safeguard's pursuit of its right in the Insurance Litigation to impact underwriting of Morgan Stanley's insurance renewal, knowing that this would cause Morgan Stanley to undermine Safeguard's position in the Insurance Litigation; and (c) seeking and making use of confidential information regarding Safeguard's litigation strategy in the Insurance Litigation.[341]

Again, Plaintiffs assert that their injuries include:

> loss of the financial benefits that the BCR parties would have received from a resolution of the Insurance Litigation as quarterly distributions but for the delay and corruption of that litigation caused by the defendants' misconduct, and the incurring of additional costs (including capital investments) as a result of that delay and interference, and the financial losses the BCR parties suffered as a result of the bad faith actions taken by Morgan Stanley in connection with the invocation of the Buy/Sell provision.[342]

Fifth, Plaintiffs bring a claim for breach of fiduciary duty.[343] Plaintiffs allege that "Lloyd's

---

[338] *Id.* at ¶ 152.

[339] *Id.* at ¶¶ 154–61.

[340] *Id.* at ¶ 156.

[341] *Id.* at ¶ 159.

[342] *Id.* at ¶ 160.

[343] *Id.* at ¶¶162–76.

had fiduciary duties to Safeguard and its members as the insurer of Safeguard"[344] and that Lloyd's

breached these duties "by not paying Safeguard's claims in good faith recognition of the expansive

business interruption coverage applicable to Safeguard's losses, and by deliberating commingling

underwriting considerations with claims handling.[345] As a result, Plaintiff s maintain that they have

> . . . suffered the loss of millions of dollars, in a specific amount to be determined at trial, due to the undermining of Safeguard's settlement and litigation position in the Insurance Litigation through, *inter alia*, the sharing of confidential litigation information, the refusal to seek bad faith damages against all of the Insurers, the initial concealment of the availability of expansive business-interruption coverage, the delay in and failure to seek the full value of Safeguard's claims, and the stripping of control over the litigation from the BCR parties.[346]

Sixth, Plaintiffs assert a claim against Lloyd's for aiding and abetting breach of fiduciary

duty.[347] According to the complaint,

> Lloyd's induced Morgan Stanley to engage in actions to breach fiduciary duties and to cause PPF to breach its fiduciary duties under the LLC Agreement and the implied contractual covenant of good faith and fair dealing, through Lloyd's actions to gain confidential litigation information about the Insurance Litigation and through its threats to not renew insurance coverage for Morgan Stanley's properties if Morgan Stanley did not gain control over Safeguard.[348]

Next, Plaintiffs assert a claim for civil conspiracy,[349] alleging that Lloyd's acted in concert

with MSREA

> . . . to undermine the value of the recovery in the Insurance Litigation, and to wrongfully dislodge the BCR parties from any control over or ownership interest in Safeguard, to wrongfully disable the BCR parties from becoming "Purchasing Members" of Safeguard, and/or to wrongfully thwart the BCR parties from receiving any profits from Safeguard, including but not limited to proceeds of the Insurance

---

[344] *Id.* at ¶ 173.

[345] *Id.* at ¶ 174.

[346] *Id.* at ¶ 175.

[347] *Id.* at ¶¶ 177–82.

[348] *Id.* at ¶ 181.

[349] *Id.* at ¶¶ 183–89.

Litigation, much less the highest amount of proceeds possible from the Insurers to compensate Safeguard's members for damages incurred as a result of Hurricane Katrina.[350]

Eighth, Plaintiffs bring a claim for unjust enrichment.[351] Specifically, Plaintiffs contend that "Lloyd's was unjustly enriched at the expense of the BCR parties through its avoidance of its obligation to pay the Katrina-related insurance claims under the expansive excess policy that provided coverage for, without limitation, all gross revenues and business development opportunities lost as a result of Hurricane Katrina."[352]

Finally, Plaintiffs bring a claim against all defendants under the Louisiana Unfair Trade Practices and Consumer Protection Law.[353] According to Plaintiffs, as a result of defendants' unfair trade practices, "the BCR parties have been and continue to be damaged, including through loss of control over or ownership interest in Safeguard, with the attendant loss of revenues and profits from Safeguard, including but not limited to proceeds from the Insurance Litigation."[354]

As was similarly evident in the breakdown of Plaintiff's claims against the Morgan Stanley Defendants, although Plaintiffs assert nine causes of action against Lloyd's, Plaintiffs allege only a few underlying harms. First, Plaintiffs contend that they were harmed because Lloyd's acted in concert with the Morgan Stanley Defendants to avoid paying business interruption claims to Safeguard; thus Plaintiffs never received the portion of the insurance proceeds to which they were entitled. Second, Plaintiffs aver that they were harmed because when Lloyd's improperly delayed payment under the insurance policy, Plaintiffs were unable to become "Purchasing Members" during

---

[350] *Id.* at ¶ 184.

[351] *Id.* at ¶¶196–201.

[352] *Id.* at ¶ 200.

[353] *Id.* at ¶¶ 202–06.

[354] *Id.* at ¶ 205.

the Safeguard buyout; thus, Plaintiffs were deprived of their future profit interest in Safeguard. The Court now turns to whether Plaintiffs have standing to bring claims premised on these harms.

### 2. Harms Related to Payment of the Insurance Proceeds

As just discussed, Plaintiffs first contend that they were harmed because they never received the portion of the insurance proceeds to which they would have been entitled. Under Louisiana law,[355] "[a] plaintiff has standing to sue under an insurance policy if the plaintiff is a named insured or additional named insured, or if the plaintiff is an intended third-party beneficiary."[356] A contract for the benefit of a third party—or a "stipulation *pour autrui*"—is addressed in Louisiana Civil article 1978, which provides that "[a] contracting party may stipulate a benefit for a third person called a third party beneficiary."[357] Although article 1978 states that stipulations *pour autrui* are permissible, "[t]he code provides no analytic framework for determining whether a third party beneficiary contract exists" in any given situation.[358] Rather, "the code has left to the jurisprudence the obligation to develop the analysis to determine when a third party beneficiary contract exists on a case by case basis. Each contract must be evaluated on its own terms and conditions in order to determine if the contract stipulates a benefit for a third person."[359] In making this determination, a

---

[355] Both parties apply Louisiana law in analyzing whether Plaintiffs may bring suit under the insurance policy.

[356] *Williams v. Certain Underwriters at Lloyd's of London*, 398 F. App'x 44, 47 (5th Cir. 2010) (internal citations omitted); *see also Axis Surplus Ins. Co. v. Third Millennium Ins. and Fin. Serv., Inc.*, 781 F. Supp 2d 320, 323 (E.D. La. 2011) (Vance, J.) ("Under Louisiana law, only a named insured, additional insured, or third-party beneficiary may bring suit under an insurance policy."); *Lee v. Safeco Ins. Co. of Am.*, No. 08-1100, 2008 WL 2622997, at *2 (E.D. La. July 2, 2008) (Africk, J.) ("In Louisiana, a plaintiff may sue under an insurance policy where he is a named insured, additional insured, or third-party beneficiary."); *Harrison v. Safeco Ins. Co. of Am.*, No. 06-4664, 2007 WL 1244268, at *4 (E.D. La. Jan. 26, 2007) (Barbier, J.) ("This Court finds that Plaintiffs have no standing to bring their claims against Defendants as Plaintiffs are not parties to any insurance contracts with Defendants and because Plaintiffs are not the direct or third party beneficiaries of the insurance contracts at issue.").

[357] La. Civ. Code art. 1978; *Williams*, 398 F. App'x at 47; *Joseph v. Hosp. Serv. Dist. No. 2 of Parish of St. Mary*, 2005-2364 (La. 10/15/06), 939 So. 2d 1206, 1211.

[358] *Joseph*, 939 So. 2d at 1211.

[359] *Id.* at 1212.

court should consider whether "1) the stipulation for a third party is manifestly clear; 2) there is certainty as to the benefit provided the third party; and 3) the benefit is not a mere incident of the contract between the promisor and the promisee."[360] The existence of a third party beneficiary contract "is never presumed."[361] "The party claiming the benefit bears the burden of proof."[362]

In their opposition to Lloyd's "Motion to Dismiss," Plaintiffs do not appear to contend they are the named or additional insured under Safeguard's insurance policy. Indeed, it seems that such an argument would certainly fail. An LLC "is a separate legal entity from its member owners,"[363] and pursuant to Louisiana statute, "[a] member, manager, employee, or agent of a limited liability company is not a proper party to a proceeding by or against a limited liability company, except when the object is to enforce such a person's rights against or liability to the limited liability company."[364] Relying on these principles, another court in the Eastern District of Louisiana determined in *Axis Surplus Insurance Company v. Third Millennium Insurance and Financial Services, Inc.* that LLC members may not bring suit under a policy naming only the LLC as the insured.[365]

Plaintiffs suggest that they may bring their claims as third party beneficiaries "[b]ecause the insurance contract with Lloyd's was for the ultimate benefit of Safeguard's members, and particularly to protect the BCR parties in light of their entitlement to the disproportionate waterfall distribution under the LLC Agreement."[366] Plaintiffs, however, have the burden of proving a stipulation *pour autri*, and as noted above, the existence of a third party beneficiary contract "is

---

[360] *Id.*

[361] *Id.*

[362] *Id.*

[363] *Ne. Realty, L.L.C. v. Misty Bayou, L.L.C.*, 40,573 (La. App. 2 Cir. 1/25/06), 920 So. 2d 938, 940.

[364] La. R.S. § 1320(C).

[365] *Axis Surplus Ins. Co.*, 781 F. Supp. 2d at 324.

[366] Rec. Doc. 209 at p. 64.

never presumed."[367] To meet this burden, Plaintiffs must show "1) the stipulation for a third party is manifestly clear; 2) there is certainty as to the benefit provided the third party; and 3) the benefit is not a mere incident of the contract between the promisor and the promisee."[368] In this case, Plaintiffs do not point to any language that could be construed as a "manifestly clear" stipulation that the insurance policy was for the benefit of Plaintiffs as members of the LLC. As *Axis Surplus Insurance Company* observed, "a person is not a third-party benefit of a contract just because he or she has an ownership interest in a company that is a party to the contract."[369] Further, *Harrison v. Safeco Insurance Company of America*, another case from the Eastern District of Louisiana, suggests that "Louisiana federal courts have determined that the 'proper means' to include a stipulation *pour autri* in an insurance contract is to 'name the third party as an additional insured.'"[370] Here, Plaintiffs have not alleged that they were additional insureds on the policy.

Thus, the Court finds that Plaintiffs are not a named insured, additional insured, or third party beneficiary of the insurance policy. Accordingly, they lack standing to sue under the policy and cannot bring claims premised on their entitlement to insurance proceeds.

### 3. Harm Related to the Buy/Sell Provision

Additionally, Plaintiffs assert that because Lloyd's improperly delayed payment under the insurance policy, Plaintiffs were unable to become "Purchasing Members" during the Safeguard buyout; thus, Plaintiffs were deprived of their future profit interest in Safeguard. As discussed above in the context of the Morgan Stanley Defendant's "Motion to Dismiss," the Court has determined

---

[367] *Joseph*, 939 So. 2d at 1212.

[368] *Id.*

[369] *Axis Surplus Ins. Co.*, 781 F. Supp. 2d at 324.

[370] *Harrison*, 2007 WL 1244268, at *5 (quoting *Nesom v. Chevron U.S.A., Inc.*, 633 F. Supp. 55, 58 (E.D. La. 1984) (Wicker, J.)); *see also St. Julien v. Diamond M. Drilling*, 403 F. Supp. 1256, 1259 (E.D. La. 1975) (Rubin, J.) ("It is not uncommon to include a stipulation for the benefit of a third person in an insurance contract; the means used is to name the third party as an additional insured.").

that based on the Stipulated Judgment in the Delaware I Litigation, collateral estoppel applies. Thus, Plaintiffs are precluded from asserting that they were deprived of the fair value of their interest in Safeguard. As the Court has noted, in order to have standing, a plaintiff must have suffered an injury that is "concrete, particularized, and actual or imminent."[371] Here, it has already been determined that Plaintiffs were not harmed by the Buy/Sell transaction or the price paid for their interests in Safeguard. Accordingly, Plaintiffs cannot show any actual injury, and they thus lack standing.

**D.    Conclusion**

In this litigation, Plaintiffs bring numerous causes of action but essentially allege two harms: (1) that they never received the portion of the insurance proceeds to which they were entitled, and (2) that because Lloyd's improperly delayed payment under the insurance policy, Plaintiffs were unable to become "Purchasing Members" during the Safeguard buyout, and thus, were deprived of their future profit interest in Safeguard. Considering that Plaintiffs are not named insureds, additional insureds, or third party beneficiaries of the insurance policy, Plaintiffs lack standing to bring the first claim. With respect to the second harm, pursuant to the doctrine of collateral estoppel, Plaintiffs cannot establish that they were deprived of the fair value of their interest in Safeguard. Considering that Plaintiffs cannot show any injury, they do not have standing.

Since the Court concludes that Plaintiffs do not have standing, the Court grants Lloyd's Rule 12(b)(1) Motion to Dismiss for Lack of Subject Matter Jurisdiction. Accordingly, the Court need not address the portions of Lloyd's motion relating to failure to plead fraud with particularity under Rule 9(b), insufficient process under Rule 12(b)(4), or failure to state a claim under Rule 12(b)(6).

---

[371] *Monsanto Co.*, 561 U.S. at 149.

## V. Conclusion

For the reasons set forth above,

**IT IS HEREBY ORDERED** that Plaintiffs BCR Safeguard Holding, L.L.C.'s, JAC Safeguard Holding, L.L.C.'s, and Safeguard Development Group II, L.L.C.'s "Motion to Dissolve Injunction"[372] is **GRANTED IN PART AND DENIED IN PART**, and the May 19, 2009 email thread is no longer subject to the Court's injunction;

**IT IS FURTHER ORDERED** that Defendants Morgan Stanley Real Estate Advisor, Inc.'s, PPF Safeguard, L.L.C.'s, and Scott Allen Brown's "Motion to Dismiss Amended Complaint"[373] is **GRANTED**, as the Court finds that it lacks subject matter jurisdiction, and all claims against Defendants Morgan Stanley Real Estate Advisor, Inc., PPF Safeguard, L.L.C., and Scott Allen Brown are **DISMISSED WITHOUT PREJUDICE**;

**IT IS FURTHER ORDERED** that Defendant Lloyd's Underwriters' "Motion to Dismiss Amended Complaint for Damages"[374] is **GRANTED**, as the Court finds that it lacks subject matter jurisdiction, and all claims against Defendant Lloyd's Underwriters are **DISMISSED WITHOUT PREJUDICE**.

**NEW ORLEANS, LOUISIANA**, this __2nd__ day of September, 2014.

*Nannette Jolivette Brown*

**NANNETTE JOLIVETTE BROWN**
**UNITED STATES DISTRICT JUDGE**

---

[372] Rec. Doc. 229.

[373] Rec. Doc. 186.

[374] Rec. Doc. 188.